IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

MICHAEL COSCIA,

        Defendant.

Case No. 14 CR 551

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Michael Coscia's ("Coscia") Motion to Dismiss the Indictment (the "Indictment") charging him with six (6) counts of "spoofing" under 7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2) and six (6) counts of commodities fraud under 18 U.S.C. § 1348 [ECF No. 27]. For the reasons stated herein, the Motion is denied.

### I. BACKGROUND

Coscia began his career as a commodities futures trader in 1988. Since 2007, Coscia served as the principal of Panther Energy Trading LLC, a high-frequency futures trading firm.

According to the Indictment, in August 2011, Coscia developed and implemented a high-frequency trading strategy that allowed him to enter and cancel large-volume orders in a matter of milliseconds. (Indictment ¶ 3.) Allegedly, this strategy moved prices in the market, such that Coscia was able to

purchase contracts at lower prices, or sell contracts at higher prices, than the prices available in the market before the large-volume orders were entered and canceled. (*Id.*) Coscia would then "repeat[] his strategy in the opposite direction," reselling the low-price contracts he purchased at a high price, or buying back the high-price contracts he sold at a low price. (*Id.*) The Indictment charges that Coscia implemented his strategy "to create a false impression regarding the number of contracts available in the market, and to fraudulently induce other market participants to react to the deceptive market information that he created." (*Id.*) Coscia reaped approximately $1.5 million in profits as a result of the alleged scheme. (*Id.*)

To carry out the scheme, Coscia enlisted the help of a computer programmer to design two computer programs, Flash Trader and Quote Trader. (*Id.* ¶ 4.) Coscia employed the programs in 17 different CME Group markets and three different markets on the ICE Futures Europe exchange. (*Id.* ¶ 5.) The programs detected the conditions in which Coscia's strategy worked best (*id.* ¶ 6), and operated through a system of trade orders and quote orders (*id.* ¶¶ 8-9).

On one side of the market, the programs would place a bona fide "trade order" to be filled. (*Id.* ¶ 8.) On the other side, they would place several layers of large-volume "quote orders"

to manipulate market conditions. (*Id.* ¶ 9.) The quote orders, however, were canceled within a fraction of a second. (*Id.*) Once Coscia filled the first trade order, he would enter a second trade order on the other side of the market, again employ misleading quote orders, and ultimately "profit on the difference in price between the first and second trade orders." (*Id.* ¶ 12.) The entire series of transactions would take place in a matter of milliseconds. (*Id.* ¶ 13.)

## II. LEGAL STANDARD

A legally sufficient indictment is one that "(1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecutions." *United States v. White*, 610 F.3d 956, 958-59 (7th Cir. 2010) (citing FED. R. CRIM. P. 7(c)(1)). The Court reviews an indictment on its face, *id.*, accepting all of its allegations as true. *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009). The Court does not consider whether any of the Indictment's charges have been established by evidence, or whether the Government will ultimately be able to prove its case. *White*, 610 F.3d at 959. "Indictments are reviewed on a practical basis and in their entirety, rather than in a hypertechnical manner." *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000) (citations

and internal quotations omitted). In general, an indictment that tracks the words of a statute to state the elements crime is acceptable, provided that it states sufficient facts to place a defendant on notice of the specific conduct at issue. *White*, 610 F.3d at 958-59.

### III. ANALYSIS

The Indictment charges Coscia under two relatively new statutory provisions: (1) the "anti-spoofing" provision of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, which amended the Commodity Exchange Act's ("CEA") "Prohibited Transactions" section; and (2) the Fraud Enforcement and Recovery Act, which, in 2009, expanded the anti-fraud provisions of 18 U.S.C. § 1348 to apply to commodities futures trading. Coscia seeks to dismiss the Indictment in its entirety, arguing that (1) the CEA's anti-spoofing provision is void for vagueness, and (2) the commodities fraud counts are legally invalid and similarly vague.

### A. Spoofing

The "anti-spoofing" provision of the CEA prohibits "any trading, practice, or conduct [that] . . . is of the character of, or is commonly known to the trade as, 'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution)." 7 U.S.C. § 6c(a)(5)(C). Knowing violation of the anti-spoofing provision is a felony. *Id.* § 13(a)(2). Coscia

argues that the anti-spoofing provision is unconstitutionally vague because it fails to offer any ascertainable standard that separates spoofing from legitimate trade practices such as partial-fill orders (larger-than-necessary orders entered to ensure a sufficient quantity is obtained) and stop-loss orders (orders that are programmed to execute only when the market reaches a certain price). (See, Def.'s Mem., ECF No. 28, at 17.) Coscia also notes that at the time of the alleged transactions, only limited interpretative guidance on the meaning of "spoofing" was available from the Commodity Futures Trading Commission (the "CFTC").

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 132 S.Ct. 2307, 2317 (2012). A statute is impermissibly vague, and violative of the Due Process Clause, if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). If a reasonable person would have been on notice that his or her conduct was at risk, and reasonable guidelines for enforcement exist, the due process concerns raised in a vagueness challenge are overcome. *United States v.*

*Pitt-Des Moines, Inc.*, 168 F.3d 976, 987 (7th Cir. 1999). "It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550 (1975); *Pitt-Des Moines*, 168 F.3d at 986.

In determining whether a statute is void for vagueness, the focus of the inquiry is statutory clarity. *See, United States v. Jones*, 689 F.3d 696, 701 (7th Cir. 2012). Courts must strive to "construe, not condemn, Congress' enactments" because of their strong presumptive validity. *Skilling v. United States*, 561 U.S. 358, 403 (2010). Nevertheless, as the Supreme Court has often cautioned, the Constitution does not permit Congress to "set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (quoting *United States v. Reese*, 92 U.S. 214, 221 (1876) (internal quotations omitted).

Coscia posits that there is no commonly understood meaning of "spoofing" in the world of futures trading. To illustrate this point, he traces the CFTC's interpretation of the statute back to November 2010, just months after the passage of the Dodd-Frank Act. Then, the CFTC published an advanced notice of

proposed rulemaking, inviting public comment on the nature of "spoofing." 75 Fed. Reg. 67,301-01, 67,302 (Nov. 2, 2010). Coscia cites numerous comments from CFTC's December 2010 roundtable discussions revealing difficulty defining a precise meaning of "spoofing." (*See*, Def.'s Mem., ECF No. 28, at 7-8 ("I'm not sure [i]f the definition of spoofing can be agreed upon by the ten people around this table.").)

By March 2011, the CFTC terminated its rulemaking efforts and published proposed interpretative guidance regarding spoofing. Under the proposed guidance, "orders, modifications, or cancellations" would not be considered spoofing if "submitted as part of a legitimate, good-faith attempt to consummate a trade." 76 Fed. Reg. 14,943, 14,947 (Mar. 18, 2011). The proposed guidance also stated that it is possible to distinguish between spoofing and legitimate trading by evaluating factors such as "the market context, the person's pattern of trading activity (including fill characteristics), and other relevant facts and circumstances." *Id.* The proposed guidance provided three specific examples of spoofing: "[1] submitting or cancelling bids or offers to overload the quotation system of a registered entity, [2] submitting or cancelling bids or offers to delay another person's execution of trades[,] and [3] submitting or cancelling multiple bids or offers to create an appearance of false market depth." *Id.* In May of 2013, the

CFTC issued final interpretive guidance on the term spoofing, adding an additional example: "submitting or canceling bids or offers with intent to create artificial price movements upwards or downwards." 78 Fed. Reg. 31,890, 31,896 (May 28, 2013).

According to Coscia, the ongoing debate surrounding the meaning of spoofing "illustrates the crucial point that the status of Mr. Coscia's alleged conduct was an open question from the outset." (Def.'s Mem., ECF No. 28, at 24.) At the time of the alleged trades, September 2011, the only available interpretation of the statute was the CFTC's proposed, non-binding guidance. Even if this guidance had been binding, Coscia argues that his conduct was not encompassed by any of the three examples provided. Coscia further states that his conduct was not encompassed by the fourth example added in May of 2013 — "submitting or canceling bids or offers with intent to create artificial price movements upwards or downwards" — because he did not create "artificial" price movement. (*Id.* at 26 n.1.)

Despite the contentious disagreement about the precise meaning of the term "spoofing," the Government argues that there was never any serious debate as to whether the conduct alleged in the Indictment — intentionally entering bids and offers with the intent to cancel them — falls within the meaning of the statute. For instance, in January 2011, before the CFTC had issued any interpretive guidance, CME's CEO Craig Donohue opined

that: "The distinguishing characteristic between 'spoofing' . . . and the legitimate cancellation of other unfilled or partially filled orders is that 'spoofing' involves the intent to offer non bona fide orders for the purpose of misleading market participants and exploiting that deception for the spoofing entity's benefit." (Ex. G to Def.'s Mot., ECF No. 27-3, at 296). Further, the CFTC's proposed guidance, issued approximately five months before the alleged trades took place, suggests that there was some degree of consensus as to what conduct was included and excluded: "In the view of the Commission, a . . . 'spoofing' violation requires that a person intend to cancel a bid or offer before execution . . . [L]egitimate, good-faith cancellation of partially filled orders would not violate [the statute]." 76 Fed. Reg. at 14,947.

Because First Amendment rights are not at stake, the Court must assess whether the statute is unconstitutional as applied to Coscia's conduct, *Mazurie*, 419 U.S. at 550, not to the conduct of the "hypothetical legitimate traders" who voiced concerns about the statute's applicability to practices such as partial-fill and stop-loss orders, (see, Pl.'s Opp., ECF No. 31, at 2-3). Similarly, Coscia's concerns regarding the applicability of the statute to other common trade practices, such as "Fill or Kill" orders, which are canceled unless they

are filled immediately, are not relevant here. "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982).

Turning to the allegations of the Indictment, which the Court must accept as true for the purposes of this Motion, Coscia "entered large-volume orders that he intended to immediately cancel before they could be filled by other traders." (Indictment ¶ 3.) Coscia had no intention of filling the orders, but instead "devised [his] strategy to create a false impression regarding the number of contracts available in the market, and to fraudulently induce other market participants to react to the deceptive market information that he created." (*Id.*) Without question, this conduct tracks the language of the statute, and constitutes "spoofing" as the statute defines that term: "bidding or offering with the intent to cancel the bid or offer before execution." 7 U.S.C. § 6c(a)(5)(C). Coscia argues that his intent to cancel was "concededly conditional," and in this respect his "trading was virtually identical to other durational or contingent orders routinely permitted by exchange trading interfaces." (Def.'s Mem., ECF No. 18, at 28.) However, this is not what the Indictment alleges. The Indictment charges that Coscia placed orders with the intent to

cancel, not with the intent to fill them under certain conditions. (*See,* Indictment ¶ 3.)

Coscia cites three other cases in which defendants prevailed on an as-applied challenge to certain language in the CEA. *See, United States v. La Mantia*, 2 Comm. Fut. L. Rep. (CCH) ¶ 20,667 (N.D. Ill. Aug. 9, 1978) ("fictitious sales"); *Stoller v. CTFC*, 834 F.2d 262 (2d Cir. 1987) ("wash sales"); *United States v. Radley*, 659 F.Supp.2d 803 (S.D. Tex. 2009), *aff'd on other grounds*, 632 F.3d 177 (5th Cir. 2011) ("manipulate"). However, as the Government correctly notes, these cases are distinguishable because in all three instances, Congress had not defined the challenged term in the statute. In contrast, § 6(a)(C)(5) provides a definition of "spoofing."

The statute's "intent to cancel" requirement is significant. "When the government must prove intent and knowledge, these requirements do much to destroy any force in the argument that application of the statute would be so unfair that it must be held invalid." *United States v. Cherry*, 938 F.2d 748, 754 (7th Cir. 1991) (citations, internal quotations, and alterations omitted). Coscia argues that the intent requirement does nothing to distinguish between lawful and unlawful conduct because both illegal "spoofing" and legitimate trading are intentional activities. However, unlike the conduct alleged in the Indictment, it is far from clear that the

legitimate trading activities Coscia discusses "involve[] the entry of bids or offers with the intent to cancel those bids or offers before they are executed." (Pl.'s Opp., ECF No. 31, at 2 n.1.) For instance, although Fill or Kill orders "must be filled immediately or the entire order is cancelled," (Def.'s Mem., ECF No. 28, at 18), they are not entered with the intent to cancel. The same is true of partial-fill orders, which are entered with the intent to consummate a trade, not with the intent to cancel the order altogether. *See*, 78 Fed. Reg. at 31,896 ("[T]he Commission interprets the statute to mean that a legitimate, good-faith cancellation or modification of orders (*e.g.*, partially filled orders or properly placed stop-loss orders) would not violate the statute.")

Coscia's alleged "intent to cancel" sets his conduct apart from the legitimate trading practices described in his memorandum. The conduct in the Indictment involves the entry of large-volume orders with the intent to "immediately cancel." (Indictment ¶ 3.) Because the alleged conduct clearly involves "bidding or offering with the intent to cancel" the Court does not find § 6c(a)(5)(C) impermissibly vague as applied to Coscia.

### B. Commodities Fraud

Under 18 U.S.C. § 1348, it is unlawful to execute, or attempt to execute, a scheme or artifice "to defraud any person in connection with any commodity for future delivery" or "to

obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any commodity for future delivery." Coscia argues that the commodities fraud counts are legally invalid for three reasons. First, Coscia argues that his conduct cannot constitute fraud because it is not prosecutable under the anti-spoofing provision. (Def's Mem., ECF No. 28, at 27 ("[O]nce the spoofing charges fail for vagueness, the fraud charges must also be dismissed.").) Second, he argues that the Indictment fails to allege that Coscia made any affirmative or implied misrepresentations to other market participants, which a scheme to defraud would require. Finally, Coscia argues that § 1348 is impermissibly vague as applied to the alleged trading activity. Because the Court has already determined the spoofing statute is not vague as applied to Coscia's conduct, the Court focuses its attention on Coscia's second and third arguments.

Coscia relies on Seventh Circuit case law interpreting the language of mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, which parallel the language of § 1348. Under these statutes, the Seventh Circuit has repeatedly held that a necessary element of a scheme to defraud is "the making of a false statement or material misrepresentation, or the concealment of a material fact." *Williams v. Aztar Ind. Gaming*

*Corp.*, 351 F.3d 294, 299 (7th Cir. 2003) (mail fraud); *United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009) (wire fraud). According to Coscia, he never communicated anything to other market participants when he placed the quote orders, nor did he misrepresent that his orders would remain available for any specific amount of time. Because no false statement was made, or material facts omitted, Coscia claims that he cannot be held liable under § 1348. Coscia likens this case to *Radley*. Although the court found that another prohibition of the CEA precluded the price manipulation charges against defendants, it nevertheless concluded that defendants had not misled traders by placing "best bids" and "stacked bids" that drove up the price of propane:

> The "best bids," even if they were higher than any others, were actually bids, and when they were accepted, defendants actually went through with the transactions. Other counterparties may have assumed that the "stacked bids" came from multiple parties, but defendants did not perpetuate or cause this misconception. Since defendants were willing and able to follow through on all of the bids, they were not misleading.

*Radley*, 659 F.Supp.2d at 815.

Although the Indictment does not specifically allege that Coscia made a false statement or material misrepresentation, or concealed a material fact, the following allegations demonstrate a scheme to defraud: (1) Coscia carried out his strategy "to create a false impression regarding the number of contracts

available in the market, and to fraudulently induce other market participants to react to the deceptive market information," (Indictment ¶ 3); and (2) Coscia "intended to trick others into reacting to the false price volume information he created with his fraudulent and misleading quote orders . . . [and] intended to, and did, mislead other traders, causing them to react," (*Id.* ¶¶ 8, 11). While the word "misrepresentation" is absent, the Court declines to review the Indictment in a "hypertechnical manner." *Smith*, 230 F.3d at 305.

Coscia's narrow interpretation of § 1348 is inconsistent with its broad wording and at least one judicial interpretation. Statutory prohibitions against schemes to defraud are often worded broadly because Congress cannot anticipate each and every new context in which they might be carried out. *See, United States v. Motz*, 652 F.Supp.2d 284, 295 (E.D.N.Y. 2009) (noting that § 1348 is "intentionally broad because Congress sought to create a mechanism by which prosecutors could combat the myriad of ever-evolving securities fraud schemes"). Although the Seventh Circuit has not yet addressed securities or commodities fraud under § 1348, the Second Circuit has interpreted the statute's application to securities fraud broadly, noting that "false representations or material omissions are not required" under § 1348(1), as long as there is "(1) fraudulent intent, (2) [a] scheme or artifice to defraud, and (3) [a] nexus with a

security." *United States v. Mahaffy*, 693 F.3d 113, 125 (2d Cir. 2012).

Moreover, the fraudulent conduct alleged in the Indictment is distinct from that in *Radley*, in which defendants were apparently willing and able to follow through with the bids they placed. This is not the case here, where the Indictment plainly states that Coscia designed his programs to cancel automatically all the quote orders placed. (*See*, Indictment ¶ 11.) Whether the Government will be able to prove that Coscia actually misled other traders through his use of quote orders is an issue for trial. *White*, 610 F.3d at 959 (noting that court does not consider whether government will be able to prove its case when assessing sufficiency of indictment); *see also, United States v. Finnerty*, 533 F.3d 143, 149 (2d Cir. 2008) (affirming defendant's acquittal on § 10(b) charges where government failed to prove at trial that defendant "conveyed a misleading impression to customers" through his trading activity).

Coscia's final challenge is that § 1348 is impermissibly vague as applied to the alleged conduct. Coscia argues that the Government does not cite any judicial decision or source of authority "that could have provided reasonable notice that [his] alleged trading activity might be considered a form of fraud at the time of that activity." (Def.'s Reply, ECF No. 33, at 19.) However, the Court declines to conclude, based solely on the

scarcity of cases interpreting § 1348, that the statute "fails to provide a person of ordinary intelligence" fair notice of the conduct that it prohibits. *Williams*, 553 U.S. at 304. Here, the allegations of the Indictment — that Coscia created a "false impression," "fraudulently induce[d]", and "tricked" others, (Indictment ¶¶ 3, 8, 11) — are consistent with the scheme to defraud and use of "false or fraudulent pretenses, representations, or promises" described in the statute.

### IV. CONCLUSION

For the reasons stated herein, Coscia's Motion to Dismiss the Indictment [ECF No. 27] is denied.

**IT IS SO ORDERED.**

                                                                                  Harry D. Leinenweber, Judge
                                                                                  United States District Court

Dated: 4/16/2015