**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA

                    v.

MICHAEL COSCIA,

                              Defendant.

14 CR. 551

Judge Harry D. Leinenweber


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR
JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL**


SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

*Attorneys for Defendant Michael Coscia*

December 18, 2015

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

STANDARD OF REVIEW ..........................................................................................5

ARGUMENT ...............................................................................................................6

I.  THE GOVERNMENT'S PURE INDUCEMENT THEORY OF
    COMMODITIES FRAUD FAILS AS A MATTER OF LAW. .........................6

    A.  The Government Switched Its Theory At Trial Because It Could Not
        Prove Any Fraud Or Deception. ............................................................6

    B.  The Government's Pure Inducement Theory Is Not A Cognizable
        Theory Of Fraud. ...................................................................................9

        1.  The Government Avoided Proving Deception. ...........................10

        2.  The Government Avoided Proving Materiality. .........................12

II. THE GOVERNMENT'S SPOOFING THEORY FAILS AS A MATTER OF
    LAW AND IS WHOLLY UNSUPPORTED BY THE EVIDENCE. ...............14

    A.  Mr. Coscia Lacked Any Notice Of The Government's Intent-To-
        Immediately-Cancel Interpretation Of The Anti-Spoofing Provision. ..................14

    B.  The Government Did Not Prove That Mr. Coscia Intended To Cancel
        All Of His Orders In Their Entirety At The Time They Were Placed. ..................17

III. THE JURY WAS WRONGLY INSTRUCTED ON BOTH THE
     COMMODITIES FRAUD AND SPOOFING CHARGES. ...............................22

    A.  The Jury Should Have Been Properly Instructed On Materiality For The
        Commodities Fraud Charges. ...............................................................22

    B.  The Jury Should Have Been Instructed On Conditional Intent For The
        Spoofing Charges. ................................................................................23

IV. THE GOVERNMENT INTRODUCED FALSE AND HIGHLY
    PREJUDICIAL TESTIMONY THAT UNDERMINED MR. COSCIA'S
    RIGHT TO A FAIR TRIAL. ...........................................................................25

    A.  The Government's Witnesses Gave Inadmissible Opinion Testimony
        About Mr. Coscia's Intent. ..................................................................25

B.      The Government's Witnesses Gave Undisclosed, Unqualified, And
        Speculative Testimony About The Effect Of Mr. Coscia's Trading. ....................28

C.      The Government's Witnesses Gave False And Unfairly Prejudicial
        Testimony About Mr. Coscia's Trading Strategies. ...............................................30

CONCLUSION .................................................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Med. Ass'n* v. *United States*,
    887 F.2d 760 (7th Cir. 1989) ............................................................................15, 16

*CFTC* v. *Schor*,
    478 U.S. 833 (1986).......................................................................................................16

*Chicago* v. *Morales*,
    527 U.S. 41 (1999)........................................................................................................14

*Grayned* v. *City of Rockford*,
    408 U.S. 104 (1972)......................................................................................................14

*Kolender* v. *Lawson*,
    461 U.S. 352 (1983)......................................................................................................14

*Smith* v. *Goguen*,
    415 U.S. 566 (1974)......................................................................................................14

*United States* v. *Bender*,
    539 F.3d 449 (7th Cir. 2008) ..................................................................................30, 31

*United States* v. *Binday*,
    804 F.3d 558 (2d Cir. 2015)....................................................................................12, 13

*United States* v. *Britton*,
    289 F.3d 976 (7th Cir. 2002) ......................................................................................11

*United States* v. *Conn*,
    297 F.3d 548 (7th Cir. 2002) ......................................................................................28

*United States* v. *Coscia*,
    100 F. Supp. 3d 653 (N.D. Ill. 2015) ............................................................... passim

*United States* v. *Doherty*,
    969 F.2d 425 (7th Cir. 1992) ......................................................................................10

*United States* v. *Durham*,
    645 F.3d 883 (7th Cir. 2011) ......................................................................................19

*United States* v. *Giles*,
    246 F.3d 966 (7th Cir. 2001) ......................................................................................10

*United States* v. *Guzzino*,
   810 F.2d 687 (7th Cir. 1987) ...................................................................................25, 26

*United States* v. *Jones*,
   713 F.3d 336 (7th Cir. 2013) ...............................................................................................5

*United States* v. *Jones*,
   739 F.3d 364 (7th Cir. 2014) .............................................................................................28

*United States* v. *Kuzniar*,
   881 F.2d 466 (7th Cir. 1989) ...............................................................................................6

*United States* v. *Lanier*,
   520 U.S. 259 (1997)............................................................................................................15

*United States* v. *Leahy*,
   464 F.3d 773 (7th Cir. 2006) .............................................................................................13

*United States* v. *LeDonne*,
   21 F.3d 1418 (7th Cir. 1994) .......................................................................................10, 12

*United States* v. *Locke*,
   643 F.3d 235 (7th Cir. 2011) .......................................................................................25, 27

*United States* v. *McKnight*,
   665 F.3d 786 (7th Cir. 2011) .............................................................................................22

*United States* v. *Perez*,
   43 F.3d 1131 (7th Cir. 1994) .............................................................................................22

*United States* v. *Powell*,
   576 F.3d 482 (7th Cir. 2009) .............................................................................................13

*United States* v. *Regent Office Supply Co.*,
   421 F.2d 1174 (2d Cir. 1970).............................................................................................12

*United States* v. *Reed*
   875 F.2d 107 (7th Cir. 1989) .........................................................................................5, 6

*United States* v. *Ryan*,
   213 F.3d 347 (7th Cir. 2000) .......................................................................................10, 11

*United States* v. *Sloan*,
   505 F.3d 685 (7th Cir. 2007) .............................................................................................13

*United States* v. *Taylor*,
   600 F.3d 863 (7th Cir. 2010) .............................................................................................31

*United States* v. *Van Eyl*,
    468 F.3d 428 (7th Cir. 2006) ............................................................................6

*United States* v. *Washington*,
    184 F.3d 653 (7th Cir. 1999) ........................................................................5, 6

**Statutes, Regulations, and Rules**

7 U.S.C. § 6c(a)(5)(C) ................................................................................1, 14

7 U.S.C. § 13(a)(2) ...........................................................................................1

18 U.S.C. § 1341 ...............................................................................10, 11, 13

18 U.S.C. § 1343 ...................................................................................10, 13

18 U.S.C. § 1344 ...................................................................................10, 11

18 U.S.C. § 1348(1) ...........................................................................1, 10, 12

76 Fed. Reg. 14,943 (2011) ......................................................................15, 16

78 Fed. Reg. 31,890 (2013) ......................................................................15, 20

Fed. R. Crim. P. 16 ..................................................................................28, 32

Fed. R. Crim. P. 29 ...........................................................................................5

Fed. R. Crim. P. 33 ......................................................................................5, 6

Fed. R. Evid. 701 ...............................................................................25, 26, 27, 28

Fed. R. Evid. 702 ..................................................................................28, 30

Fed. R. Evid. 704 ...............................................................................25, 26, 27

**Other Authorities**

CFTC Q&A — Proposed Interpretive Order on Disruptive Trading Practices,
    *available at* http://www.cftc.gov/Law Regulation/DoddFrankAct/
    Rulemakings/DF_24_ DisruptiveTrading/index.htm .............................................16

CFTC Staff Roundtable on Disruptive Trading Practices (Dec. 2, 2010) ..............................15, 17

Hendrik Bessembinder, *High Frequency Trading: Some Perspective* (Nov. 9,
    2012), *available at*: https://www.youtube.com/watch?v= wxGIHQfz9Us ............................19

Letter from John M. Damgard, President, Futures Industry Association, to David
    A. Stawick, Secretary, CFTC (Dec. 23, 2010) ...................................................15

Letter from Stuart J. Kaswell, General Counsel, Managed Funds Association, to
    David A. Stawick, Secretary, CFTC (Dec. 28, 2010)............................................................15

## PRELIMINARY STATEMENT

This prosecution—the first ever of its kind—has been deeply flawed from the start. The Government has introduced error at virtually every stage of the proceedings, and that error warrants outright acquittal or, at the least, a new trial.

The Government charged Michael Coscia with two sets of offenses: commodities fraud under 18 U.S.C. § 1348(1) and "spoofing" under 7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2). Neither of those offenses had ever been construed by any court before this case. Section 1348(1) was amended to prohibit commodities fraud in 2009, and no court before this one has ever had occasion to interpret the provision in the commodities context, let alone instruct a jury on it. And as this Court is well aware, the anti-spoofing provision of the Commodity Exchange Act took effect in 2011, and this case marks the first-ever civil or criminal enforcement of it. Indeed, at the time of the charged conduct, the expert agency responsible for administering the provision, the CFTC, had not issued any binding guidance interpreting the provision. That guidance did not come until a full 18 months *after* Mr. Coscia's trading.

In light of this prosecution's novelty and precedential import, the Government should have turned the squarest of corners in interpreting both statutes, but instead it led this Court into omitting absolutely critical elements of both offenses. And in doing so, it has set a dangerous precedent that may deter legitimate trading and reduce market liquidity as market participants opt out rather than risk prosecution under the Government's mistaken interpretation of the law.

In contrast to a typical fraud case, the Government did not allege that Mr. Coscia committed fraud by making any misrepresentations or misleading omissions to other market participants. Indeed, he could not possibly have done so given that all of his conduct occurred anonymously on electronic futures exchanges, and the supposed "victims" he traded with were other high-frequency algorithmic traders. Instead, the Government relied on a virtually unheard of

theory of "fraud by conduct." According to the Indictment, Mr. Coscia placed large orders that "he intended to immediately cancel," thereby "creat[ing] a false impression regarding the number of contracts available in the market," "fraudulently induc[ing] other market participants to react to the deceptive market information that he created," and "mov[ing] the market in a direction favorable to him." Indictment ¶ 3. Through this same conduct, the Government also charged Mr. Coscia with the first-ever "spoofing" violation.

      In defending these novel charges against Mr. Coscia's motion to dismiss, the Government made certain promises to this Court. With respect to the commodities fraud counts, it promised to prove that Mr. Coscia's conduct was "false" and "deceptive"—*i.e.*, that his orders were "fraudulent and misleading." *United States* v. *Coscia*, 100 F. Supp. 3d 653, 660 (N.D. Ill. 2015) (quoting Indictment ¶¶ 3, 11). With respect to the spoofing counts, the Government promised to prove that Mr. Coscia "placed orders with the intent to cancel" them "immediately," which is what supposedly distinguished his conduct from "legitimate trading practices." *Id*. at 658, 659 (citing Indictment ¶ 3). On the basis of those assurances, this Court declined to dismiss the Indictment, and the case proceeded to trial. But the Government was never in a position to deliver on its promises to the Court—and it knew so. At trial, the Government's own witnesses made clear that there was nothing "false" about Mr. Coscia's orders, they were not "immediately" canceled, the market did not move "in a direction favorable to him," and Mr. Coscia's orders were programmed to cancel only upon the occurrence of certain market conditions.

      The Government therefore pivoted and embraced a new theory of supposed "fraud": Mr. Coscia's large orders were "bait" intended only to "induce" other traders to transact with the small orders he placed on the other side of the market. There was only one problem with the Government's new inducement theory: it allowed the jury to convict Mr. Coscia for something

that was not a crime. Mere inducement alone is simply not enough to sustain a claim of fraud. The Government was required to prove that Mr. Coscia had "*fraudulently* induce[d] other market participants to react to the *deceptive* market information that he created." Indictment ¶ 3 (emphasis added). But the Government never came close to proving that there was anything false or deceptive about Mr. Coscia's orders.

The Government then compounded its error by introducing prejudicial (and in some instances, false) testimony without proper notice, and by misleading this Court into giving jury instructions that relieved the Government of its obligation to prove key elements of the offenses. The speed of the jury's verdict then is hardly surprising. That speed reflects not the strength of the Government's case, but the magnitude of its errors. In view of this, Mr. Coscia is entitled to acquittal or a new trial for the following four reasons.

*First*, the Government's inducement theory of commodities fraud fails as a matter of law, because the Government did not prove that there was anything "false" or "deceptive" about any of Mr. Coscia's orders. The evidence at trial showed that Mr. Coscia placed real orders; he did not mislead other traders about any aspect of his orders (such as volume or price); and the orders were in the market for a very long time by high-frequency trading standards—plenty of time for other algorithms to trade them. Because the Government did not prove that Mr. Coscia's orders "create[d] a false impression regarding the number of contracts available in the market," Indictment ¶ 3, it shifted to arguing that Mr. Coscia committed commodities fraud simply by inducing other market participants to trade with him. But without any evidence of actual fraud or deception, the Government's pure inducement theory—or what might be called a "but-for" theory of commodities fraud—allowed the Government to duck its statutory burden in two critical respects. The Government relieved itself of the obligation to establish either that there was any

deception, or that Mr. Coscia intended to deceive other market participants about a material matter, such as the quality, price, or subject matter of the transactions at issue.

*Second*, the Government's spoofing theory fails as a matter of both law and fact. It is a basic principle of due process that a statute's text must distinguish lawful from unlawful activity or else it is void for vagueness. Here, the plain text of the anti-spoofing provision covers a wide range of routine and permissible market activity. The Government therefore offered an after-the-fact, intent-to-immediately-cancel standard that appears nowhere in the text of the anti-spoofing provision. But the crucial point is that neither the statute nor any regulatory guidance put Mr. Coscia on notice *at the time of his conduct* that what separates "spoofing" from legitimate market trading was whether the trader intended to "immediately" cancel the order. In any event, the Government could not even satisfy its proposed standard at trial. The evidence overwhelmingly showed that Mr. Coscia did *not* intend to immediately cancel the entirety of his orders at the time they were placed. In light of the evidence at trial, no rational jury could have found beyond a reasonable doubt that, at the time Mr. Coscia placed the bid or offer specified in each count, he intended to cancel the entire bid or offer "immediately," as opposed to only under certain conditions.

*Third*, the Government essentially guaranteed itself convictions on both the commodities fraud and spoofing charges by convincing this Court to reject jury instructions that would have exposed the charges' legal flaws. On the commodities fraud counts, the Government remarkably objected to Mr. Coscia's request for an instruction requiring proof that he intended to deceive as to the nature of the transactions at issue, such as their quality or price. As a result, the Government relieved itself of the burden to prove that Mr. Coscia intended to deceive his counterparties about any material matter in order to establish fraud. On the spoofing counts, the

Government challenged Mr. Coscia's request for a conditional-intent instruction. As a result, the Government had to prove only that Mr. Coscia intended to cancel his orders under certain circumstances or conditions, not that Mr. Coscia intended to cancel his orders at the time they were placed and under all conditions—which, according to the Government, is the essence of spoofing. The omission of these instructions was devastating to Mr. Coscia, since each went to the very heart of his defense. Their omission caused manifest prejudice to Mr. Coscia, thereby entitling him to a new trial.

*Fourth* and finally, the Government supported its flawed theories with unfounded and inaccurate testimony on core issues in the case. The Government introduced inadmissible opinions on the central issue at trial, Mr. Coscia's intent. The Government also used lay witnesses to offer what amounted to undisclosed, unqualified, and speculative expert opinion about the effect of Mr. Coscia's trading strategy. And the Government's witnesses gave patently false testimony about Mr. Coscia's trading strategy. Standing alone and taken together, these errors were highly prejudicial and require a new trial.

## STANDARD OF REVIEW

When a defendant timely renews his motion after a guilty verdict, a court must "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c)(1). The "inquiry is whether a reasonable jury considering the evidence in the light most favorable to the government could have found each element of the offense beyond a reasonable doubt." *United States* v. *Jones*, 713 F.3d 336, 340 (7th Cir. 2013).

A court may likewise, on the defendant's motion, "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). When reviewing a motion for a new trial based on insufficiency of the evidence, a court "must consider the weight of the evidence, and must grant a new trial if that evidence 'preponderates heavily against the verdict,

-5-

such that it would be a miscarriage of justice to let the verdict stand.'" *United States* v.

*Washington*, 184 F.3d 653, 657-58 (7th Cir. 1999) (quoting *United States* v. *Reed*, 875 F.2d 107,

113 (7th Cir. 1989)).

        Courts have also interpreted Rule 33 "to require a new trial . . . in a variety of

situations in which the substantial rights of the defendant have been jeopardized by errors or

omissions during trial," including where the jury was erroneously instructed as to the law and

evidence was erroneously admitted. *United States* v. *Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989).

A new trial is appropriate based on trial error if there is a "reasonable possibility that [the] error

had a prejudicial effect upon the jury's verdict." *United States* v. *Van Eyl*, 468 F.3d 428, 436 (7th

Cir. 2006).

## ARGUMENT

## I. THE GOVERNMENT'S PURE INDUCEMENT THEORY OF COMMODITIES FRAUD FAILS AS A MATTER OF LAW.

### A. The Government Switched Its Theory At Trial Because It Could Not Prove Any Fraud Or Deception.

        The Indictment charged a specific theory of commodities fraud. It alleged that

Mr. Coscia "entered large-volume orders that he intended to immediately cancel before they could

be filled by other traders." Indictment ¶ 3. According to the Indictment, Mr. Coscia did that "to

create a false impression regarding the number of contracts available in the market, and to

fraudulently induce other market participants to react to the deceptive market information that he

created." *Id.* In other words, the Government alleged that by creating a "false" and "deceptive"

impression about the number of contracts available in the market, Mr. Coscia led other traders to

engage in transactions based on those false impressions. In so doing, Mr. Coscia allegedly

"moved the market in a direction favorable to him, enabling him to purchase contracts at prices

lower than, or sell contracts at prices higher than, the prices available in the market before he entered and canceled his large-volume orders." *Id.*

But the Government ran into a serious problem at trial: it could not prove any of this. The premise of its fraud theory, that there was something "false" or "deceptive" about Mr. Coscia's orders, or that other market participants were misled about the "number of contracts available in the market," was exposed as a complete sham. The Government's own evidence revealed that every order placed by Mr. Coscia was a real order that was available for other market participants to trade with while it was in the market. *See, e.g.*, Trial Tr. 234 (A. Vrabel) (agreeing that "any order that's actually in the order book" is "tradable"); *id.* at 358 (R. Cobb) (testifying to having reviewed "bids and offers that [were] available"). Moreover, there was no evidence at trial that any of the information Mr. Coscia made available to other market participants about the orders he placed—including contract, volume, and price information—was untrue or inaccurate. The orders were exactly as Mr. Coscia represented, and they were available to trade while in the market.

Equally damning for the Government's fraud theory, all of the evidence indicated that Mr. Coscia's large-volume orders were programmed to be in the market for a very long time by high-frequency trading standards, between 100 and 450 milliseconds. Gov't Ex. Quote Trader Settings; Trial Tr. 493-96 (J. Park). As the Government's witnesses repeatedly testified, this was more than enough time to execute trades. *See, e.g.*, Trial Tr. 680 (H. Dermenchyan) (agreeing that algorithms could trade "[w]ithin one or two milliseconds"); *id.* at 744 (J. Shaw) (algorithms could trade in "about five milliseconds"); *see also, e.g.*, Def. Ex. 502 (showing 89,356 orders executed in five milliseconds or less in eight CME contracts over five days). Indeed, Mr. Coscia's large orders *did* trade—and at a rate more than *five times* that of other high-frequency traders. Def. Ex. 522

(showing fill rate of 2.1% for Mr. Coscia's large orders as compared to .4% for other high-frequency traders' large orders). The Government itself calculated that Mr. Coscia's large orders "traded in full or in part . . . 8,108 times" on CME exchanges. Trial Tr. 417 (R. Cobb); *see* Gov't Ex. CME Summary Chart 2. *Cf. Coscia*, 100 F. Supp. 3d at 660 (reasoning, in rejecting Mr. Coscia's motion to dismiss, that "the Indictment plainly states that [he] designed his programs to cancel automatically all the quote orders placed").

The Government likewise introduced no evidence that Mr. Coscia's trading strategy "moved the market in a direction favorable to him." Indictment ¶ 3. None of the Government's witnesses testified to performing any analysis that could establish a causal link between Mr. Coscia's trading activity and changes in market prices. *See, e.g.*, Trial Tr. 323 (J. Redman). To the contrary, the evidence showed that the trades charged in the Indictment were executed at prices that were at, or within, the bid/ask spread that existed prior to Mr. Coscia's placing his orders into the market. *See, e.g.*, Gov't Ex. Counts 1 and 7 Detail Chart (trades executed at 14288 and 14289 where bid/ask spread was 14288/14289 at outset); Def. Ex. 601 (all charged trades executed within pre-existing bid/ask spread). Even assuming that Mr. Coscia's placement of orders prompted a reaction by other traders' algorithms, the execution of trades at or within the prevailing bid/ask spread is not a "movement of market prices" as alleged in the Indictment.

Because Mr. Coscia placed real orders that were in the market for more than enough time to trade, the Government never even attempted to show that Mr. Coscia intended his orders to mislead his counterparties as to any material aspect of their transactions, such as price or the quality of the underlying futures contracts. Nor did the Government prove that any counterparty could possibly have been misled as to any material matter. Mr. Coscia's

counterparties got the benefit of their bargains. They bought or sold the contracts they bargained for at the prices they bargained for, which were the best available in the market when they traded. *See, e.g.*, Trial Tr. 642-43 (A. Twells) (agreeing that, at the time he traded with Mr. Coscia, he traded at the best available prices in the market); *id*. at 727 (A. Gerko) (same); *id.* at 771-72 (J. Eddy) (same). And there was no evidence that Mr. Coscia ever reneged on any trade. Simply put, on the basis of the Government's evidence at trial, no rational jury could conclude that Mr. Coscia's orders "create[d] a false impression regarding the number of contracts available in the market." Indictment ¶ 3. Because the Government could not—and did not—prove the commodities fraud alleged in the Indictment, Mr. Coscia is entitled to a judgment of acquittal on the commodities fraud charges.

**B.      The Government's Pure Inducement Theory Is Not A Cognizable Theory Of Fraud.**

This left the Government in a bind: its evidence did not show that Mr. Coscia's orders were "false" or "deceptive." *Id.* The Government therefore shifted its theory and argued to the jury that Mr. Coscia committed commodities fraud merely by "inducing" other market participants to trade with him. As the Government put it, "[Mr. Coscia's large] bait trades were used to induce other people to react, to trade his small trades so he could make a profit. That's the switch, inducing people to trade." Trial Tr. 1421 (Gov't Summation); *see, e.g.*, *id.* at 1432 (Gov't Summation) ("[Mr. Dermenchyan] also told you that he was induced into trading the small orders. His computer program was induced into trading the small orders as a result of the large orders."); *id*. at 1457 (Gov't Summation) ("All the evidence you've heard shows you [the large orders are] designed to induce trading into the small order."); *id*. at 1561 (Gov't Summation) ("He moved the market by inducing market participants to trade with him when they wouldn't have otherwise.").

The Government, however, did *not* charge that theory of pure inducement in the Indictment.  Rather, the Government alleged that by "creat[ing] a *false* impression regarding the number of contracts available in the market," Mr. Coscia "*fraudulently* induce[d] other market participants to react to the *deceptive* market information that he created."  Indictment ¶ 3 (emphasis added).  In other words, the Government correctly recognized that inducement alone was not enough under Section 1348(1):  it had to show that other traders were *fraudulently* induced to react to false or deceptive information.  But as explained above, the Government failed to prove the necessary first step, which is that Mr. Coscia ever introduced any false information into the market.  The Government's pure inducement theory—or what might be called a "but-for" theory of commodities fraud—thus diverged from the Indictment and allowed the Government to duck its statutory burden in two critical respects.  The Government did not have to establish any deception or that Mr. Coscia intended to deceive other market participants about a material matter, such as the quality, price, or subject matter of the transactions at issue.   In essence, the Government relieved itself of the duty to prove the "fraud" part of "commodities fraud."  A judgment of acquittal is therefore required on the commodities fraud charges.

### 1.    The Government Avoided Proving Deception.

The defining characteristic of a scheme to defraud is that it is "designed to *deceive*." *United States* v. *LeDonne*, 21 F.3d 1418, 1426 (7th Cir. 1994) (interpreting bank fraud statute, 18 U.S.C. § 1344) (emphasis added); *see United States* v. *Giles*, 246 F.3d 966, 973 (7th Cir. 2001) (similar; interpreting mail fraud statute, 18 U.S.C. § 1341).[1]  A defendant must act "with specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing

---

[1]  As the Court has recognized, the mail fraud and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, "parallel the language of" the commodities fraud statute.  *Coscia*, 100 F. Supp. 3d at 659; *see, e.g.*, *United States* v. *Doherty*, 969 F.2d 425, 429 (7th Cir. 1992) ("'scheme to defraud' means the same thing under §§ 1341, 1343 and 1344").

financial loss to another." *United States* v. *Ryan*, 213 F.3d 347, 350 (7th Cir. 2000) (interpreting Section 1344) (citation omitted); *see United States* v. *Britton*, 289 F.3d 976, 981 (7th Cir. 2002) (similar; interpreting Section 1341). The Government's but-for theory of commodities fraud, however, lacked any element of deception. The Government failed to establish anything deceptive—or false or fraudulent or misleading—about any of Mr. Coscia's orders. As explained above, *see supra* pp. 7-8, Mr. Coscia placed real orders; he did not offer any inaccurate information to other market participants about those orders; and he left the orders in the market for plenty of time (in the world of high-frequency trading) for other traders to execute trades.

To make matters worse for the Government, its supposed victims—who were other experienced traders—testified that they did not know, and did not expect to know, how long any order would be in the market. *See, e.g.*, Trial Tr. 676 (H. Dermenchyan) (agreeing that "[w]hen you see an order in the market, you don't know how long it's going to be resting in the market before it's withdrawn"); *id.* at 768-69 (J. Eddy) (similar); *see also, e.g.*, *id.* at 238 (A. Vrabel) (agreeing that "traders are not obligated to inform other traders how long they intend to keep their contracts available for execution" and that "there's not really a way to do so"). Placing real orders with accurate market information that are available to be traded, especially in the absence of any legitimate expectation that the orders will remain in the market for a particular duration, is not the stuff of fraud. The Government's but-for theory of commodities fraud simply did not require it to show the necessary intent to defraud. *Cf. Coscia*, 100 F. Supp. 3d at 660-61 ("Whether the Government will be able to prove that [Mr.] Coscia actually misled other traders through his use of [large] orders is an issue for trial.").

Notably, this is not a case in which the evidence was sufficient to establish that Mr. Coscia acted with the intent to deceive others, but simply did not succeed in doing so. *See*

Trial Tr. 850 (Rule 29 motion ruling) ("[I]ntent to defraud can be found even where [the scheme is] unsuccessful."); *see also LeDonne*, 21 F.3d at 1426 ("[I]t matters not whether . . . the fraud succeeded and the victim [was] deceived"; "[a]s long as the scheme was devised with the intent to deceive, how that intent manifests itself in execution is irrelevant."). No rational jury could possibly have concluded that Mr. Coscia acted with the intent to deceive others, because the Government flatly failed to show that there was anything deceptive about Mr. Coscia's orders or that anything he did was even capable of deceiving others.

### 2. The Government Avoided Proving Materiality.

Under Section 1348(1), the Government was required to prove not only that Mr. Coscia intended to defraud counterparties into entering into transactions, but that he did so by deceiving as to a material matter, such as the quality, price, or subject matter of the transactions. Courts have long held that a defendant cannot engage in the requisite "scheme to defraud," whatever his intent, "when the customer gets exactly what he expected and at the price he expected to pay." *United States* v. *Regent Office Supply Co.*, 421 F.2d 1174, 1180-81 (2d Cir. 1970) (addressing mail fraud statute). As the Second Circuit has explained, even when a defendant intends to mislead a counterparty, that state of mind does not amount to the necessary intent to defraud if "the deceit d[oes] not go to the nature of the bargain itself." *Id.* at 1182. It is therefore insufficient under the federal anti-fraud statutes "to show merely that *the victim would not have entered into a discretionary economic transaction but for the defendant's misrepresentations*." *United States* v. *Binday*, 804 F.3d 558, 570 (2d Cir. 2015) (emphasis added). Rather, "the deceit must affect the very nature of the bargain itself, such as by creating a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *Id.* at 568 (internal quotation marks omitted).

-12-

The Seventh Circuit's decisions interpreting the federal anti-fraud statutes have similarly contemplated that a defendant harbors fraudulent intent where his deceptive conduct contemplates altering the nature of the bargain received by his counterparty. *See*, *e.g.*, *United States* v. *Powell*, 576 F.3d 482, 487-91 (7th Cir. 2009) (affirming mail fraud conviction where defendant misled non-profit organization into "lending" its tax-exempt status in exchange for $50,000; although defendant paid the $50,000, he failed to inform the organization that it would incur substantial tax liability and have to transfer title to property); *United States* v. *Sloan*, 505 F.3d 685, 690 (7th Cir. 2007) (affirming mail fraud conviction where defendants "fraudulently inflat[ed] value of" real estate through "false appraisal[s]," forcing properties into foreclosure proceedings that resulted in "HUD incurring a substantial financial loss"); *United States* v. *Leahy*, 464 F.3d 773, 793-94 (7th Cir. 2006) (affirming mail and wire fraud convictions where defendant failed to "provide the consideration for which [the victim] bargained").

Here, the Government's but-for theory of commodities fraud lacks this requisite component: the Government has purported to show "merely that [other traders] would not have entered into a discretionary economic transaction but for [Mr. Coscia's orders]." *Binday*, 804 F.3d at 570. The Government did not attempt to show at trial—and there was no evidence of—any added element of deception as to a material matter. Mr. Coscia did not mislead counterparties about any material aspect of their transactions, such as the price or the quality of the underlying futures contracts. Nor did the Government argue or offer any evidence that any counterparty was so misled. In short, even assuming the Government proved that Mr. Coscia's orders induced other traders to react, the Government did not prove that those orders "*fraudulently* induce[d] other market participants to react to . . . *deceptive* market information." Indictment ¶ 3 (emphasis added). To convict Mr. Coscia of commodities fraud, the Government had to prove that his

allegedly deceptive conduct altered the nature of the bargain received by his counterparties.  The Government did not even attempt to do so at trial.

## II.   THE GOVERNMENT'S SPOOFING THEORY FAILS AS A MATTER OF LAW AND IS WHOLLY UNSUPPORTED BY THE EVIDENCE.

### A.   Mr. Coscia Lacked Any Notice Of The Government's Intent-To-Immediately-Cancel Interpretation Of The Anti-Spoofing Provision.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned* v. *City of Rockford*, 408 U.S. 104, 108 (1972). Congress must define crimes "with sufficient definiteness that ordinary people can understand what conduct is prohibited."  *Kolender* v. *Lawson*, 461 U.S. 352, 357 (1983).  When a statute's text covers both permissible and impermissible activity, it must provide some principle for distinguishing between them or else it is void for vagueness.  *See, e.g.*, *Chicago* v. *Morales*, 527 U.S. 41, 57 (1999); *Smith* v. *Goguen*, 415 U.S. 566, 573-74 (1974).  Here, the plain text of the anti-spoofing provision—which prohibits all "bidding or offering with the intent to cancel the bid or offer before execution," 7 U.S.C. § 6c(a)(5)(C)—covers a wide range of routine and permissible market activity, including placing orders with the intent to cancel them under certain conditions. The provision offers no ready way to separate out this lawful conduct from unlawful spoofing.  *See* Def.'s Mem. Supp. Mot. Dismiss 15-22; Def.'s Mot. J. Acquittal 10-11.

In opposing Mr. Coscia's motion to dismiss, the Government did not argue simply that Mr. Coscia placed orders "with the intent to cancel [them] before execution," as the statute requires.  7 U.S.C. § 6c(a)(5)(C).  That type of intent would not have differentiated Mr. Coscia's conduct from commonplace forms of trading.  Rather, the Government argued that, at the time Mr. Coscia placed his orders, he intended to cancel them "immediately."  *See Coscia*, 100 F. Supp. 3d at 658.  Mr. Coscia's contemporaneous intent to cancel immediately was what "set[] his conduct apart from . . . legitimate trading practices," such as the conditional-order types made

available by the exchanges. *Id*. at 659. But for vagueness purposes, the question is not whether the

Government can devise an after-the-fact standard as part of a criminal prosecution. Rather, the

question is whether the statute or some other regulatory guidance put Mr. Coscia (and other

traders) on notice *at the time of his conduct* that the difference between prohibited "spoofing" and

permissible market trading was whether the trader contemporaneously intended to cancel the order

immediately. *See, e.g.*, *United States* v. *Lanier*, 520 U.S. 259, 267 (1997) ("[T]he touchstone is

whether the statute, either standing alone or as construed, made it reasonably clear *at the relevant*

*time* that the defendant's conduct was criminal.") (emphasis added).

The Government has never pointed to anything in the statutory text that would have

provided Mr. Coscia notice of its intent-to-immediately-cancel standard. As Mr. Coscia explained

in his motion to dismiss, the statutory text provides no such guidance. And at least when

Mr. Coscia traded, no extra-textual referent filled the statutory gap. To begin, "spoofing" had no

common industry understanding. Even the most experienced futures industry participants could

not agree on a meaning. *See, e.g.*, CFTC Staff Roundtable on Disruptive Trading Practices, at 64,

111, 171 (Dec. 2, 2010) (Def.'s Mot. Dismiss Ex. C); Letter from John M. Damgard, President,

Futures Industry Association, to David A. Stawick, Secretary, CFTC, at 6 (Dec. 23, 2010) (Def.'s

Mot. Dismiss Ex. D); Letter from Stuart J. Kaswell, General Counsel, Managed Funds

Association, to David A. Stawick, Secretary, CFTC, at 7 (Dec. 28, 2010) (Def.'s Mot. Dismiss Ex.

F).

The CFTC, moreover, did not issue binding guidance on the statute's meaning until

over 18 months *after* Mr. Coscia's trading. *See* 78 Fed. Reg. 31,890 (2013) (final interpretive

guidance and policy statement). While the CFTC had issued a proposed interpretive order before

Mr. Coscia's trading, *see* 76 Fed. Reg. 14,943 (2011), "an agency's proposed rule is merely that, a

proposal," *Am. Med. Ass'n* v. *United States*, 887 F.2d 760, 769 (7th Cir. 1989). As such, the proposed interpretive order was not binding on market participants (or the CFTC) and could not be relied on as a ground for rejecting Mr. Coscia's vagueness challenge. *Compare Coscia*, 100 F. Supp. 3d at 657 ("At the time of the alleged trades, . . . the only available interpretation of the statute was the CFTC's proposed, nonbinding guidance."), *with CFTC* v. *Schor*, 478 U.S. 833, 845 (1986) ("It goes without saying that a proposed regulation does not represent an agency's considered interpretation of its statute and that an agency is entitled to consider alternative interpretations before settling on the view it considers most sound."); CFTC Q&A — Proposed Interpretive Order on Disruptive Trading Practices, *available at* http://www.cftc.gov/Law Regulation/DoddFrankAct/Rulemakings/DF_24_ DisruptiveTrading/index.htm (last visited Dec. 17, 2015) ("The Proposed Interpretive Order is a proposal — it does not bind the Commission or the public.").

Finally, there was no existing judicial construction of the anti-spoofing provision, of course, because no civil or criminal enforcement proceeding had *ever* been initiated on the basis of it. In short, the Government's intent-to-immediately-cancel standard is a creation that postdates Mr. Coscia's conduct, and thus it was not understood within the industry at the time as the proper interpretation of the anti-spoofing provision. As such, it cannot rescue the anti-spoofing provision from its unconstitutional vagueness, and a judgment of acquittal is required on the spoofing charges. If allowed to stand, Mr. Coscia's spoofing convictions run the risk of chilling lawful and constructive trading activity, and thereby affecting vital market liquidity, as market participants

refrain from such perfectly legitimate conduct for fear of prosecution under the Government's after-the-fact interpretation of a vague statute.[2]

**B.      The Government Did Not Prove That Mr. Coscia Intended To Cancel All Of His Orders In Their Entirety At The Time They Were Placed.**

In addition to the fact that the Government's manufactured intent standard postdates Mr. Coscia's trading (and thus he lacked any notice of what the anti-spoofing provision supposedly requires), the Government could not even prove that standard at trial.  The jury was instructed:

> 'Spoofing' is defined as 'bidding or offering with the intent to cancel the bid or offer before execution.'  To find this element satisfied, you must find that the government has proven beyond a reasonable doubt that, [1] at the time Mr. Coscia entered the bid or offer specified in the Count that you are considering, [2] he intended to cancel [3] the entire bid or offer before it was executed, and that he did not place the bid or offer as part of a legitimate, good-faith attempt to execute at least part of that bid or offer.

Jury Instr. 24 (numbering added).  Simply put, the Government did not make those showings.  The evidence at trial was insufficient for a rational jury to find beyond a reasonable doubt that, at the time Mr. Coscia placed the bid or offer specified in each count, he intended to cancel the entire bid or offer before it was executed.  Mr. Coscia is therefore entitled to a judgment of acquittal on the spoofing charges.

*First*, the Government failed to establish that Mr. Coscia had the intent to cancel the bids or offers alleged in the Indictment *at the time* he placed them—*i.e.*, that he acted with the requisite contemporaneous intent, as opposed to an intent to cancel only upon the occurrence of certain conditions.  *See id.*; Def.'s Mot. J. Acquittal 8-9.  Mr. Coscia's large orders were

---

[2]  *See, e.g.*, CFTC Staff Roundtable on Disruptive Trading Practices, at 159 (Dean Payton, Deputy Chief Regulatory Officer, CME) ("[A]s people look at this new section of the Act, they are very much concerned about the lack of clarity in terms of what these disruptive practices mean.  And, you know, there's certainly going to be concern about if people do not have the clarity that they need in order to determine whether or not to participate in these markets, if you chill that participation it's going to impact liquidity . . . .").

programmed to cancel only in response to changes in specific market conditions that occurred subsequent to their entry. *See, e.g.*, Trial Tr. 465-66, 469, 499, 536 (J. Park); *id.* at 1010 (M. Coscia); Gov't Ex. Quote Trader Settings. Mr. Park, a witness for the Government who developed Mr. Coscia's trading program, explained that the large orders cancelled after the passage of a set amount of time or the trading of some or all of the small or large orders. Trial Tr. 460, 465-66; *see id.* at 971-72 (M. Coscia) (confirming cancellation logic). Mr. Bessembinder, the Government's own expert witness, agreed that "what prompts a cancellation of an order or an attempt to cancel an order is in part when that order begins to be filled in part." *Id.* at 1393. The Government itself admitted that Mr. Coscia's large orders were programmed to cancel only upon the occurrence of certain conditions:

> There are three scenarios he is asked where the large orders are canceled. He's asked, one, is that true the large orders are canceled if the small side is filled? He says yes. Two, are the large orders canceled if any part of them is executed? He says yes. Three, are they canceled—do they cancel if they time out . . . He says, yes.

*Id.* at 1461-62 (Gov't Summation); *see, e.g.*, *id.* at 1457 (Gov't Summation). Contrary to the allegations in the Indictment, *see* Indictment ¶ 3, and the centerpiece of the Government's case, the evidence showed that Mr. Coscia's "intent to cancel was 'concededly conditional.'" *Coscia*, 100 F. Supp. 3d at 658 (quoting Def.'s Mem. Supp. Mot. Dismiss 28).

The conditionality of Mr. Coscia's intent in placing his large orders makes sense. Traders routinely place orders that they want filled under conditions that they believe maximize profit while minimizing risk. If those conditions do not come about, or if conditions otherwise change, they cancel their orders. *See, e.g.*, Trial Tr. 1002, 1028, 1037-40 (M. Coscia) (testifying nine times on cross examination that he wanted orders filled "under [his] conditions"). That is not spoofing. It is the essence of legitimate trading.

-18-

As Mr. Bessembinder has explained elsewhere: "If there are people out there that know more than you when they trade against you, it's bad news. How do you protect yourself against that? Well, as soon as you get any inkling that things have changed, you'd like to update your quotes. . . . The essence of high-frequency [trading] is you can update your quotes frequently, and they do update their quotes frequently." Hendrik Bessembinder, *High Frequency Trading: Some Perspective* (Nov. 9, 2012), *available at*: https://www.youtube.com/watch?v= wxGIHQfz9Us. In sum, a *conditional* intent to cancel is not the same as a *contemporaneous* intent to cancel. The Government could not carry its burden on the spoofing charges by pointing to evidence that Mr. Coscia intended to cancel his orders only under certain conditions. *See Coscia*, 100 F. Supp. 3d at 658, 659 (denying Mr. Coscia's motion to dismiss on the ground that the "Indictment charges that [he] placed orders with the intent to cancel, not with the intent to fill them under certain conditions," and that this "alleged 'intent to cancel' sets his conduct apart from . . . legitimate trading practices").

*Second*, the Government failed to prove that Mr. Coscia acted with the *purpose or conscious desire* to cancel before execution the bids or offers at issue—*i.e.*, that he acted with the necessary specific intent. *See* Jury Instr. 24; Def.'s Mot. J. Acquittal 7-8; *United States* v. *Durham*, 645 F.3d 883, 891 n.1 (7th Cir. 2011) ("Specific intent crimes require additional proof of the defendant's intent to effectuate a particular result.") (internal quotation marks omitted). To be sure, Mr. Coscia programmed his large orders to cancel under certain conditions, but that is something all high-frequency traders do. *See, e.g.*, Trial Tr. 676-77 (H. Dermenchyan) (agreeing that it is "routine for any algorithm that's designed" to "include an automatic cancellation element either via the passage of time or because something else trades in the market or because of other conditions"); *id.* at 1160 (A. Warren) ("I have never seen [an algorithm] that doesn't have a

-19-

cancellation [protocol].").  Accordingly, this evidence was insufficient to prove that Mr. Coscia specifically intended to cancel any of the bids or offers at issue.

The Government's reliance on Mr. Coscia's cancellation statistics was equally unavailing.  The evidence at trial showed that high cancellation rates are routine among high-frequency traders.  *See, e.g.*, *id.* at 239 (A. Vrabel); *id.* at 1164-65 (A. Warren); *id.* at 1237 (M. Evans).  Indeed, the evidence showed that Mr. Coscia got "a greater percentage of his large orders filled, either part or whole, than . . . comparison high-frequency traders."  *Id.* at 1234 (M. Evans).  At most, therefore, the Government established that Mr. Coscia knew, or should have known, that cancellation before execution was likely—a feature of *all* orders placed by high-frequency traders.  But that evidence was insufficient to prove that Mr. Coscia specifically intended to cancel any of the bids or offers specified in the Indictment.[3]

*Third*, the Government failed to establish that, at the time he placed the bid or offer at issue, Mr. Coscia intended to cancel the *entire* bid or offer before it was executed.  *See* Jury Instr. 24; *see* Def.'s Jury Instrs. Reply 2-4; 78 Fed. Reg. at 31,896 (distinguishing intent to execute part of a bid or offer from intent "to cancel the *entire* bid or offer prior to execution and not attempt to consummate a legitimate trade") (emphasis added).  Mr. Coscia's algorithm itself was clear evidence that he intended to execute his large orders, whether in full or in part.  As explained above, uncontroverted evidence showed that Mr. Coscia programmed his large orders to cancel only *after an execution*, in full or in part, or after a period of time expired.  *See, e.g.*, Trial Tr. 460,

---

[3]  The Government repeatedly solicited testimony that all entered orders are "real" and "tradable."  *See, e.g.*, Trial Tr. 553 (J. Park); *id.* at 1384 (H. Bessembinder).  The Government's position appears to be that, if the fact that an order was tradable rendered it immune from a charge of spoofing, all orders would be so immune.  *See id.* at 847 (Gov't argument on Rule 29 motion) ("[T]he argument that these orders are real, your Honor, they're tradeable orders, that's also a red herring.").  The Government's position overlooks that orders that are entered during an exchange's pre-open session are not live executable orders, yet theoretically could be entered with an intent to cancel them before execution.

465-66 (J. Park); *id.* at 971-72 (M. Coscia); *id.* at 1393 (H. Bessembinder). Based on Mr. Coscia's algorithm alone, it was irrefutable that he placed the orders at issue with the intent to execute at least part of them.[4] That is exactly what his algorithm was programmed to do, and a rational jury could not conclude otherwise.

   This programming was reflected in how the algorithm traded. Although the Government focused on Mr. Coscia's full fill of 347 large orders, the evidence established that Mr. Coscia's large orders were partially filled an additional 7,761 times on CME exchanges. *See id.* at 417 (R. Cobb); Gov't Ex. CME Summary Chart 2. Mr. Coscia, therefore, executed *over 8,000 trades*, in full or in part, on his large orders. Given the results of Mr. Coscia's trading, no rational jury could find beyond a reasonable doubt that Mr. Coscia placed his large orders with the intent to cancel them in their entirety at the time they were placed. The Government's emphasis that the large orders were programmed to cancel if "touched"—if even one contract traded—merely underscored that Mr. Coscia placed his orders as part of a legitimate attempt to consummate at least part of a trade. *See*, *e.g.*, *id.* at 164 (Gov't Opening Statement); *id.* at 1451, 1462, 1552 (Gov't Summation). *Cf. Coscia*, 100 F. Supp. 3d at 658 (referencing, in denying Mr. Coscia's motion to dismiss, CME CEO Craig Donohue's statement that "[t]he distinguishing characteristic between 'spoofing' . . . and the legitimate cancellation of other unfilled or partially filled orders is that 'spoofing' involves the intent to offer non bona fide orders for the purpose of misleading market participants and exploiting that deception for the spoofing entity's benefit"). An order that was "touched" was partially traded. Accordingly, the evidence at trial was insufficient to establish that Mr. Coscia placed each bid and offer at issue with the intent to cancel

---

[4] In addition, on the CME alone, Mr. Coscia placed more than 19,000 large orders without a small order on the opposite side of the market, indicating that, as a trader, he had an interest in and a willingness to assume large positions and execute sizable orders. *See* Def. Ex. 100.

the *entire* order, as opposed to as part of a legitimate, good-faith attempt to execute at least part of that order.  *See id.* at 659 (distinguishing, in denying Mr. Coscia's motion to dismiss, "intent to cancel" alleged in Indictment from intent behind "partial-fill orders, which are entered with the intent to consummate a trade, not with the intent to cancel the order altogether").

## III.   THE JURY WAS WRONGLY INSTRUCTED ON BOTH THE COMMODITIES FRAUD AND SPOOFING CHARGES.

The Government all but guaranteed itself victory on its commodities fraud and spoofing charges by convincing the Court to reject jury instructions that would have exposed those charges' legal infirmities.  Mr. Coscia was legally entitled to any jury instruction that was a "correct statement[] of the law that [was] supported by the evidence," *United States* v. *Perez*, 43 F.3d 1131, 1137 (7th Cir. 1994), and that was necessary "to ensure that the case [wa]s submitted to the jury in a full and fair manner," *United States* v. *McKnight*, 665 F.3d 786, 792 (7th Cir. 2011).  His proposed materiality and conditional-intent instructions satisfied this standard and should have been given.  Their omission warrants a new trial.

### A.   The Jury Should Have Been Properly Instructed On Materiality For The Commodities Fraud Charges.

The Government successfully challenged Mr. Coscia's requested materiality instruction.  As a result, to satisfy its burden on the commodities fraud charges, the Government was not required to prove that Mr. Coscia intended to deceive his counterparties about a material matter.  Mr. Coscia's proposed instruction read:

> It is not sufficient for the Government to prove that Mr. Coscia intended that his large-volume orders would induce others to react to allegedly deceptive market information and enter into futures transactions with him. The Government must also prove that Mr. Coscia's allegedly deceptive market information was intended to mislead others as to the quality or price of the futures transactions at issue, or otherwise to the nature of the bargain at issue.  Stated differently, to prove that Mr. Coscia engaged in a scheme to defraud, he must have acted with intent to deprive others with whom he traded of the benefit of the bargain they struck.

Def.'s Proposed Add'l Instr.

As explained above, *see supra* pp. 12-14, the proposed instruction was a correct statement of the law. For a conviction under the federal anti-fraud statutes, the Government must prove that a defendant intended to deceive a counterparty as to a material matter—namely, one that went to the very nature of the bargain at issue, such as its subject matter, quality, or price. The proposed instruction was absolutely essential to ensure that the jury was able to consider the case in a full and fair manner. Without it, the jury was invited to find Mr. Coscia guilty for conduct that does not amount to commodities fraud. Moreover, the evidence at trial overwhelmingly supported the instruction. There was no evidence that Mr. Coscia intended his orders to mislead as to the nature of the bargain struck with his counterparties. Nor were any of his counterparties so misled. They bought (or sold) the futures contracts they bargained for at the prices they bargained for, which were the best prices available in the market at the time they traded. This is not fraud, and Mr. Coscia is entitled to a new trial with a jury properly instructed.

**B.    The Jury Should Have Been Instructed On Conditional Intent For The Spoofing Charges.**

The Government also successfully challenged Mr. Coscia's request for a conditional-intent instruction. As a result, to carry its burden on the spoofing charges, the Government was required to prove only that Mr. Coscia intended to cancel his orders under certain circumstances or conditions. The Government was not compelled to prove what it has argued (and the Court has accepted) the anti-spoofing provision requires: that Mr. Coscia intended to cancel his orders at the time they were placed under *all* circumstances and conditions. Mr. Coscia's proposed instruction read:

> It is not sufficient for the Government to prove . . . that [Mr. Coscia] intended to cancel the bid or offer under some, but not all, circumstances or conditions. Put another way, if you find that Mr. Coscia intended to execute his bid or offer under some, but not all circumstances, then the

> Government has failed to prove that he had an intent to cancel the bid or offer before execution, and this element has not been satisfied.

Def.'s Proposed Instrs. 14-16.

As explained above, *see supra* pp. 17-19, the proposed instruction was a correct statement of the law. For a conviction under the anti-spoofing provision, the Government must show that a defendant placed orders with the contemporaneous intent to cancel them, *i.e.*, regardless of what occurs in the market. It is not enough to place orders with the intent to cancel them under certain conditions, which is commonplace and entirely legitimate market behavior. Again, the proposed instruction was absolutely essential for ensuring that the jury was able to consider the case in a full and fair manner. The Government misled this Court by contending that Mr. Coscia's proposed conditional-intent instruction was "inapplicable to the facts of this case." Gov't Resp. to Def.'s Proposed Instrs. 4. But Mr. Coscia's *entire* defense centered on his intent to cancel his orders under only certain conditions—namely, if they rested in the market for a certain period of time without being executed, or if they were executed in whole or in part. That defense was complete as a matter of law, and Mr. Coscia's proposed instruction was necessary to ensure the jury's ability to consider it properly.

Finally, ample trial evidence supported the instruction. Multiple witnesses—both for the Government and Mr. Coscia—testified that Mr. Coscia's trading program was designed to cancel orders under only certain conditions, and that such "cancellation logic" was a routine and unremarkable element of high-frequency trading programs. *See, e.g.*, Trial Tr. 460, 465-66, 536 (J. Park); *id.* at 676-77 (H. Dermenchyan); *id.* at 1160 (A. Warren). Mr. Coscia himself repeatedly testified that he intended to cancel his orders under only certain conditions. *See, e.g.*, *id.* at 971-72 (M. Coscia ("Q: Okay. So you canceled when either they expired, because there was no trading,

or there was a trade?  A:  Right.  Which is market conditions."); *see id.* at 562-65, 573 (M. Coscia Prior Testimony).

That the jury was not required to credit Mr. Coscia's testimony as to his conditional intent does not dispose of this issue.  Because the Court did not instruct the jury that proof of conditional intent to cancel is insufficient for spoofing, the jury was obligated to return a guilty verdict *even if it credited Mr. Coscia's testimony* about conditional cancellation—and all of the evidence supporting it.  The instructions as given therefore prevented the jury from considering Mr. Coscia's defense, causing irreparable prejudice to Mr. Coscia and entitling him to a new trial.

## IV.    THE GOVERNMENT INTRODUCED FALSE AND HIGHLY PREJUDICIAL TESTIMONY THAT UNDERMINED MR. COSCIA'S RIGHT TO A FAIR TRIAL.

The Government compounded the legal errors in this case by repeatedly offering unfounded and inaccurate testimony on core issues.  The Government (1) introduced inadmissible opinion testimony on *the* central issue at trial, Mr. Coscia's intent; (2) used lay witnesses to offer what amounted to undisclosed, unqualified, and speculative expert opinion on Mr. Coscia's trading strategy; and (3) offered false testimony about Mr. Coscia's trading strategy.  These errors were highly prejudicial and require a new trial.

### A.    The Government's Witnesses Gave Inadmissible Opinion Testimony About Mr. Coscia's Intent.

Admission of opinion testimony as to a criminal defendant's intent is carefully limited by the Federal Rules of Evidence.  Expert witnesses "must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged."  Fed. R. Evid. 704(b).  And while "there is no theoretical prohibition against allowing lay witnesses to give their opinions as to the mental states of others," any such testimony must meet the requirements of Rule 701.  *United States* v. *Locke*, 643 F.3d 235, 240 n.2 (7th Cir. 2011) (citation omitted).  In other words, it must be "within the personal knowledge of the witness

and helpful." *United States* v. *Guzzino*, 810 F.2d 687, 699 (7th Cir. 1987) (internal quotation marks omitted); *see* Fed. R. Evid. 701(a) and (b) (requiring that lay opinion testimony be "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue").

The Government violated all of these principles. In patent disregard of Rule 704(b)'s prohibition, it asked Mr. Bessembinder, its rebuttal expert, to opine on Mr. Coscia's intent. *See* Trial Tr. 1389-90 ("Q: Do you recall the defendant's testimony regarding placing large orders to generate a reaction from other traders in the market? . . . What did you understand him to mean by that?"). Mr. Bessembinder was allowed to explain Mr. Coscia's testimony, stating that "if one is . . . seeking to generate a reaction, the only way one could do that is by inducing people to change their order submissions." *Id.* at 1390.[5] Mr. Bessembinder further testified that Mr. Coscia's fill rates were "very much consistent with the idea that the reaction that was generated [by Mr. Coscia's large orders] *was to induce* other traders to submit orders to trade against, interact with the small orders." *Id.* at 1391 (emphasis added). That testimony was crucial to the Government's commodities fraud charges. In essence, Mr. Bessembinder told the jury that Mr. Coscia's testimony amounted to an admission that he intended to induce others to change their order submissions because that is "the only way" one could generate a reaction.

Mr. Bessembinder's testimony effectively revised Mr. Coscia's testimony as to what his intent was when he placed his orders. Mr. Bessembinder's opinion was that Mr. Coscia placed his large orders to induce other traders to trade with his small orders—*i.e.*, that he had acted with the intent necessary to establish the Government's pure inducement theory of commodities fraud. *See supra*

---

[5] Mr. Coscia objected repeatedly to this line of questioning and to Mr. Bessembinder's testimony. Trial Tr. 1389-90.

pp. 9-14. Mr. Bessembinder's testimony thus fell squarely within the Rule 704(b) bar on expert opinion testimony as to a defendant's *mens rea* and should never have been admitted.

Mr. Dermenchyan—a lay witness, but from whom the Government elicited extensive opinion testimony—also gave utterly improper testimony about Mr. Coscia's intent that should also have been excluded. Mr. Dermenchyan told the jury that "after noticing the behavior and doing a little more research," he could conclude that "[Mr. Coscia's large] orders were placed *with the intention* of essentially moving the market down and then pushing the market back up." Trial Tr. 652-53 (emphasis added); *see id.* at 685. Although as a lay witness, Mr. Dermenchyan was not categorically barred from testifying as to Mr. Coscia's intent, he plainly lacked the requisite personal knowledge to support that testimony. *See* Fed. R. Evid. 701(a); *Locke*, 643 F.3d at 240 n.2. Mr. Dermenchyan had never met, spoken to, or otherwise communicated with Mr. Coscia. Trial Tr. 665 (H. Dermenchyan). And Mr. Dermenchyan's testimony about what Mr. Coscia intended vastly exceeded what he could rationally observe from trading as an anonymous counterparty in the futures markets. As a result, Mr. Dermenchyan's testimony was rank speculation that should never have been admitted.[6]

Mr. Bessembinder's and Mr. Dermenchyan's testimony was highly prejudicial to Mr. Coscia. Mr. Coscia's intent was not just *an* element of the offense. It was *the* central issue in contention at trial. Mr. Bessembinder's and Mr. Dermenchyan's testimony improperly encouraged the jury to rely on the former's claimed expertise and the latter's claimed knowledge, as opposed to its own evaluation of Mr. Coscia's testimony and the other evidence at trial on this fundamental issue. A new trial is therefore warranted.

---

[6] Mr. Coscia objected to this specific testimony on the ground that Mr. Dermenchyan was speculating about someone else's intent, Trial Tr. 652, and moved to strike his testimony in its entirety, *id.* at 688-91.

**B.      The Government's Witnesses Gave Undisclosed, Unqualified, And Speculative Testimony About The Effect Of Mr. Coscia's Trading.**

A lay witness may not give opinion testimony "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). Testimony that "goes beyond the observations that a normal person could make, and is based instead on the specialized knowledge obtained through experience in the field must meet the requirements of Rule 702 as expert testimony." *United States* v. *Jones*, 739 F.3d 364, 369 (7th Cir. 2014); *see, e.g.*, *United States* v. *Conn*, 297 F.3d 548, 553-54 (7th Cir. 2002). Rule 702, in turn, allows opinion testimony by a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" when the testimony is helpful and reliable. But the Government must disclose such expert testimony and provide a written summary of it at a defendant's request. Fed. R. Crim. P. 16(a)(1)(G).

Before trial, the Government disclosed to Mr. Coscia that it did not "anticipate calling any Rule 702 expert witnesses to offer opinion testimony in its case-in-chief." Letter from Sunil Harjani to Steven Peikin, at 1 (Oct. 6, 2015). The Government, however, elicited from two of its supposed lay witnesses, Mr. Redman and Mr. Dermenchyan, what amounted to expert testimony about the impact of Mr. Coscia's trading strategy. Mr. Redman, the Government's witness from ICE Futures Europe, testified that Mr. Coscia's large orders impacted market prices because they generated "buying pressure" and "selling pressure" in the market:

> Q:      What do you see has happened to prices in this particular first cycle?
> A:      They've risen.
>
> *        *        *
>
> Q:      . . . [W]hat do you see here; buyer pressure or seller pressure?
> A:      Seller pressure. There's a lot more volume on offer on the selling side than on the buying side.

> Q:      And does seller pressure have any effect in the market at ICE?
> A.      It would tend to reduce prices, yes.

Trial Tr. 276, 278-79; *see id.* at 274-75 (defining "buying pressure" and "selling pressure").[7]

Mr. Dermenchyan, one of the Government's putative victims, testified that Mr. Coscia's orders generated the appearance of supply and demand, thereby impacting market prices:

> [I]f large orders were placed on the demand side and it appeared as though there was tremendous demand in the market, if trades were to occur on the opposite sides thereby pushing prices up by just a little, those orders would go away immediately . . . .
>
> *       *       *
>
> [T]hose orders were, again, multiples of the usual inside size, and when they were placed, it's generally an indication that, hey, prices are going to go down.  Again, basic supply and demand.  If those orders were placed in the offer, then it's an indication that the prices would go down, so, generally, participants would sell rather than buy to those prices.

*Id.* at 654, 682.[8]

Mr. Redman's and Mr. Dermenchyan's testimony marshalled economic concepts outside the purview of lay testimony and opined on market price impact without any basis.  The testimony was based on specialized knowledge that they obtained from their experience in the futures markets.  As such, Mr. Redman's and Mr. Dermenchyan's testimony was subject to proper pretrial disclosure and expert qualification.  Because neither of those requirements was met, their testimony should have been excluded.  Moreover, the failure to exclude the testimony was undeniably prejudicial to Mr. Coscia.  Mr. Redman's and Mr. Dermenchyan's testimony invited

---

[7]  Mr. Coscia moved to strike Mr. Redman's testimony about effect on prices because it was undisclosed and unqualified expert testimony.  Trial Tr. 353-54.

[8]  Mr. Coscia moved to strike Mr. Dermenchyan's testimony in its entirety, including on the ground that he was "converted into an expert."  Trial Tr. 688-91.

the jury to conclude that Mr. Coscia's large orders moved market prices—a core allegation of the

Indictment. *See* Indictment ¶ 3.

Even if Mr. Redman and Mr. Dermenchyan had been properly disclosed and

qualified as experts, the testimony at issue still would not have been admissible under Rule 702

because it was totally unreliable. Mr. Redman performed no analysis that could have established a

causal link between Mr. Coscia's trading activity and changes in market prices. *See* Trial Tr. 323

(J. Redman) (conceding that he had not analyzed other factors that could affect market prices when

evaluating Mr. Coscia's orders). And Mr. Dermenchyan did not testify to having conducted *any*

meaningful analysis of Mr. Coscia's trading—causal or otherwise. This comes nowhere near

satisfying Rule 702's requirements that expert witnesses base their testimony on "sufficient facts

or data," employ "reliable principles and methods," and apply those principles and methods

"reliably . . . to the facts of the case." Accordingly, the testimony should have been excluded, and

its prejudice to Mr. Coscia requires a new trial.

### C. The Government's Witnesses Gave False And Unfairly Prejudicial Testimony About Mr. Coscia's Trading Strategies.

The damage done by the Government's witnesses to the fairness and integrity of

Mr. Coscia's trial was compounded by Mr. Redman's and Mr. Dermenchyan's presentation of

materially false testimony about Mr. Coscia's trading strategies. A defendant is entitled to a new

trial based on false testimony when

> (a) the court is reasonably well satisfied that the testimony given by a
> material witness is false; (b) the jury might have reached a different
> conclusion absent the false testimony or if it had known that testimony by a
> material witness was false; and (c) the party seeking the new trial was taken
> by surprise when the false testimony was given and was unable to meet it or
> did not know of its falsity until after the trial.

-30-

*United States* v. *Bender*, 539 F.3d 449, 456 (7th Cir. 2008) (citation and brackets omitted); *see, e.g.*, *United States* v. *Taylor*, 600 F.3d 863, 870 (7th Cir. 2010). Mr. Redman's and Mr. Dermenchyan's false testimony satisfies this standard.

      *First*, each witness presented false testimony. Mr. Redman testified that he examined Mr. Coscia's trading on "a particular date when a lot of money was lost"—September 27, 2011—and determined that the loss was sustained as a result of the execution of Mr. Coscia's large orders. Trial Tr. 303-04. Mr. Redman testified that "[d]uring the early part of the day, a fairly large number of Mr. Coscia's large buy orders were actually executed in part or in whole. So he built a position during the course of the day and the market price then fell, moved against him." *Id*. That testimony was false. In fact, Mr. Coscia's loss on that date resulted from the execution of his *small* orders, not his large orders. Ex. A (showing that Mr. Coscia built a position on September 27, 2011, as a result of execution of small orders placed by his algorithm).

      Mr. Dermenchyan testified as one of the supposed "victims" of Mr. Coscia's trading activity. Mr. Dermenchyan testified that he saw Mr. Coscia's trading pattern repeat "4,000 times" in one day "over the course of six hours." Trial Tr. 651. Mr. Dermenchyan described this activity as "deviat[ing] in a very large way" from normal market conditions. *Id*. This too was untrue. On the day in question, Mr. Coscia entered 1,836 orders *in total* and only 583 large orders. Ex. B.

      *Second*, the jury might have reached a different conclusion without Mr. Redman's and Mr. Dermenchyan's false testimony. The Government used this false testimony extensively as evidence of Mr. Coscia's scheme to defraud and spoofing. The Government relied in particular on Mr. Redman's false testimony to argue that Mr. Coscia's large orders were unprofitable "bait" orders that were used only to defraud his counterparties and spoof the markets. *See* Trial Tr. 1439

(Gov't Summation) ("Mr. Redman, you remember from ICE from London, told you when defendant's large orders traded that one day on September 27th, he lost $120,000. The large orders is a loss. The small orders is where the profit is because the large orders are just the bait."). And Mr. Dermenchyan's false testimony provided foundation for the Government's argument that Mr. Coscia repeated his trading cycle "[o]ver and over again . . . [l]arge orders flashing, small order trading," catching market participants "in a bait and switch scheme." *Id.* at 1418 (Gov't Summation).

*Third*, Mr. Redman's and Mr. Dermenchyan's false testimony took Mr. Coscia by surprise at trial and precluded his rebuttal of their important errors. Although Mr. Redman and Mr. Dermenchyan gave expert testimony, their specialized, technical testimony was not disclosed to Mr. Coscia as required by Rule 16(a)(1)(G). *See supra* p. 28. Nor could Mr. Coscia reasonably anticipate and repudiate their testimony based on any of the other discovery materials provided to him by the Government. Mr. Redman and Mr. Dermenchyan testified about detailed facts that could be identified only through a highly technical analysis: for Mr. Redman, how Mr. Coscia built a position and then worked out of it over the course of a day; and for Mr. Dermenchyan, how many trading loops Mr. Coscia engaged in over a six-hour period. Mr. Coscia did not know before trial that these witnesses would testify to these specific facts, and he could not have known that this testimony was false without a complex review of trading data performed by qualified analysts. As a result, Mr. Coscia was unable to meaningfully rebut or even identify these errors until after trial, and is therefore entitled to a new trial.

## CONCLUSION

For the foregoing reasons, a judgment of acquittal should be entered on all charges.

In the alternative, a new trial should be granted on all charges.

Respectfully submitted,

/s/ Steven R. Peikin
Steven R. Peikin
Kenneth M. Raisler
Karen Patton Seymour
Kate L. Doniger
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Of Counsel*:

Jeffrey B. Wall
Julia A. Malkina

*Attorneys for Defendant Michael Coscia*

December 18, 2015

**CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2015, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all attorneys of record:

Renato Mariotti
Renato.mariotti@usdoj.gov

Sunil R. Harjani
Sunil.harjani@usdoj.gov

/s/ Steven R. Peikin
Steven R. Peikin