UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.    14 CR 551 |
| v. | ) | |
| | ) | |
| MICHAEL COSCIA | ) | Judge Harry Leinenweber |

## UNITED STATES' POSITION AS TO SENTENCING FACTORS AND RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, hereby submits the following sentencing memorandum for defendant Michael Coscia, and responds to defendant's sentencing position. The government agrees with the PSR that the properly calculated advisory sentencing guideline range is between 70 and 87 months' imprisonment.   The government recommends a sentence within the guideline range under the factors set forth in 18 U.S.C. § 3553(a).

### I.    Introduction

With the advent of electronic trading, and implementation of algorithms to execute trades, it has become possible for traders to manipulate the markets with rapid orders and cancellations.   This scheme, called spoofing, has been uncovered, investigated by the exchanges and regulators, and has led to this criminal prosecution.   This Court now has the opportunity to send a message, loud and clear, that our financial markets operate on principles of honesty and transparency, and do not allow a select few traders to profit in the trading markets through illegal bait and switch schemes at the expense of other traders.

1

Here, defendant Michael Coscia orchestrated a scheme to dupe and trick other traders into trading with him by creating the false impression of significant market demand and supply. His spoofing scheme was premeditated, intentional, and expertly designed to deceive other traders and their algorithms. Defendant took positions in futures contracts that were some of the largest in the world at the time that he traded – positions that were far larger than some of the biggest trading firms in the country. One loop of defendant's trading took place in a minuscule amount of time – about 2/3s of a second – and defendant employed his spoofing scheme day after day for about two months. Other traders who saw defendant's spoofing trades on their screens were shocked at the enormous size of the orders and the flash cancellations.

In this first criminal spoofing trial in the United States, defendant Michael Coscia was convicted by a jury of his peers on all twelve counts of the indictment. He received a fair trial by this Court, and even testified for hours in his own defense. Through its verdict, the jury clearly recognized the fraud and spoofing scheme, and correctly rejected defendant's false testimony and his nonsensical explanations of his trading activity. Now, facing sentencing on twelve counts, a total maximum sentence of 25 years on each of the fraud counts and 10 years on each of the spoofing counts, and an advisory sentencing guideline range of 70 to 87 months' imprisonment, defendant asks this Court to impose the most lenient sentence possible – probation. Such a sentence would be a complete slap on the wrist for a defendant who engaged in fraud and spoofing, has denied all criminal conduct, proceeded to trial, testified falsely, has never expressed any remorse, and has profited to the tune of over $1 million. Indeed, defendant's sentencing memorandum continues to show his unrepentant mindset – he continues

to nitpick the evidence and advance false explanations for his clear spoofing pattern.   This is not the kind of case where probation is even remotely appropriate.

A serious sentence of imprisonment – a deprivation of this defendant's liberty – would be proportional to the crime committed and not greater than necessary.   In particular, a strong sentence of imprisonment can ensure that spoofing schemes are curtailed and deterred, and that the public continues to have confidence in our capital markets, even with the advent of high-speed trading, as a place to invest their hard-earned funds.

## II.    Facts

After a one-and-a-half week jury trial, defendant was convicted on six counts of commodities fraud and six counts of spoofing.   At trial, the government proved that defendant engaged in a scheme to trick others to trade with him and fill his small orders.    The large orders were the deceptive bait orders that defendant had no intent to trade.   They were designed to provide the false impression that the market was headed up or down.   Defendant's program was designed to cancel the large orders automatically once the small orders traded or if any portion – even one contract – of the large orders were traded.   The scheme created the illusion of significant market activity at increasing or decreasing prices when those large orders were actually placed by defendant and were designed as spoofing trades, such that they would not be traded but canceled.   The large orders were intended to deceive so that defendant could fill his small orders – buying low and selling high (or vice versa) – at prices that had not existed in the order book prior to the large orders.   At a profit of one tick every 2/3s of a second, over almost 2 months, defendant made more than $1 million with this scheme.

At trial, defendant testified in his own defense and lied under oath.   Repeatedly, defendant

was asked to comment on specific paragraphs of the indictment and denied each and every one of them. He denied placing large orders to trick other traders, he denied wanting to trade only the small orders, and he denied creating prices that had not existed in the order book prior to his trades. His post-indictment rationale for the trading – that he wanted to trade the large orders, that he wanted to trade with only one trader, that he wanted to approach the market – all were illogical, nonsensical, contrary to the evidence, and conclusively rejected by the jury.

The jury saw defendant's trading for what it really was – a bait and switch scheme that operated to the detriment of other traders in the market. Victim traders told the jury about the massive quantities of orders inputted in the market, the rapid cancellations that they witnessed, the disruption that this trading caused to their businesses, and the losses they suffered by being induced to trade as a result of defendant's spoof trades or by being forced to exit the markets. Similarly, defendant's own programmer testified about how the large orders were used to "pump the market" and were "sizeable orders used to move the market." Indeed, defendant named the program "Flash Trader" (flash trading is another name for spoofing) and "Quote Trader" (quote meaning to display prices). These designations could not be more obvious about defendant's intent and state of mind. As this Court found, "the Government introduced ample evidence from which a reasonable jury could find intent to deceive." Docket #134, Opinion denying Def. Post-Conviction Motions, at p.5.

In his sentencing memorandum, defendant continues to advance many of the same positions that he did at trial, and that the jury rejected through its verdict. Defendant's strategy at trial was to attack each piece of evidence without putting together the picture as a whole, and defendant does much of the same thing in his sentencing memorandum. For example, defendant

claims that his cancellation rate was similar to other traders, that he placed real orders that were available to trade, that a small amount of his large orders traded, that his orders were in the market slightly longer than other traders, and that his orders violated no exchange rules. All of these arguments were asserted at trial, the government responded to each one of them at trial, and the Court has also rejected many of the arguments. For example, as the Court found, the jury was entitled to believe that defendant's scheme was not perfect – that on occasion, a counterparty was fast enough to partially fill one of defendant's large orders. Docket #124 at 5. Moreover, as to defendant's argument about placing real orders, the Court stated: "This argument ignores the substantial evidence suggesting that Coscia never intended to fill large orders and thus sought to manipulate the market for his own financial gain." *Id.* at 4.

In addition, as the government explained at trial, the case was not about defendant's cancellation of large orders in a vacuum, but rather defendant's high cancellation rates of his large orders with his abnormally high fill rate of his small orders – showing a pattern of activity designed to fill the small orders. On CME, defendant fully filled only 0.08% of his large orders while filling 41% of his small orders. Gov Ex. CME Sum. Chart 2 & 3. Similarly, on the ICE market, defendant canceled his large orders over 99% of the time, while filling 51% of his small orders. Govt. Ex. ICE Sum. Chart 2. In addition, defendant testified at trial to several examples where he asserted that he wanted to trade the large orders that had been filled. In fact, the jury heard in the government's rebuttal case that defendant had attempted to cancel those large orders as well. Tr. 1347-1358. While defendant can continue to claim that his algorithm "comported with market conditions and trade and practice" (Def. Mem. at 7), the jury through its verdict found it did not and that his algorithm did not employ a legitimate trading strategy.

These arguments by defendant continue to fail at sentencing because they ignore the key issue – that the evidence, taken as a whole, showed defendant placed trades with the *intent to cancel* and with the *intent to trick* other traders to trade with him at prices that did not exist in the order book prior to his spoofing scheme. Put another way, defendant was not prosecuted or convicted because he is an outlier – the data analysis at trial was used to show, among other things, defendant's intent to cancel the large orders and to counter defense arguments that he employed a legitimate trading strategy. Simply put, defendant was prosecuted and convicted because he engaged in fraud in the commodities market by orchestrating a spoofing manipulation scheme.

Now, defendant has retained new counsel, hired a new expert, and seeks to again attack the government's evidence at trial by pointing out miniscule discrepancies in a summary chart and by changing data calculation methodologies such as by calling modifications to orders cancellations and new orders. *See* Def. Mem. at 11, fn 4. The Court should reject such re-litigation of the case. In addition, treating "modifications" as "cancellations" results is an "apples to oranges" comparison. Modifications are generally viewed as changes to a previously placed order, such as a change to the quantity of the order. Defendant's spoofing algorithm was not programmed to *modify* the large orders – it was programmed to *cancel* the large orders. Thus, taking modifications into considering has no value in this case. Defendant, however, has done so because counting modifications as cancellations for all other traders drives up the other traders' cancellation rates while keeping defendant's cancellation rates the same. Accordingly, all of defendant's new data analysis is flawed and irrelevant.

Moreover, both parties had the opportunity to fully test their data submissions at a one-and-a-half week trial. The parties presented their analysis of the trading data to the jury,

witnesses and experts testified about the data analysis, and the evidence was subject to substantial cross-examination.   The time to litigate the merits of the case has long passed.

### III.    Fraud and the Spoofing Statute

While defendant attacks the newness of the spoofing statute, it is important to recognize that defendant was convicted of six counts of fraud – a concept that has existed since the advent of criminal laws.   Schemes to trick and deceive in the securities and commodities markets are nothing new, and the fraud statutes are flexible on purpose to allow the curtailment of new and different schemes that arise over time.   As this Court previously found, "[s]tatutory prohibitions against schemes to defraud are often worded broadly because Congress cannot anticipate each and every new context in which they might be carried out." Docket #36 at p. 15.

Moreover, schemes that are designed to manipulate markets and prices have also been made illegal and prosecuted on multiple occasions well before defendant's spoofing scheme. *See e.g. United States v. Valencia,* 600 F.3d 389 (5th Cir. 2010); *United States v. Rosen*, 409 F.3d 535 (2d Cir. 2005); *United States v. Flore*, 381 F.3d 89 (2d Cir. 2004); *see also* 7 U.S.C. § 9, 13 (prohibiting market manipulation).   In denying defendant's post-conviction motions, the Court aptly noted that "statutory prohibitions against specific forms of market manipulation are nothing new." Docket #124 at p.8.   In addition, the basic concept that traders must place orders in the market that are *bona fide* orders with the intent to fill those orders is a well-established concept that is familiar to almost any trader in the commodities market.   Defendant, with over 25 years of experience trading in the markets, knew what was permissible in the markets and what was not.   As this Court has correctly and succinctly stated, "Coscia had fair notice." Docket #124 at 7.

Moreover, while the Dodd-Frank spoofing provision went into effect in 2011, it was enacted in 2010, over one year prior to defendant's illegal spoofing program. Claims of confusion by defendant about the statute and its purported vagueness are vastly overblown. As this Court found, what sets apart illegal spoofing conduct from legitimate trading is the intent to cancel the order prior to its execution requirement. *Id.* The Court has further noted that "[t]he statute's intent to cancel requirement is significant." Docket #34 at 11. In contrast, order types such as "fill-or-kill" referenced by defendant are placed with the intent to fill the order. *Id.* at 12. And the Court has already twice rejected defendant's arguments about the constitutional vagueness of the statute, and need not readdress the matter here. Docket #35 and #124.

### IV. Guideline Calculations

#### A. Sentencing Enhancement for Defendant's Gain in the Offense

The PSR correctly determined that defendant's base offense level should be increased by 14 levels, pursuant to Application Note 3(B) of Guideline § 2B1.1, by using the gain that resulted from the offense because there is a loss that cannot reasonably be determined. Defendant executed hundreds of thousands of trades over the course of two months in approximately twenty different markets. Because of the vast number of trades that defendant executed, at this time, the loss to traders who traded on the other side of defendant's small trades cannot reasonably be determined. Defendant's trading loop generally occurred in 2/3s of a second. He employed this pattern of trading nearly every trading day, for hours at a time, over the course of 2 ½ months. The volume of data for defendant's trading at the CME and ICE is enormous. In addition, the analysis entails multiple aspects of loss that cannot be reasonably determined. For example, a trader who was caught in defendant's spoofing activity, where

defendant made a profit, resulted in a loss for that trader. However, another trader who was fraudulently induced to buy or sell contracts in ½ a loop could also have not immediately sold his position, and lost money depending on the trader's overall trading strategy. Without obtaining each traders' trading data for the days in question, it is impossible to know how their overall strategy was affected by defendant's spoofing algorithm. Nevertheless, victims at trial testified that they did suffer a loss because their algorithms were induced to make trades as a result of the false impression of market depth created by defendant's algorithm. Still others, like Jennifer Shaw from HTG, were forced to exit the market and not trade that day. Thus, because the loss in this case involves different components and many traders, the loss cannot be reasonably determined.

Moreover, the guideline standard is one of *reasonableness*. It does not require the government to expend what would be an enormous amount of time and resources to obtain and analyze data. This would be unreasonable and difficult to determine with confidence. *United States v. Vrodolyak*, 593 F.3d 676, 685 (7th Cir. 2010) (Hamilton, J. dissenting) ("Where the crime makes it so difficult to determine with confidence the amount of the loss, the guidelines and cases from this and other circuits establish that the intended gain for the conspirators is a useful substitute for loss in applying the guidelines to gauge the severity of the crime.")

Finally, contrary to defendant's claim, recent Seventh Circuit case law does not require a showing that the gain must be a reasonable estimate of loss. *See e.g. United States v. Walsh*, 723 F.3d 802, 810 (7th Cir. 2013); *United States v. Vrdolyak*, 593 F.3d 676, 680 (7th Cir. 2010). This language is also not in Application Note 3(B). Defendant simply imposes a requirement that is not necessary. Rather, the application note clearly states: "The court *shall* use the gain that

resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." App. Note. 3B to Section 2B1.1 [emphasis added]. Accordingly, the standard for using defendant's gain of $1.4 million has been met. The alternative that defendant suggests, which is to provide a loss enhancement of *zero*, would be contrary to the victims' testimony at trial and the evidence that defendant made $1.4 million from the illegal conduct, and flies in the face of Application Note 3(B). The loss/gain analysis is designed to capture the severity of the criminal conduct and account for it in the overall guideline range. Providing defendant a zero loss enhancement in the face of clear evidence of both loss to victims and gain to defendant would fail to capture this severity, and result in an improperly calculated guideline range. During trial, the government offered evidence, including defendant's own testimony, that he made a total of approximately $1.4 million from his spoofing strategy. Accordingly, defendant's gain should be used to calculate this offense level.

### B. Sentencing Enhancement for Sophisticated Means

The PSR correctly determined that, pursuant to Guideline Section 2B1.1(b)(10)(C), the offense level should be increased by 2 levels because the offense involved sophisticated means, namely the use of ping orders, trade orders, quote orders, and two computer algorithmic programs to carry out the spoofing scheme, including the rapid cancellation of the quote orders after the trade orders had been filled. The sophisticated means enhancement is warranted when a defendant's offense shows a greater level of planning or concealment than the typical fraud. *United States v. Harris*, 791 F.3d 772, 779 (7th Cir. 2015). In other words, "the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety offense." *United States v. Knox*, 624 F.3d 865, 871 (7th Cir. 2010) (citations omitted). Defendant's

10

conduct involved multiple acts of deception designed to lure other traders to trade his small orders based on the illusion of market activity from his large orders, which were pre-programmed to cancel.   These acts of deception include using layered orders that were extremely large and placed at increasing or decreasing prices.   To execute this scheme, defendant hired a computer programmer to create an algorithm for this spoofing strategy, and then executed it hundreds of times a day for over two months, with each trade cycle lasting approximately 2/3s of a second.

Defendant contends that his scheme did not involve sophisticated means merely because the use of high frequency trading algorithms is common in the futures trading industry.   To the contrary, the way in which defendant programmed and operated his spoofing algorithm makes this particular set of facts much more sophisticated than the garden-variety high frequency algorithms in the industry.   Defendant used the following techniques to execute his scheme: (1) he used both large-sized orders and small-sized orders; (2) he programmed his large orders to enter the market in layers at increasing or decreasing prices; (3) once the large orders were placed, defendant's program sent in a small order to trade on the opposite side of the market; (4) defendant's large orders were programmed to cancel if any part of the large order traded, after the small orders traded, or if they timed-out; (5) defendant used small ping orders to test the market to see if it was suitable to spoof; (6) defendant set up his program to reverse the sequence of his trading so he could buy low and sell high, or *vice versa*.   These traits are not characteristics of ordinary, high frequency trading.   Rather, they are evidence of a sophisticated spoofing algorithmic program set up to maximize defendant's profits at the expense of other traders.

11

## C.    Sentencing Enhancement for Obstruction of Justice

The PSR correctly determined, that pursuant to Guideline Section 3C1.1, the offense level is increased by 2 levels because defendant willfully obstructed and impeded the administration of justice with respect to the prosecution of the offenses of conviction. Application Note 4(B) provides that committing perjury qualifies for this enhancement. Specifically, the enhancement applies if a defendant commits perjury by "providing false testimony concerning a material matter with the willful intent to provide a false testimony, rather than as a result of confusion, mistake or faulty memory" *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003).    Defendant testified at trial in his own defense.    During his testimony, he denied that he committed spoofing, and he denied that he intended to trick other traders. Moreover, he testified that he wanted to trade the large orders and that he did not place those orders with the intent to cancel.    Defendant was also asked about many of the allegations of the indictment, and he claimed that each of those allegations in the indictment were false. (*See* Govt. Ver. Ex. B, Tr. at 969-975).    Some examples are listed below:

- ***Regarding paragraph 3 of the indictment:***

Q. Let me read another part of paragraph three of the indictment. Did you "Induce other market participants to react to the deceptive market information you created"?

A. I didn't induce anyone. And there was no deceptive – deceptive, what did you say?

Q. Deceptive market information.

A. There's no deceptive market information either.    Tr. 970

* * *

Q. Okay. And did you "move the market in a direction favorable to you"?

12

A. No, I didn't.   *Id.*

- ***Regarding paragraph 9 of the indictment:***

Q. Did you "Design your programs to place several layers of quote orders on the other side of the market from your trade orders to create an illusion of market interest"?

A. Absolutely not. How could this possibly be an illusion. These were all good orders that were executed. You saw them. They were executed. They showed you statistics. They were executed. This is no illusion. This is a trading program that I developed. Tr. 971.

- ***Regarding paragraph 10 of the indictment:***

Q. Did you "not intend for the quote orders to be filled when you entered them"?

A. I intended for every order to be filled or executed. Tr. 971

- ***Regarding paragraph 11 of the indictment***

Q. And continuing with paragraph 11 of the indictment. Did you cancel the large orders if they "were even partially filled because you did not intend and did not desire the quote orders to be filled when you entered them"?

A. No, that's absolutely wrong.   I intended to execute every order. Tr. 972-973.

       * * *

Q. This is from paragraph 11 of the indictment. Did you when you entered the large orders, "intend to trick other traders into reacting to the false price and volume information created by your fraudulent orders"?

A. I didn't intend to trick anybody. They weren't fraudulent orders. Tr. 974.

       Defendant testified about issues that were of a material matter, for example, whether he intended to trick other traders, and whether he intended to trade the large orders.   Contrary to

defendant's claims, defendant's false testimony was willful – he watched days of the government's presentation of the case before he testified, he was fully aware that he was testifying in his own defense, he was advised of his right not to testify and explicitly chose to do so, he was placed under oath by the Court, and he was represented by counsel.

By returning a verdict of guilty on all counts of the government's indictment, the jury found defendant's testimony to be false and not credible – that he did intend to trick other traders and placed the large orders with the intent to cancel them before execution. The Seventh Circuit has recognized that defendant's false testimony under oath is a basis to enhance the guideline range by two levels under Guideline Section 3C1.1. *See e.g. United Stenson*, 741 F.3d 827, 830 (7th Cir. 2014); *United States v. Chychula*, 757 F.3d 615 (7th Cir. 2014); *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003).

## V. Defendant Coscia Should be Sentenced to a Term of Imprisonment Within the Guidelines Range Under the Factors Set Forth in 18 U.S.C. §3553(a)

Defendant Coscia is richly deserving of a sentence between 70 and 87 months' imprisonment. The nature and circumstances of the scheme, the need for specific and general deterrence, and defendant's utter failure to acknowledge his criminal conduct warrant a sentence of imprisonment. Defendant has emphasized his modest upbringing, his personal success story, and the support he has in his community through letters to this Court. While the Court should consider these submissions, it should not be the case that the white-collar criminal avoids prison time simply because of his education, work ethic, personal story and family support. Indeed, it is important to recognize that defendant would not be in a position to commit this crime if he did not have these characteristics. For example, he could not be licensed to trade if he had a

14

criminal history, and he would not have the knowledge and resources to execute this sophisticated scheme without substantial experience in the trading industry. Moreover, the fact that defendant executed this scheme while enjoying so much success in his personal and professional life just goes to show that the motive for his crime was greed, coupled with a certain degree of arrogance about his ability to dupe other traders.

### A.    Nature and Circumstances of the Offense

Traders rely on accurate information in the order book that reflects actual supply and demand of futures contracts in the market. This was the impetus behind the spoofing statute because traders who place large orders in order to move the market with no intent to trade those orders are engaging in market disruption, and to a certain extent manipulation, in order for themselves to profit at better prices. Simply because real orders were placed with price and volume information does not save the trader. Congress and the courts have determined that many schemes involving real orders – such as wash trades, insider trading, and pump-and-dump schemes – are prohibited. Similarly, the spoofing statute was designed to attack a scheme that was caused by real orders being placed in the market where there was no intent to trade those orders. In effect, the spoofer is filling the order book with lies – using an algorithm that quickly pulls an order almost as soon as it is placed and flashing the orders to create an illusion of market activity in order to generate a reaction from other traders.

The CFTC, in its proposed interpretive guidance, noted that some of the purposes of the spoofing statute are to promote market integrity, prevent disruptive trading practices, and ensure fair and equitable markets. 76 FR 14943-02 (March 18, 2011). As the Court heard during trial, traders use information about the depth of the order book to make decisions about trading. As

this Court stated, demand and price are "quintessentially material to investors." Docket #124 at 6. Traders also rely on a basic principle in the markets – that orders placed are done so with the true intent to trade and execute those orders. When that fundamental principle is violated through a spoofing scheme, creating the illusion of market depth, the market is disrupted, traders are tricked, and our sense of confidence in the integrity of the markets is significantly diminished.

The nature and circumstances of this scheme are serious. This case is not about a technical trading violation of a new statute. Rather, this case is about a fraud scheme that goes to the very heart of trading in the modern era – high-speed trading using computer algorithms. Most of the trading volume today is done electronically, and a substantial percentage of that volume is done by firms engaging in high-frequency trading. While the use of algorithms and high-speed trading is here to stay, the side effect has been that the speed and quantities of the orders entered can be used to affect the market in ways that it could not before. As argued during the trial, defendant could not have hand-signaled orders and canceled them immediately over and over again in the trading pits at the CME. He would have no credibility, nobody would trade with him, and it would be readily apparent that he was simply employing a scam. The anonymity that comes with algorithmic trading, combined with the speed at which orders can be placed and cancelled, are critical to the spoofer. As is common with technological innovations, while much good can come out of it, there are always those bad apples that seek to use it for their personal gain at the expense of others. And "[d]rumming up interest on one side of the commodities market through the placement of large [illusory] quote orders seems obviously material to the other market participants' investment decisions." Docket #124 at 5.

16

Michael Coscia had over 25 years' experience in the trading industry before creating his spoofing algorithm. He was head of his own company, Panther Trading, and had multiple traders working for him. Defendant directed his computer programmer to create a spoofing algorithm – one that was specifically designed to lure traders to trade with him at prices that did not exist before in the order book. Indeed, as demonstrated during the trial, defendant's small orders did not trade before the spoof trades – there was no one willing to buy or sell at those prices. It was after defendant created the appearance of market pressure through the spoof trades, that defendant's small trades executed. As an experienced trader, defendant knew exactly what he was doing and what the effect would be of the large trade orders. Defendant's scheme occurred over a period of months and allowed for much opportunity for contemplation and reflection. His plan was conceived with much discussion between him and his programmer about the best way to execute his trading strategy. That program was tweaked over time by the programmer, at defendant's direction, until it was operating profitably.

Defendant's trading caused substantial disruption in the markets and losses to traders. Traders testified at trial that their algorithms were influenced into trading with defendant as a result of the significant market pressure that he created. Traders noticeably saw orders flashing and disappearing on their screens as a result of defendant's spoofing program. Traders testified that they lost money as a result of this trading because, while defendant bought low and sold high (and vice versa), their algorithms took the opposite, losing position, against defendant's trades. Defendant's trading was so blatant that he had the largest positions in the world in 11 out of 17 CME markets. The profit he generated – about $1.4 million in just two months – was far in excess of anything he had made in the previous years. While defendant emphasizes that his

17

conduct occurred for approximately ten weeks (or about 2 months), that period of time, in the world of microsecond algorithmic trading, is an eternity.

Defendant's crime was significant and had real impact in the financial markets. The crime led to multiple investigations and disciplinary actions. While defendant claims that he has already been subject to numerous regulatory enforcement actions, it is important to consider that defendant's conduct was viewed as so serious and damaging that it warranted this level of scrutiny. His spoofing led to complaints by market participants. It led to investigations by both the CME and ICE. It led to referrals to the CFTC and the FCA (UK), and regulatory action by those entities. His spoofing scheme was so blatant that it warranted a criminal prosecution. These actions are a testament to the serious nature and circumstances of the crime and weigh towards a substantial sentence of incarceration.

### B. History and Circumstances of Defendant

Defendant places great emphasis on his personal and family life in asking for a probationary sentence. While the Court should consider defendant's background and circumstances, those circumstances are both mitigating and aggravating. Defendant engaged in this scheme despite all of the success and support in his life. Defendant was an educated man with much experience in the commodities and futures world. Close to the time that he engaged in the scheme, he had a net worth of approximately $15 million. Defendant had 25 years of experience in trading, owned and operated his own trading firm, and employed and supervised numerous people. He has substantial family support and many friends who spoke well of him. It is significant that defendant committed this crime without any desperate financial pressures or lack of opportunities. *See, e.g.*, *United States v. Anderson*, 517 F.3d 953, 966 (7th Cir. 2008) (noting

18

that district court considered that defendant was "well off financially and could have relaxed and enjoyed his golden years" and that "[w]hile many criminals commit crimes from lack of opportunity and desperation, [defendant] acted out of greed.").

Another characteristic to consider is that defendant has not acknowledged his crime or expressed any remorse. While defendant has a constitutional right to assert a defense and testify on his own behalf, the Court can and should consider that defendant does not understand or even acknowledge the ramifications of what he has done. Courts generally credit a defendant's acknowledgement of guilt and expression of remorse in imposing a sentence. In the same fashion, this Court should consider defendant's wholesale denial of any scheme to defraud, his false testimony at trial, and his stark denial of placing the large trades with the intent to cancel.

Defendant places great weight on his letters of support that he has submitted to the Court. Those letters, which are in excess of 70, display a caring father, husband, and friend to many. No doubt, such characteristics are common in the white-collar criminal – they are generally good people in their personal lives and the Court should consider these facts in fashioning a sentence. No one is suggesting that defendant Coscia is an evil person. Nonetheless, these characteristics do not directly translate into a sentence of probation. If that were the case, the vast majority of white-collar criminals would be free to commit crime with the knowledge that they will eventually escape prison time by showing family support and charitable acts. That, however, has not been the case in sentencings across the United States, it is contrary to the Sentencing Commission's intent with the Guidelines, and it is inconsistent with Congress' intent that the history and characteristics of a defendant are just one of many factors to consider in imposing

sentence under 18 U.S.C. § 3553(a).   In the context of charity being used at sentencing, the Seventh Circuit aptly commented: "Wealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card." *United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010); *see also United States v. Repking*, 467 F.3d 1091 (7th Cir. 2006) (reversing sentence where district court relied excessively on defendant's charitable work and repayment of restitution).   Similarly, defendant's support from his family and friends should not allow him to escape prison.

Defendant points to the disgorgement and fines he has paid in his regulatory settlements as mitigating, and that concept is recognized here by the fact that the government is not seeking any restitution or fines in this sentencing.   However, defendant's settlement of his regulatory actions by paying fines, with his vast wealth, is not a substantial mitigating factor.   Criminal prosecutions following civil regulatory settlements is a common event in the securities and commodities field, and equity and futures exchanges, in particular, have limited enforcement tools and remedies to address violations, unlike criminal actions.   What would be mitigating in this context is if defendant *acknowledged* the wrongfulness of his conduct, settled the civil actions, and pleaded *guilty* to a criminal offense. That has not happened here, and thus defendant's prior regulatory settlements bear little in the way of mitigation.

Finally, defendant comes from a large and supportive family.   While it is admirable that he cares for his mother, he can surely find a family member or a home to care for his mother. Indeed, defendant comes to this Court in a much better position than most criminal defendants in this courthouse, who do not have the family support or the wealth to take care of their loved ones

before they report to prison. Defendant's family circumstances are not even close to warranting a substantial departure from the guideline as defendant requested.

### C. Specific and General Deterrence

Specific deterrence is a consideration here given defendant's lack of acknowledgement of wrongdoing. There is a risk that he may reoffend in other ways in the trading markets. He continues to have a substantial net worth and continues to trade in the markets. Thus, the government advances specific deterrence as a consideration in this case, but it is a less significant consideration than general deterrence.

General deterrence is a much more important factor in sentencing defendant Coscia. As this Court is no doubt aware, significant attention has been given to this prosecution because it is the first criminal spoofing prosecution in the United States. The securities, commodities, and business world is watching this case closely. While the conviction certainly has a deterrent effect, a much more substantial deterrent effect will come with a serious sentence of incarceration. A term of incarceration will display that the United States justice system takes seriously schemes in the trading markets, and that it views a fair and honest market as important to our capital markets system. Conversely, a term of probation or a short term of imprisonment will have the exact opposite effect in the securities and commodities industry. A sentence of probation is almost always viewed as a win for the defense, and encourages a gross disparity between sentences imposed in federal white collar crimes versus narcotics and firearms crimes.

Strong sentences in this and other trading cases serve to actually deter individuals from committing the same crime. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that

either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227,1240 (11th Cir. 2006). There is little a white collar criminal fears more than the deprivation of his liberty for a significant period of time where he is away from his family and friends. An individual like defendant Coscia would gladly pay a fine of $1 million when his net worth was $15 million near the time of the offense – he is still $14 million rich. However, a deprivation of his liberty for a substantial period of time is much more of a punishment than taking away his entire net worth. That concept – the true fear of imprisonment – is what helps deter the white-collar individual contemplating a fraud scheme.

It is also true that prosecutions for complex trading cases are not brought often. They are difficult to detect, investigate, and successfully prosecute. When they are brought, it is an opportunity, through the sentence imposed, to impose real change in the securities and commodities industry. A strong sentence will require the industry to take more care in its trading strategies, to scrutinize them for compliance with the law, and to impose procedures within firms for reviewing and approving trading strategies. Traders contemplating sophisticated scams will think twice if they know that there are more significant consequences than a civil lawsuit or a regulatory action. Hedge funds and proprietary trading firms will closely review their traders, and strike down get-rich-quick manipulation trading schemes because the cost is not worth the benefit. There is much good in the way of general deterrence that can result from a serious term of imprisonment in this case.

### D.     Just Punishment and Respect for the Law

Through his false testimony and his defiant stand to this prosecution, it is clear that defendant Michael Coscia has no respect for our nation's commodities laws.   He has steadfastly refused to recognize his conduct, admit his deception, and sees this prosecution as nothing more than a vendetta against high-speed algorithmic trading.   Thus, this is a case where a sentence of imprisonment can promote respect for the law both by defendant and by others in the securities and commodities industry.   A sentence of imprisonment also serves as a just punishment for defendant's offense.   In contrast, a sentence of probation amounts to almost no sanction, as the government is not seeking a restitution or fine.   Defendant, as the owner of his own trading firm with his vast wealth and multiple properties, will simply go back to his trading business with a sentence of probation and minimal supervision by the Probation Office, well knowing that he may have lost the battle but won the war.   He will continue to publicly deny his illegal conduct, while enjoying his wealth and his personal freedom.   Such a position would be completely contrary to the sentencing goals that Congress has laid out in 18 U.S.C. § 3553(a), and will not promote respect for the law.

### E.     Unwarranted Sentencing Disparities

Close adherence to the sentencing guidelines will reduce sentencing disparities across defendants and districts, which is itself a statutorily-mandated factor. 18 U.S.C. § 3553(a)(6); *see United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country."); *see also Booker v. United States*, 543 U.S. 220, 250 (2005) ("Congress' basic statutory goal – a system that diminishes sentencing disparity").   A court that sentences within a properly calculated

23

guidelines range necessarily gives weight and consideration to avoiding unwarranted disparities.

*United States v. Turner*, 604 F.3d 381, 389 (7th Cir. 2010).

Policy statements from the Sentencing Commission make clear that fraud and trading crimes warrant a sentence of incarceration. The Commission's policy as to white-collar offenses such as insider trading is set forth in Guideline Chapter 1 Part A, introductory comment 4(d):

> Under pre-guidelines sentencing practice, courts sentenced to probation an inappropriately high percentage of offenders guilty of certain economic crimes, such as theft, tax evasion, antitrust offenses, insider trading, fraud, and embezzlement, that in the Commission's view are "serious."

> The Commission's solution to this problem has been to write guidelines that classify as serious many offenses for which probation previously was frequently given and provide for at least a short period of imprisonment in such cases. The Commission concluded that the definite prospect of prison, even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm.

As further elaborated by then Circuit Judge, now Supreme Court Justice, Stephen Breyer, who served on the Sentencing Commission when the Guidelines were drafted:

> A second area of traditional compromise involves the Commission's decision to increase the severity of punishment for white-collar crime. The Commission found in its data significant discrepancies between pre-Guidelines punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white-collar fraud was involved, courts granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. To mitigate the inequities of these discrepancies, the Commission decided to require short but certain terms of confinement for many white-collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 20-21 (1988). The guideline range here appropriately take into

24

account factors that demonstrate the severity of the crime – defendant's gain in the offense, his use of sophisticated means, and his special skill as a trader – as well as his lack of acceptance of responsibility and his false testimony at trial.

Defendant cites to various cases where probation was imposed for various fraud schemes, but such citations are generally not enlightening, because the government can similarly point to trading and manipulation schemes where terms of prison were imposed. *See e.g. United States v. Jordan*, 813 F.3d 442 (1st Cir. 2016) (imposing sentence of 30 months' imprisonment for penny stock manipulation scheme); *United States v. Georgiou*, 777 F.3d 125 (3d Cir. 2015) (imposing sentence of 300 months' imprisonment for market manipulation scheme involving more than $55 million in losses); *United States v. Catalfo*, 64 F.3d 1070 (7th Cir. 1995) (affirming sentence of 42 months' imprisonment for futures trader who placed large quantities of orders to fool other traders into thinking the market was heading down, and subjected clearing firm to a massive risk of loss). Sentencing disparities are most avoided by imposing a sentence within or close to the guidelines. Indeed, it remains the law of this Circuit, even post-*Rita, Gall,* and *Kimbrough,* that "the best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett,* 567 F.3d 901, 908 (7th Cir. 2009). Here, there are few, if any, mitigating factors that warrant a departure from a range of 70 to 87 months' imprisonment down to probation.   In a case where defendant engaged in a sophisticated fraud scheme, testified falsely, and continues to deny guilt, a guideline sentence is entirely appropriate and ensures sentencing disparities are minimized.

## VI.     Conclusion

The government submits that the guideline range here is appropriate and proportional to the crime that was committed.    A sentence within the guideline range, particularly in light of the nature of the crime, defendant's false testimony at trial, and the strong need for general deterrence, is a sentence that is sufficient but not greater than necessary to meet the sentencing goals under 18 U.S.C. §3553(a).    The government respectfully asks this Court to impose a sentence between 70 and 87 months' imprisonment.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:    _s/ Sunil R. Harjani_
SUNIL R. HARJANI
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

July 6, 2016