**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **No. 14-CR-0551** |
| | ) | |
| | ) | **Honorable Harry D. Leinenweber** |
| **v.** | ) | |
| | ) | |
| **MICHAEL COSCIA,** | ) | |
| | ) | EVIDENTIARY HEARING AND |
| | ) | ORAL ARGUMENT REQUESTED |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
<u>MICHAEL COSCIA'S MOTION FOR A NEW TRIAL</u>**

Leonid Feller
Sunil Shenoi
Benjamin O'Connor
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
leonid.feller@kirkland.com
sunil.shenoi@kirkland.com
benjamin.oconnor@kirkland.com

*Attorneys for Defendant Michael Coscia*

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

    A.    Mr. Coscia Was Indicted in October 2014 and Convicted in November 2015 ................................................................................................................. 3

    B.    CME and ICE Produced Substantial Additional Trading Data After Trial. .......... 4

    C.    At Trial, The Government Wrongly Portrayed Mr. Coscia as an Outlier on the CME and ICE Markets .................................................................................... 8

        1.    The Government Wrongly Claimed That Mr. Coscia's Large Order Fill Rates Were Unusually Low; in Fact, Mr. Coscia Filled More Large Orders Than Any Other Trader. ................................................... 10

        2.    The Government Wrongly Claimed That The Ratio Of Mr. Coscia's Average Order Size Relative to His Average Trade Size was Unusually Large ............................................................................ 15

        3.    The Government Wrongly Claimed That Mr. Coscia's Pattern of Placing Large and Small Orders with Different Fill Rates Was Unusual. ................................................................................................ 17

        4.    The Government Now Acknowledges that the Testimony of Jeremiah Park, Mr. Coscia's Programmer, Does Not Establish Any Wrongdoing. ......................................................................................... 19

    D.    Subsequent Spoofing Indictments Involved Similar Trading During the Same Time Period for the Same Commodities on the Same Markets. ................. 21

        1.    *United States v. Jiongsheng Zhao,* No. 18-CR-000249 (N.D. Ill.). .......... 22

        2.    *United States v. Krishna Mohan,* No. 18-CR-00610 (S.D. Tex.). ............. 23

        3.    *United States v. David Liew*, No. 17-CR-00001 (N.D. Ill.). ..................... 24

        4.    *United States v. Andre Flotron*, No. 17-CR-00220 (D. Conn.). ............... 24

        5.    *United States v. Edward Bases and John Pacilio*, No. 18-CR-00048 (N.D. Ill.) ...................................................................................... 25

        6.    *United States v. James Vorley and Cedric Chanu*, No. 18-CR-00035 (N.D. Ill.) ...................................................................................... 25

7.   *United States v. John Edmonds*, No. 18-CR-00239 (D. Conn.)............... 26

8.   *United States v. Yuchun Mao*, No. 18-CR-00606 (S.D. Tex.). ................ 26

9.   *United States v. Kamaldeep Gandhi*, No. 18-CR-00609 (S.D. Tex.). ..................................................................................................... 26

**LEGAL STANDARD** .................................................................................................. **27**

**ARGUMENT** ................................................................................................................. **27**

A.   The Government Presented False Evidence to the Jury........................................ 28

B.   CME and ICE Post-Trial Data Prove That Mr. Coscia Was Not an Outlier. ....... 29

1.   Mr. Coscia Was Among the Market Leaders in Filling Large Orders and His Fill Rank Was Consistent with His Order Rank............. 29

2.   Hundreds of Other Traders Had Large Order-To-Trade-Size Ratios. ....................................................................................................... 31

3.   Hundreds of Other Traders Routinely Placed Both Small and Large Orders, With Different Fill Rates............................................................. 32

C.   Subsequent Indictments Show That Mr. Coscia Was Not an Outlier.................. 33

**CONCLUSION** ............................................................................................................. **36**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*United States v. Arroyo,*
   301 F. Supp. 2d 217 (D. Conn. 2004) ............................................................... 29, 32

*United States v. Austin,*
   103 F.3d 606 (7th Cir. 1997)............................................................................... 29

*United States v. Bender,*
   539 F.3d 449 (7th Cir. 2008)............................................................................... 29

*United States v. Coscia,*
   866 F.3d 782 (7th Cir. 2017)............................................................. 8, 16, 28, 32

*United States v. Ginsberg,*
   No. 14-CR-462, 2018 WL 5729745 (N.D. Ill. Nov. 2, 2018)............................... 27

*United States v. Kladouris,*
   739 F. Supp. 1221 (N.D. Ill. 1990) ..................................................................... 35

*United States v. Kuzniar,*
   881 F.2d 466 (7th Cir. 1989)............................................................................... 27

*United States v. Lanas,*
   324 F.3d 894 (7th Cir. 2003)............................................................................... 29

*United States v. Lipowski,*
   423 F. Supp. 864 (D.N.J. 1976) .......................................................................... 35

*United States v. Mazzanti,*
   925 F.2d 1026 (7th Cir. 1991)............................................................................. 29

*United States v. O'Malley,*
   833 F.3d 810 (7th Cir. 2016)......................................................................... 27, 35

*United States v. Reed,*
   986 F.2d 191 (7th Cir. 1993)............................................................................... 27

**Rules**

FED. R. CRIM. P. 33 ................................................................................................ 27

## INTRODUCTION

On October 1, 2014, Michael Coscia was indicted on six counts of commodities fraud and six counts of spoofing related to trading activity that occurred on 17 Chicago Mercantile Exchange ("CME") markets and one Intercontinental Exchange ("ICE") market from August to October 2011. (*See* 10/1/14 Indictment, *United States v. Coscia*, No. 1:14-CR-00551, ECF 1, at 1–19 (Counts I–XII).) Throughout trial, the central premise of the government's case was that Mr. Coscia's trading activity was unique and extraordinary—indeed, that Mr. Coscia *was the only person who traded the way he did.* (*See, e.g.*, Trial Transcript, excerpts attached to the Declaration of Sunil Shenoi ("Shenoi Decl."), Ex. 1, at 1562:15–19 ("It's important to show that you this guy isn't just doing the same thing everyone else has been doing for years and just is being charged with a crime for that. . . . ***He's doing something very different from everyone else.***") (emphasis added).) In other words, the government purported to present evidence to convince the jury that Mr. Coscia was an "outlier"—and being an outlier, according to the government, placed Mr. Coscia so far outside the bounds of legitimate trading activity that it demonstrated Mr. Coscia's criminal intent to commit commodities fraud and spoofing.

But two sets of evidence only discovered *after* trial demonstrate that Mr. Coscia was not in any way the outlier the government made him out to be. The first set of evidence is trading data obtained from the CME and ICE following trial. Before trial, the government produced only a limited set of trading data for a narrow, incomplete set of dates, futures contracts, and traders. Only after trial did CME and ICE produce broader sets of additional data. CME, in particular, produced trading data for all traders, across all 17 markets, and for the entire 10-week period of alleged offense conduct. As to ICE, although it required this Court's ruling following contested motion practice, ICE too produced additional trading data, albeit nowhere near as wide-ranging as the CME production. Incredibly, when it produced this additional data, ICE also admitted to two

fundamental errors relevant to ICE Summary Chart 6, a crucial piece of evidence at trial: (1) that ICE Summary Chart 6 was mislabeled—it did not summarize Mr. Coscia's share of *all market cancellations* (claimed to be 96% when, in fact, Mr. Coscia's actual share of market cancellations during the relevant period was a fraction of one percent; rather, ICE Summary Chart 6 only reflected Mr. Coscia's share of trades identified by a particularized ICE software alert (*see* Declaration of Alex Rinaudo ("Rinaudo Decl.") at 5–6 (¶¶ 13–14))); and (2) that ICE had substantially miscalculated the 96% figure even as to Mr. Coscia's share of alerts. (June 22, 2016 K. Kliebard Ltr. To J. Manning, attached hereto as Shenoi Decl., Ex. 3, at 1–2.) That is, the jury convicted Mr. Coscia—and the Seventh Circuit affirmed his conviction—believing that he was responsible for 96% of cancellations on the ICE market during the relevant period; following trial, ICE admitted that fundamental fact was not true. (*Id.*)

More broadly, the newly-discovered CME and ICE data conclusively demonstrates that Mr. Coscia's trading activity was the same as hundreds of other traders. Indeed, this new data proves that three key points repeatedly advanced by the government regarding Mr. Coscia's purported outlier status are demonstrably and verifiably false: (1) Mr. Coscia's cancellation rates for large orders were *not* abnormally high in comparison to other traders (as the government sought to illustrate in CME Summary Chart 5); (2) the size of Mr. Coscia's orders compared to the size of trades he executed (his "order-to-trade size" ratio) was not abnormally large (as the government sought to illustrate in ICE Summary Chart 3); and (3) like Mr. Coscia, there are many dozens and even hundreds of market participants who placed both large and small orders and, also like Mr. Coscia, filled small orders at a substantially higher rate than they filled large orders, directly contrary to the testimony of both CME and ICE witnesses. Without these key pillars, each of which was based on incomplete and inaccurate data and each of which was repeated time and again

through opening and closing arguments, incorrect witness testimony, and inaccurate documentary evidence, there simply would have been no case against Mr. Coscia.

The second set of evidence that became available only after Mr. Coscia's trial, and that directly rebuts the government's claim that Mr. Coscia was an outlier, is that the government indicted almost a dozen other individuals who engaged in substantially similar trading, in the same commodities, on the same markets, and during the same time periods as Mr. Coscia. The government told this Court, the jury, and the Seventh Circuit that Mr. Coscia was unique and one-of-a-kind; in fact, because it was simultaneously conducting investigations of almost a dozen others for the very same conduct, the government knew—or, at a bare minimum, should have known—that these representations were false.

Accordingly, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, defendant Michael Coscia seeks a new trial based on newly-discovered evidence that was not available at the time of trial.

## **BACKGROUND**

### A.    **Mr. Coscia Was Indicted in October 2014 and Convicted in November 2015.**

On October 1, 2014, Michael Coscia was indicted for allegedly improper trading activity "[b]eginning in or around August 2011, and continuing until in or around October 2011" on two sets of exchanges: (i) the CME Group markets;[1] and (ii) the ICE Futures Europe market. (Indictment, ECF 1, at 3 (¶ 2).)  Mr. Coscia's indictment was "the first federal prosecution nationwide under the anti-spoofing provision" established by the 2010 Dodd-Frank Wall Street

---

[1]    The CME Group is comprised of designated contract markets like the Chicago Mercantile Exchange ("CME"), the Chicago Board of Trade ("CBOT"), the New York Mercantile Exchange ("NYMEX"), and the Commodity Exchange, Inc. ("COMEX").  (Indictment, ECF 1, at 1 (¶ 1b).)

Reform and Consumer Protection Act.[2] The trading activity covered by the Indictment—including six counts of commodities fraud and six counts of spoofing—occurred on 17 CME markets and one ICE market. (Indictment, ECF 1, at 4 (¶ 5).)[3]

After a one-week trial in October and November of 2015, the jury convicted Mr. Coscia on all twelve counts of the indictment. (11/3/15 Order, ECF 83.)

### B. CME and ICE Produced Substantial Additional Trading Data After Trial.

Although the government indicted Mr. Coscia for alleged improper conduct lasting from August to October 2011, the government failed to produce trading data for all market participants during that time period, nor was Mr. Coscia given access to such information through discovery (and, as Mr. Coscia would learn, in many instances the government itself did not gather such data in investigating and prosecuting the offenses charged). (*See* Rinaudo Decl. at 2 (¶ 5).) Instead, Mr. Coscia was provided with trading data for a limited time period, a narrow set of futures contracts, and a small set of traders.[4] (*Id*.) For example, ICE produced a limited set of trading data to Mr. Coscia that covered only five days and the activity of only 10 firms. (*Id*.) Similarly,

---

[2]  Press Release, Department of Justice, High-Frequency Trader Indicted For Manipulating Commodities Futures Markets In First Federal Prosecution For "Spoofing" (Oct. 2, 2014), *available at* https://www.justice.gov/usao-ndil/pr/high-frequency-trader-indicted-manipulating-commodities-futures-markets-first-federal.

[3]  At trial, the government presented trading data relating to 17 CME markets: Australian Dollar, British Pound, Canadian Dollar, EUR/USD, Swiss Franc, Crude Oil, S&P Mid Cap, Gold, Copper, Natural Gas, E-mini NASDAQ, Treasury Bond, Corn, Soybean Oil, Soybean Meal, Soybeans, Wheat. At trial, the government also presented trading data relating to one ICE market, New Brent.

Although the Indictment refers to alleged improper activity taking place on three ICE markets (Indictment, ECF 1, at 4 (¶ 5)), in fact, only one ICE market is at issue—the Brent crude oil futures market. All of the conduct alleged concerned occurred on this one ICE market, but concerned three contracts—one each in October, November, and December 2011.

[4]  CME and ICE also produced to Mr. Coscia his own trading data for certain time periods. (Rinaudo Decl. at 2 (¶ 6).)

CME produced four disjointed sets of data that ranged from one to five days, covered only some markets, and included only some firms. (*Id*.)

Consequently, Mr. Coscia sought additional trading data from both the CME and ICE. It was not until after he was convicted, however, that the CME eventually produced additional trading data to Mr. Coscia, which included the complete 10-week period covering the purported offense conduct, for all 17 markets that Mr. Coscia traded in, and for all traders in those markets. (*Id*. at 3 (¶ 7).)

ICE, in contrast, continued to refuse to produce the data sought by Mr. Coscia— specifically, the data underlying ICE Summary Charts 3 and 6 presented at trial. (*See id*. at 3 (¶ 8).) Indeed, Mr. Coscia was forced to move to compel the data. (ECF 139, Exs. 1–2.) During the motion to compel hearing, counsel for the government made a startling disclosure: even the government had never received or reviewed the data underlying summary charts presented at trial by ICE's witness, John Philip Redman, the Senior Director for Market Oversight for ICE Futures Europe. (6/15/16 Hrg. Transcript, attached to S. Shenoi Decl., Ex. 2, at 4:10–16 (data "compar[ing] Mr. Coscia's cancellation of large orders after the filling of the small order to everybody else in the market .... was not obtained by [] the government . . . pretrial"); *id*. at 5:3–4 ("THE COURT: Does the government have that data [underlying ICE Summary Chart 6]? [A.] No, we don't have the data.") Put another way, ***the government has admitted in this case that it indicted and proceeded to prosecute and convict Mr. Coscia, in substantial part, based on information from private exchanges without ever independently reviewing or verifying the accuracy and veracity of the underlying data.***

ICE's subsequent production included two additional disclosures that, if known by the jury, would have impacted the outcome of the trial. (*See* Shenoi Decl., Ex. 3, at 1–2.) ***First***, ICE

5

admitted that ICE Summary Chart 6 was grossly mislabeled.  ICE Summary Chart 6 was labeled, "Order cancellation comparison," and purported to compare Mr. Coscia's order cancellations for September and October 2011 against "[a]ll other participants." (*Id.*)  According to ICE Summary Chart 6, Mr. Coscia's trading activity represented 96% of *all* cancellations on the Brent Crude futures market:

Order cancellation comparison: September

| Day | Date | Mr. Coscia | All other participants |
|---|---|---|---|
| Tues | 09/06/11 | 273 | 2 |
| Weds | 09/07/11 | 966 | |
| Thur | 09/08/11 | 611 | |
| Fri | 09/09/11 | 363 | |
| Mon | 09/12/11 | 589 | |
| Tues | 09/13/11 | 918 | 1 |
| Weds | 09/14/11 | 219 | |
| Thur | 09/15/11 | 129 | |
| Fri | 09/16/11 | 216 | 7 |
| Mon | 09/19/11 | 23 | |
| Tues | 09/20/11 | 212 | 1 |
| Weds | 09/21/11 | 362 | 3 |
| Thur | 09/22/11 | 149 | 1 |
| Fri | 09/23/11 | 123 | 1 |
| Mon | 09/26/11 | 272 | |
| Tues | 09/27/11 | 408 | 2 |
| Weds | 09/28/11 | 483 | |
| Thur | 09/29/11 | 901 | |
| Fri | 09/30/11 | 1,178 | 50 |

Order cancellation comparison: October

| Day | Date | Mr. Coscia | All other participants |
|---|---|---|---|
| Mon | 10/03/11 | 804 | 3 |
| Tues | 10/04/11 | 477 | 67 |
| Weds | 10/05/11 | 365 | 96 |
| Thur | 10/06/11 | 377 | 82 |
| Fri | 10/07/11 | 261 | 2 |
| Mon | 10/10/11 | 497 | 2 |
| Tues | 10/11/11 | 1,187 | 59 |
| Weds | 10/12/11 | 560 | 39 |
| Thur | 10/13/11 | 584 | 68 |
| Fri | 10/14/11 | 382 | 82 |
| Mon | 10/17/11 | 585 | 102 |
| Tues | 10/18/11 | 89 | 1 |
| Total Sep + Oct | | 14,563 | 671 |
| Per cent of instances | | 96% | 4% |

Directly contrary to what was presented to the jury, ICE's post-trial disclosure admitted that ICE Summary Chart 6 did *not* represent a summary of order cancellations. (Shenoi Decl., Ex. 3, at 1–2.) That is, ICE admitted that Mr. Coscia did *not* represent 96% of all market cancellations and that such testimony presented to the jury was false. (*Id.*) Instead, ICE Summary Chart 6 was actually based on a limited set of data that was identified by "an ICE system tool that, for regulatory purposes, generates an alert when the tool detects suspicious trading activity." (*Id.* at Ex. 3, at 1.) Thus, while Mr. Coscia may have represented 96% of all such alerts—the methodology of which was never explained during trial—this was far different than representing 96% of all cancellations on the market. (*See* Rinaudo Decl. at 3 (¶ 8).) ***In fact, Mr. Coscia represented a fraction of one percent of all order cancellations.*** (*See id.* at 6 (¶ 14).)

Yet under a false impression as a result of the labeling error, this Court itself noted that ICE Summary Chart 6 "seemed to indicate that he was the only one" canceling large orders. According to the Court:

- The chart "was introduced at the trial [to] show[] that Mr. Coscia's rate of cancellations was astronomically higher than any of the other active traders on that exchange." (S. Shenoi Decl., Ex. 2, at 3:2–9.)

- The chart presented "a huge disparity [between Mr. Coscia and] everybody else. It obviously gave the impression that he was an outlier." (*Id.* at 8:4–8.)

- "Well, it was, I thought, a very strong element, though, in the case to show that—it made the government's case certainly pretty strong." (*Id.* at 7:14–17.)

- "It showed that he was doing something should be in brief differently than everybody else." (*Id.* at 8:14–15.)

And the labeling error carried on all the way through appeal; even the Seventh Circuit relied on the mislabeled chart purporting to represent Mr. Coscia's share of all cancellations: "Mr. Coscia's cancellations represented 96% of all Brent futures cancellations on [ICE] during the two-month

period in which he employed his software." *United States v. Coscia*, 866 F.3d 782, 795–96 (7th Cir. 2017) (citing Shenoi Decl., Ex. 1, at 308).

**Second**, to add insult to injury, ICE admitted that the data presented was wrong even as to its own self-defined alert system:

> [D]ue to an inadvertent error in calculating the total alerts from the Backup Data [i.e., an Excel spreadsheet containing underlying order and trade information] to create [ICE] Summary Chart 6, *the totals for the alerts for Mr. Coscia and "All other participants" in … ICE Summary Chart 6* **were misstated**. In particular, the corrected number of alerts for Mr. Coscia is 14,141. Also, for "All other participants," the corrected number of alerts is 1,328.

(Shenoi Decl., Ex. 3, at 1–2 (emphasis added).) Thus, even as to ICE's alert system, Mr. Coscia's trading represented 91% of alerts, rather than the 96% figure that was presented to the jury. Subsequent data analysis casts substantial doubt even on the 91% figure. (*See* Rinaudo Decl. at 5 (¶ 13).) But the takeaway point is simply this: the jury was told that a critical piece of evidence, ICE Summary Chart 6, set forth Mr. Coscia's share of all market cancellations when it did not and at a percentage that was miscalculated.

**C.    At Trial, The Government Wrongly Portrayed Mr. Coscia as an Outlier on the CME and ICE Markets.**

The central thrust of the government's evidence and argument at trial was that Mr. Coscia's order and trading activity were unique on the various futures markets on which he traded. According to the government, Mr. Coscia was an outlier—and being an outlier, according to the government, was not just unusual; it was the central evidence demonstrating Mr. Coscia's criminal intent to commit commodities fraud and spoofing.

Throughout the trial, the government repeatedly emphasized that Mr. Coscia's trading was "not normal" and "out of the ordinary." One government witness, Chris Roenbaugh, testified that he did not "see flashing activity like this . . . ." (Shenoi Decl., Ex. 1, at 628:7–21.) Another government witness, Jennifer Shaw, echoed Roenbaugh's testimony: she "saw large orders

flashing and disappearing, orders eight times the size of what was happening in the market at that time, completely out of the ordinary, completely not normal . . . ." (*Id.* at 1432:9–13.) The government also elicited testimony from Hovannes Dermenchyan that "people don't trade [large orders] like that in the high frequency trading world." (*Id.* at 1450:25–1451:3.). And during its argument opposing Mr. Coscia's motion for judgment of acquittal after the close of the government's case, the government stated, "Defendant argues that high cancellation rates are common in the industry. You heard to the contrary …. [N]obody has cancellation rates that differ between large orders and small orders [like Mr. Coscia]. That's the key distinction. That's what you heard from CME. That's what you heard from ICE." (*Id.* at 847:8–13.)

During its closing argument, the government again hammered Mr. Coscia for purportedly being an outlier: "What does this tell you, ladies and gentlemen? Well, it tells you that defendant's trading is not normal." (*Id.* at 1447:2–5, 15–17.)

The government never retreated from the claim that Mr. Coscia's trading was a singular aberration, even during appellate arguments:

- "[T]he statistics show that during time frame that he was operating a scheme, it was ***one of a kind***, insofar as ***he's the only person that was attempting to manipulate the markets like this***." (*United States v. Michael Coscia*, No. 16-3017 (7th Cir. Nov. 10, 2016), Transcript of Oral Argument, attached hereto as Shenoi Decl., Ex. 4, at 24:22–25 (emphasis added).)

- "It was the market data showing that ***he was the only trader in the market*** who was canceling large orders after filling small orders." (*Id.* at 32:10–12.) (emphasis added).

To establish that Mr. Coscia was an outlier and, therefore, had the requisite criminal intent, the government repeatedly advanced three key points through its opening and closing argument, witness testimony, and documentary evidence: (1) Mr. Coscia's cancellation rates for large orders were unusually high in comparison to other traders; (2) the ratio of Mr. Coscia's order-to-trade-size was unusually high in comparison to other traders; and (3) Mr. Coscia was unique in placing

both large and small orders and in filling small orders at a substantially different rate than large orders. Each of these points is demonstrably and verifiably false as demonstrated through the new data obtained following trial, as discussed in more detail below.

> **1. The Government Wrongly Claimed That Mr. Coscia's Large Order Fill Rates Were Unusually Low; in Fact, Mr. Coscia Filled More Large Orders Than Any Other Trader.**

The Government's Claim:

The government attempted to demonstrate that Mr. Coscia did not intend for his large orders to be executed by claiming that while he placed more large orders than any other market participant, he filled comparatively few orders relative to the market as a whole. The government introduced CME Summary Chart 5 (reproduced below), which purported to show (1) Mr. Coscia's total number of large orders **placed** in 17 CME markets (Column 2); (2) Mr. Coscia's rank among those who **placed** the most large orders (Column 3, where a rank of 1 means that a trader placed the most large orders) ("Large Order Entry Rank"); and (3) Mr. Coscia's rank in terms of volume of contracts **traded**, regardless of whether those contracts were executed through large or small orders (Column 4, where a rank of 1 means that a trader traded the highest volume of contracts ("Total Execution Volume Rank"). (Rinaudo Decl. at 6–7 (¶ 16).)

| *Large Order and Volume Rank* | | | |
|---|---|---|---|
| | # of Large Orders | Large Order Entry Rank | Volume Rank |
| Aus. Dollar | 31,011 | 1 | 33 |
| British Pound | 4,403 | 8 | 87 |
| Canadian Dollar | 5,360 | 2 | 97 |
| Copper | 13,827 | 1 | 32 |
| Corn | 20,765 | 1 | 79 |
| Crude Oil | 65,301 | 1 | 31 |
| E-mini Nasdaq | 924 | 21 | 658 |
| EUR/USD | 126,363 | 1 | 18 |
| Gold | 34,370 | 1 | 21 |
| Natural Gas | 15,557 | 1 | 58 |
| S&P Midcap 400 | 4,791 | 3 | 22 |
| Soybean Meal | 26,963 | 1 | 13 |
| Soybean Oil | 797 | 4 | 250 |
| Soybeans | 36,366 | 1 | 17 |
| Swiss Franc | 1,445 | 4 | 51 |
| Treasury Bond | 36,535 | 1 | 74 |
| Wheat | 28,826 | 1 | 12 |

GOVERNMENT EXHIBIT
CME Summary Chart 5

CME Summary Chart 5 indicated that, for example, Mr. Coscia ranked first in placing large orders on the Australian Dollar Market, but thirty-third in orders actually executed; first in placing large orders on the Gold Market, but twenty-first in orders actually executed; first in placing orders on the Corn Market, but seventy-ninth in executing total orders; and first in placing orders on the Treasury Bond Futures Market, but seventy-fourth in executing total orders. (*See also* Shenoi Decl., Ex. 1, at 401:24–403:24.) Using the purported dichotomy evidenced on this chart, the government claimed that a trader who intended his large orders to be executed would have a Large Order Entry Rank and Total Execution Volume Rank that are roughly similar. (*Id.* at 1446:6–1448:12.) The government further asserted that the difference in Mr. Coscia's Large Order Entry Rank and Total Execution Volume Rank reflected his intent to cancel his large orders and, therefore, his criminal intent. (*Id.* at 1461:2–11.)

In its closing argument, the government further emphasized the allegedly extreme nature of Mr. Coscia's high rate of placing large orders and low rate of large order executions:

11

- "The defendant … is **the number one in the world in large order entries** in 11 CME markets." (*Id.* at 1446:17–1447:1 (emphasis added).)

- "You know, it just so happened that he entered more large orders than everyone else in the world on the CME markets." (*Id.* at 1563:24–1564:1; *see also id.* at 1564:21–22 ("the defendant entered more large orders than everyone else in the world").)

- "And on CME markets, how do you know he placed these orders with the intent to cancel them? Well, because they almost never traded." (*Id.* at 1458:4–6.)

- "He only fully fills about 347 out of over 400,000 of his large orders on CME. You heard that many times during this trial. .08 percent of his large orders get filled." (*Id.* at 1446:13–16.)

<u>Newly-Discovered Evidence Demonstrates That The Government's Claim Was False</u>:

The newly-produced data demonstrates that CME Summary Chart 5 was inaccurate in three critical respects. ***First***, CME Summary Chart 5 failed to include "modifications" as "cancellations." (Rinaudo Decl. at 7 (¶ 17).) That is, any time an order is "modified" (*e.g.*, the trader decides to change the price at which he is willing to purchase a given quantity of a commodity), the original order is cancelled and a new order is placed. (*See* Shenoi Decl., Ex. 1, at 237:8–10 (Andrew Vrabel from CME testifying that "a modification effectively cancels the order message that's there and replaces it with a new message or a new order").)[5] Yet notwithstanding government witnesses' own testimony that every order modification includes a cancellation, CME Summary Chart 5 inexplicably excluded modifications in calculating the total number of cancellations and, therefore, Mr. Coscia's order rank. (*Id.* at 7–8 (¶ 17).)

***Second***, CME Summary Chart 5 compared Mr. Coscia's trading activity—an individual—to the trading activity of firms that are made up of dozens of individual traders. (*Id.*) In many

---

[5] *See also* CME Group, Order Cancel-Replace Request, *available at* https://www.cmegroup.com/confluence/display/EPICSANDBOX/Order+Cancel+Replace+Request (describing order functionality on CME Globex system and noting that an "Order Cancel-Replace Request" message "effects the modification of a resting order. A modification may cause the order to lose priority in the book by cancelling an accepted order and replacing it with a new order.") (last visited Jan. 10, 2019).

instances, a firm may be made up of dozens of traders. (*Id.*) The newly-disclosed data provided information at both the individual and firm level and allowed for appropriate comparisons between Mr. Coscia's trading against other individual traders, regardless of whether they worked at the same trading firm. (*Id.*)

***Third***, CME Summary Chart 5 compared the ranking of <u>large</u> orders placed to the ranking of volume filled for <u>both large and small orders</u>. (*Id.*) To the extent CME Summary Chart 5 asked the jury to draw an inference from the fact that Mr. Coscia ranked high in large orders placed but lower in orders filled, the apples-to-apples comparison should be of <u>large</u> orders placed to <u>large</u> orders filled. (*Id.*) This is consistent with the government's presentations in CME Summary Chart 2 and CME Summary Chart 3, where Ryan Cobb, a CME witness, summarized various fill statistics for large (Chart 2) and small (Chart 3) orders (*see* Shenoi Decl., Ex. 1, at 380:16–395:5); for some undisclosed reason, however, the government combined large and small orders in calculating "Volume Rank" in CME Chart 5 but not in calculating "Large Order Entry Rank." (Rinaudo Decl. at 7–8 (¶ 17).)

When these errors are accounted for, the results are set out below.

**Table 1: Coscia's Large Order Ranks (CME 5)**

| | Large Order Rank | Filled Large Order Rank |
|---|---|---|
| Aus Dollar | 4 | 1 |
| British Pound | 14 | 8 |
| Canadian Dollar | 7 | 6 |
| Copper | 5 | 2 |
| Corn | 2 | 18 |
| Crude Oil | 2 | 2 |
| E-mini Nasdaq | 57 | 426 |
| EUR/USD | 1 | 1 |
| Gold | 6 | 2 |
| Natural Gas | 2 | 4 |
| S&P Mid Cap | 6 | 1 |
| Soybean Meal | 3 | 9 |
| Soybean Oil | 10 | 141 |
| Soybeans | 2 | 7 |
| Swiss Franc | 22 | 2 |
| Treasury Bond | 3 | 28 |
| Wheat | 1 | 2 |

(*Id*. at 8–9, Table 1 (¶ 18).)

As a starting point, Table 1 demonstrates that when order modifications are included, Mr. Coscia has the most large orders placed in only two of 17 markets. (*Id*. at 9 (¶ 19).) In other markets, his rank in placing large orders drops to 10th, 14th, 22nd, and even 57th. (*Id*. at 8–9, Table 1 (¶ 18).)

More importantly, when Mr. Coscia's fill rank in comparison to all other traders is calculated using only large orders (*i.e.*, an apples-to-apples comparison), two things become clear. First, when only large orders are considered, Mr. Coscia in fact had among the highest fills of anyone in the industry over the relevant time period: ranked ***first*** in Australian dollars, Euros and S&P mid-cap, ranked ***second*** in copper, crude oil, gold, Swiss francs, and wheat. (*Id*.) Second, whereas the government attempted to show that Mr. Coscia placed the most large orders but had a much lower number of fills, in fact, his order and fill ranks are comparable: for example, he placed seventh in the number of large orders for Canadian Dollars, and sixth in filling large orders of Canadian dollars. (*Id*.)

14

> **2.    The Government Wrongly Claimed That The Ratio Of Mr. Coscia's Average Order Size Relative to His Average Trade Size was Unusually Large.**

The Government's Claim:

At trial, the government introduced ICE Summary Chart 3 (reproduced below), which purported to show that on a single ICE market, the New Brent crude market, Mr. Coscia's average order size was 1,592% larger than his average trade size ("Order-to-Trade-Size Ratio")—*i.e.*, that the size of orders placed by Mr. Coscia was nearly 16 times greater than the size of the orders he actually filled.[6]  (Shenoi Decl., Ex. 1, at 295:23–296:2.)  Mr. Coscia was the only trader with this astronomical order-to-trade-size ratio, according to the government; the next firm in line had a ratio of only 264%—less than 3:1.  (*Id.* at 296:12–297:4.)

**Orders-to-trades comparison**

| Company | Total orders traded | Average orders traded per day | Average size of trade | Average size shown to market | Proportion of order size to trade size | # of Traders | # of Accounts |
|---|---|---|---|---|---|---|---|
| | All activity for 09/06/2011 - 10/18/2011 in Oct11, Nov11 and Dec11 Brent | | | | | | |
| Panther Trading | 90,454 | 2,918 | 2.5 | 39.8 | 1592% | 3 | 3 |
| Virtu West | 107,658 | 3,473 | 1.4 | 3.7 | 264% | 24 | 1 |
| DRW | 174,112 | 5,617 | 1.4 | 2.8 | 200% | 62 | 9 |
| T Gile | 187,585 | 6,051 | 1.2 | 2.4 | 200% | 242 | 5 |
| Virtu | 75,095 | 2,422 | 1.3 | 2.1 | 162% | 19 | 1 |
| Jump | 218,251 | 7,040 | 1.5 | 2.2 | 147% | 137 | 8 |
| All Brent | 4,906,468 | 158,273 | 1.5 | 2.1 | 140% | 7,208 | 2,326 |
| Geneva | 80,729 | 2,604 | 1.4 | 1.7 | 121% | 86 | 26 |
| Chopper | 398,427 | 12,852 | 1.2 | 1.4 | 117% | 31 | 1 |
| Allston | 65,610 | 2,116 | 1 | 1 | 100% | 22 | 3 |
| Getco | 231,895 | 7,480 | 1.1 | 1 | 91% | 28 | 7 |
| Hudson | 350,612 | 11,310 | 1.1 | 1 | 91% | 24 | 1 |

GOVERNMENT EXHIBIT ICE Summary Chart 3

---

[6]    Further review of the post-trial data that ICE provided shows that Mr. Coscia's proportion of order size to trade size was actually 698%, not 1,592%. (Rinaudo Decl. at 11 n.10 (¶ 19).)

The Seventh Circuit cited to the 1,592% ratio as a key piece of evidence against Mr. Coscia in affirming his conviction.  *See Coscia*, 866 F.3d at 789.

In discussing ICE Summary Chart 3 during his testimony, ICE's witness, Mr. Redman, compared Mr. Coscia's Order-to-Trade-Size Ratio to the same ratio for other trading entities. According to Redman, Mr. Coscia's Order-to-Trade-Size Ratio was multiple times higher than other high-frequency traders on the same market.  (Shenoi Decl., Ex. 1, at 297:25–299:2.)  Redman ultimately testified that Mr. Coscia's Order-to-Trade-Size Ratio was "not in line" with the high-frequency traders on the Brent futures market in 2011 because Mr. Coscia had a "high cancellation rate for large orders [and] … small cancellation rate for small orders," whereas "essentially everybody's orders are all about the same size."  (*Id.* at 299:7–300:5.)

Newly-Discovered Evidence Demonstrates That The Government's Claim Was False:

Data provided by CME after trial conclusively proves that there were **many dozens and even hundreds** of traders with Order-to-Trade-Size Ratios greater than 1,592% for each of the 17 commodities traded on the CME, as set forth in Table 2 below.

**Table 2: Number of Traders
with Proportion Greater than 1592%**

| | |
|---|---|
| Aus Dollar | 96 |
| British Pound | 92 |
| Canadian Dollar | 91 |
| Copper | 104 |
| Corn | 532 |
| Crude Oil | 539 |
| E-mini Nasdaq | 371 |
| EUR/USD | 240 |
| Gold | 318 |
| Natural Gas | 191 |
| S&P Mid Cap | 43 |
| Soybean Meal | 222 |
| Soybean Oil | 312 |
| Soybeans | 400 |
| Swiss Franc | 54 |
| Treasury Bond | 522 |
| Wheat | 213 |

(Rinaudo Decl. at 11–12, Table 2 (¶ 23).)

As demonstrated in Table 2, 539 other traders in crude oil had Order-to-Trade-Size Ratios greater than 1,592%. (*Id.*) Indeed, across all 17 commodities, 12 had more than 100 traders with order-to-trade-size ratios greater than 1,592%. (*Id.*) Given the broad prevalence of large order-to-trade-size ratios, the government's claim that Mr. Coscia's order-to-trade-size ratio—perhaps the central statistic relied upon by the government during the entire trial—is plainly without merit.

**3.**      **The Government Wrongly Claimed That Mr. Coscia's Pattern of Placing Large and Small Orders with Different Fill Rates Was Unusual.**

The Government's Claim:

At trial, the government elicited testimony from Mr. Redman and Mr. Cobb that it was out of the ordinary that Mr. Coscia placed different size orders—some large, some small—and that his large orders had a fill rate significantly less than his small orders. The government introduced the testimony of ICE's witness, Mr. Redman, who testified about Mr. Coscia's activity on the ICE Brent crude oil futures markets from September 6, 2011 through October 18, 2011. (*See* Shenoi Decl., Ex. 1, at 243–352.) In describing what he believed were the "normal[]," "common and routine," and "typical[]" trading patterns on ICE futures markets, Redman testified that cancellation rates for small and large orders for high-frequency traders "are all about the same size." (*See id.* at 300:3.) He further testified:

> Q.      Now, reviewing this trading data, do you often see a discrepancy in cancellation rates between large orders and small orders among traders in ICE Futures Europe markets?
>
> A.      No, I don't.
>
> Q.      Is this something that's common and routine?
>
> A.      No, it's not.
>
> Q.      Okay. What do you normally see?

17

A.   What we normally see is people placing orders of roughly the same size most of the time and, therefore, there aren't two order sizes in use with a different cancellation rate between them. There's just one order size in use and the cancellation rate is, there's just one.

Q.   So no matter what the orders are put in, there's just one cancellation rate?

A.   Typically, yes, because most people use a small order size.

(*Id.* at 292:5–20; *see also id.* at 242:17–20 (testimony of Vrabel) ([Q.] Is it common for high-frequency traders to cancel their large orders at a very different rate than they cancel their small orders? [A.] In general, that's uncommon.).)

The government also turned to the CME's witness, Mr. Cobb, to quantify the alleged abnormality of Mr. Coscia's fill rates in placing both large and small orders and filling them at different rates. According to Cobb, 35.61% of Mr. Coscia's small orders were filled on CME markets but only 0.08% of his large orders were filled, a differential of 35.53%. (*Id.* at 394:9–13.)

In its closing argument, the government hammered the purported connection between fill rates and Mr. Coscia's alleged criminal intent. According to the government:

- Mr. Coscia "enters so many more large orders than everyone else, and he cancels them more than everybody else out there . . . ." (*Id.* at 1447:11–14.)

- "The data is telling you the defendant has the intent not to trade the large orders but to use them as a gimmick for the small orders. That is why you saw all the data presented at you, to show you what defendant is doing. ***It's not that it's just different, it is enormously different what everyone else is doing, and it is completely different when you compare large orders to just small orders***, the bait orders to the switch." (*Id.* at 1448:3–10 (emphasis added).)

- "… [H]is activity is purposeful … ***there's something different going on here, that he decided to go in a different direction from everyone else***. And just to be clear, ladies and gentlemen, our allegation is not just that it is different but that unlike these other large firms that were doing something very different from him, this man was breaking the law. (*Id.* at 1562:20–1563:1 (emphasis added).)

<u>Newly-Discovered Evidence Demonstrates That The Government's Claim Was False:</u>

Newly-discovered evidence once again demonstrates that the government's claims are demonstrably and verifiably false. Many hundreds of traders placed different-sized orders. (*See* Rinaudo Decl. at 13 (¶ 26).) More importantly, in every one of the 17 CME markets, many dozens and even hundreds of traders had fill rate differentials greater than Mr. Coscia's 35.53%, as demonstrated in Table 3 below:

Table 3: Fill Rate Differences

| | |
|---|---|
| Aus Dollar | 40 |
| British Pound | 60 |
| Canadian Dollar | 34 |
| Copper | 75 |
| Corn | 310 |
| Crude Oil | 187 |
| E-mini Nasdaq | 138 |
| EUR/USD | 93 |
| Gold | 230 |
| Natural Gas | 67 |
| S&P Mid Cap | 7 |
| Soybean Meal | 60 |
| Soybean Oil | 70 |
| Soybeans | 184 |
| Swiss Franc | 67 |
| Treasury Bond | 164 |
| Wheat | 120 |

(*Id*. at 13–14, Table 3 (¶ 25).) Indeed, in 16 of 17 markets, at least 30 traders had fill rate differentials greater than Mr. Coscia's 35.53% differential. (*Id*.) As a result of the newly-produced data, it is now plain that the government's claim that Mr. Coscia's trading patterns were "unique" or "one of a kind" is just not true.

4.    **The Government Now Acknowledges that the Testimony of Jeremiah Park, Mr. Coscia's Programmer, Does Not Establish Any Wrongdoing.**

In addition to the data described above, the government's case relied on the testimony of Jeremiah Park, who programmed Mr. Coscia's algorithm. Mr. Park testified that he created the Flash Trader and Quote Trader programs at the direction of Mr. Coscia and that the programs were

19

designed so that orders would automatically cancel when certain market conditions occurred, such as if the smaller orders were filled.  Mr. Park testified:

> Q.      Now, [in your notes], you wrote, "Used to pump market. …
>
> A.      Again, as I understood it, to stimulate the market and for the other trader and algorithms, for them to show their orders.
>
> Q.      Okay. To get a reaction from the other algorithms?
>
> A.      Something like that, yes.  (Shenoi Decl., Ex. 1, at 502:16–24.)

Based on this testimony, the government argued that the programmer testimony established Mr. Coscia's criminal intent:

- "[T]he programmer will testify that the point of th[e] large orders was to get a reaction from other traders on the market. That is because the goal of the scheme was to trade the small order on the other side . . . That is why the defendant is charged with fraud."  (*Id.* at 165:16–166:10 (during government opening statement).)

- "Remember this: The defendant told Jeremiah Park that the point of the quote order was that it was used to pump the market, and that's exactly what the defendant's large orders did."  (*Id.* at 1558:6–9 (closing rebuttal).)

- "His large orders were never filled because he preprogrammed them to cancel in all these different ways that work together to make sure that they weren't filled.  (*Id.* at 1564:10–14 (closing rebuttal).)

Today, the government has not only abandoned this position but has affirmatively represented in court pleadings that Park's testimony demonstrates no wrongdoing whatsoever.  In *United States v. Jitesh Thakkar*, the defendant programmer argued that he had been selectively prosecuted because Mr. Park was similarly situated and should have been prosecuted in Mr. Coscia's case but was not.[7]  (Def's Mem. in Supp. of Mot. to Dismiss Indictment, ECF 32, *United States v. Jitesh Thakkar*, No. 18-CR-00036 (N.D. Ill. May 29, 2018), attached to Shenoi Decl., Ex.

---

[7]     Curiously, in *Thakkar*, the defendant is represented by Renato Mariotti, formerly the lead prosecutor responsible for indicting Mr. Coscia.  Docket, *United States v. Jitesh Thakkar*, No. 18-CR-00036 (N.D. Ill.).

6, at 7–10.) In opposing the motion to dismiss the indictment in *Thakkar*, the government denied that Mr. Park's testimony formed the basis for any criminal offense whatsoever, saying "the defendant's assertion regarding Park's awareness of Coscia's intent to spoof is not supported by Park's own testimony in *Coscia*." (Govt's Resp. To Mot. To Dismiss Indictment, ECF 40, *United States v. Jitesh Thakkar*, No. 18-CR-00036 (N.D. Ill. July 9, 2018), attached to Shenoi Decl., Ex. 7, at 9 n.4.) Specifically, the government in *Thakkar* stated that Park testified that: (1) "Coscia never suggested to Park that Coscia was doing something wrong or fraudulent when using Park's trading programs"; (2) Park "did not remember having a specific conversation with Coscia regarding the purpose of the trading programs"; (3) Park understood "the trading programs' effect on the market" to be "to stimulate market activity, not to move prices improperly"; and (4) he "thought that Coscia's use of the term 'decoy' orders did not suggest something deceptive about those orders." (*Id.*) It is axiomatic that the government should not be permitted to argue that Park's testimony established Mr. Coscia's criminal intent and thereby convict him, then argue in a different case that the testimony demonstrates no evidence of wrongdoing whatsoever.

### D. Subsequent Spoofing Indictments Involved Similar Trading During the Same Time Period for the Same Commodities on the Same Markets.

Since Mr. Coscia's conviction in November 2015, the federal government has indicted various other defendants for trading activity similar to Mr. Coscia. Significantly, and directly contrary to the government's representations during Mr. Coscia's trial, these indictments alleged that other individuals (1) engaged in a pattern of trading similar to Mr. Coscia, (2) did so during the same time period as Mr. Coscia, and (3) were trading in the same commodities as Mr. Coscia.

Importantly, the point of this section is not to complain that others engaging in the same conduct were <u>not</u> prosecuted; that is not a defense and, to the contrary, the entire point is that each of the other individuals discussed *infra* <u>was</u> charged. Rather, the point is that the government's

21

repeated assertions during Mr. Coscia's trial that his trading in this identical time period on these same markets was unique and, therefore, demonstrated his criminal intent, was false. Moreover, given that many of the investigations leading to these other indictments were ongoing before Mr. Coscia ever went to trial,[8] the government knew or, at a minimum, should have known that its representations to the jury were false. Each of these indictments, which were returned only after Mr. Coscia's trial, constitute "new evidence" for purposes of this Rule 33 motion.

### 1. *United States v. Jiongsheng Zhao,* No. 18-CR-000249 (N.D. Ill.).

In January 2018, Jiongsheng Zhao was charged with wire fraud, commodities fraud, and spoofing. (1/18/18 Affidavit in Support of Criminal Compl., *United States v. Jiongsheng Zhao*, No. 18-CR-000249 (N.D. Ill.), ECF 1, at 4 (¶ 6).) According to the government, from July 2012 through March 2016, Zhao engaged in a scheme on the CME in which he "placed one or more large orders for E-Mini futures contracts on one side of the market which, at the time ZHAO placed the orders, he intended to cancel before execution." (*Id*. at 8 (¶ 16).) While these large orders were pending and had caused price movements, "ZHAO often executed smaller Primary Orders on the opposite side of the market in an attempt to profit or otherwise benefit from the artificial movement in price that he had caused or assisted in causing." (*Id*.)

The specific allegations and proofs against Zhao are nearly identical to those the government levied against Mr. Coscia:

- According to the government, Zhao executed his commodities fraud and spoofing scheme through the following steps: (i) Zhao would place a small order that averaged between one and two lots; (ii) he would place a large order on the opposite side of the market that was approximately 157 lots and close to the prevailing price; (iii) at least

---

[8] *See, e.g.*, *U.S. v. Andre Flotron*, Testimony of Kar-Hoe Chan, Trial Transcript, attached hereto as Shenoi Decl., Ex. 5, at 452:14–22 ("[Q.] I'm going to come back to your meetings with the FBI, but we can agree they stretch all the way back to 2015, right? [A.] I think the meetings started in 2014. [Q.] And, actually, even before you started meeting with the government to get ready for this testimony, your lawyers started meeting with the government on your behalf, right? [A.] Yes.").

one lot of his small order would be filled on average 0.081 seconds after the large opposite order; and (iv) Zhao would quickly cancel his large opposite order. (*Id*. at 11 (¶ 21).)

- Zhao's small orders "were filled approximately 95.1% of the time," while the large orders "were filled approximately 0.14% of the time," and Zhao's "Large-Side Order side was on average 54.7 times the size of the Small-Side Order side." (*Id*. at 9 (¶ 18).)

- In another set of 850 instances, the small orders "were filled approximately 98.1% of the time," while the large orders "were filled approximately 0.27% of the time." (*Id*. at 10 (¶ 19).) In these instances, Zhao's "Large-Side Order side was on average 48.8 times the size of the Small-Side Order side." (*Id.*)

### 2. *United States v. Krishna Mohan,* No. 18-CR-00610 (S.D. Tex.).

In January 2018, Krishna Mohan was charged with commodities fraud and spoofing. (1/26/18 Criminal Compl. and Affidavit in Support of Criminal Compl., *United States v. Krishna Mohan*, No. 18-CR-00610 (S.D. Tex.), ECF 1, at 3–4 (¶ 6).) According to the government, from November to December 2013, Mohan engaged in a scheme on the CME in which he "place[d] one or more large orders for E-Mini Dow and E-Mini NASDAQ futures contracts on one side of the market which, at the time MOHAN placed the orders, he intended to cancel before execution." (*Id*. at 9 (¶ 18).) While these large orders were pending and had caused price movements, "MOHAN often executed Primary Orders of smaller visible quantities on the opposite side of the market in an attempt to profit, mitigate losses, or otherwise benefit from the artificial movement in price that [the large orders] had caused or assisted in causing." (*Id.* at 9–10 (¶ 18).)

The specific allegations and proofs against Mohan are nearly identical to those the government levied against Mr. Coscia:

- The government described Mohan's trading pattern as follows: (1) he would "place[] one or more Primary Orders to buy or to sell" that "were typically icebergs with only one or two lots visible to the market, placed at the best bid price . . . or offer price . . . at which the E-Mini Dow [or E-Mini NASDAQ] was trading"; (2) he would "place[] one or more large visible orders on the opposite side of the market within . . . two price levels of the prevailing price" and these large orders "comprised, on average, approximately [74–75]% of the total number of orders in the entire market at the levels

at which the Opposite Orders were placed"; (3) "at least one lot of MOHAN's Primary Order was filled approximately [94–95]% of the time within 2 seconds after placement of an Opposite Order"; and (4) "after filling at least part of his Primary Orders, MOHAN would cancel the Opposite Orders within 5 seconds." (*Id*. at 11–12 (¶ 20).)

- According to the government, when Mohan executed the scheme in the E-Mini Dow futures, his small orders were executed approximately 53% of the time, whereas the large orders were executed approximately 0.2% of the time. (*Id*. at 12 (¶ 21).)

- Similarly, when Mohan executed the scheme in the E-Mini NASDAQ futures, his small orders were executed approximately 60% of the time, whereas the large orders were executed approximately 0.1% of the time. (*Id*. at 12–13 (¶ 24).)

### 3. *United States v. David Liew*, No. 17-CR-00001 (N.D. Ill.).

In June 2017, David Liew admitted to charges of conspiracy to commit commodities fraud and spoofing, in connection with his trading on the CME from December 2009 through February 2012. (6/1/17 Plea Agreement, *United States v. David Liew*, No. 17-CR-00001 (N.D. Ill.), ECF 1, at 2.) In particular, Liew "place[d] and cancele[d] one or more Spoof Orders on one side of the prevailing market price" where the "intent of these Spoof Orders was to facilitate the execution of an existing Primary Order on the opposite side of the market." (*Id*. at 7.) Like Mr. Coscia, Liew's trading involved trading in gold futures contracts. (*Id*. at 2.)

### 4. *United States v. Andre Flotron*, No. 17-CR-00220 (D. Conn.).

In September 2017, Andre Flotron was charged with conspiracy to commit wire fraud, commodities fraud, and spoofing. (9/26/17 Indictment, *United States v. Andre Flotron*, No. 17-CR-00220 (D. Conn.), ECF 14, at 4–5.) According to the government, from July 2008 through November 2013, Flotron placed small orders on the Commodity Exchange ("COMEX") in precious metals futures contracts, such as gold, and then placed "large orders . . . with the intent, at the time the orders were entered, to cancel before execution." (*Id*. at 5–6.) Mr. Coscia also traded in these same commodities during the same time period. As an example of his alleged

24

criminal conduct, Flotron allegedly placed a small order "to buy five gold futures contracts ... then placed a Spoof Order to sell 55 gold futures contracts" less than 0.8 seconds later. (*Id*. at 7.)

5.    ***United States v. Edward Bases and John Pacilio*, No. 18-CR-00048 (N.D. Ill.).**

In July 2018, Edward Bases and John Pacilio were charged with conspiracy to commit wire fraud, commodities fraud, and spoofing. (7/17/18 Indictment, *United States v. Edward Bases and John Pacilio*, No. 18-CR-00048 (N.D. Ill.), ECF 66, at 1, 9, 10.) According to the government, from 2007 through at least 2013, (*id*. at 4 (¶ 2)), Bases and Pacilio engaged in a scheme on COMEX in which they (i) placed small orders (known as Primary Orders) for precious metals futures contracts that they intended to be filled, (ii) placed fraudulent orders to buy (or sell) that were intended to give the market a false impression of increased demand (or supply), in order to drive the price of a futures contract up (or down), and "increase the likelihood that one or more of their Primary Orders would be filled," and (iii) attempted to or did cancel the fraudulent orders before they were executed. (*Id*. at 6 (¶¶ 7–12).) Like Mr. Coscia, Bases and Pacilio traded in gold futures contracts. (*Id*. at 8 (¶ 18); *id*. at 10 (¶ 24).)

6.    ***United States v. James Vorley and Cedric Chanu*, No. 18-CR-00035 (N.D. Ill.).**

In July 2018, James Vorley and Cedric Chanu were charged with conspiracy to commit wire fraud and wire fraud affecting a financial institution. (7/24/18 Indictment, *United States v. James Vorley and Cedric Chanu*, No. 18-CR-00035 (N.D. Ill.), ECF 12, at 1, 8, 9.) According to the government, from December 2009 through November 2011, (*id*. at 3 (¶ 2)), Vorley, Chanu and others engaged in a scheme on COMEX in which they (i) placed small orders (known as Primary Orders), often in the form of iceberg orders, that they intended to execute, (ii) placed fraudulent orders to buy (or sell) that were intended to give the market a false impression of increased demand (or supply), in order to drive the price of a futures contract up (or down), and "increase the

likelihood that one or more of their Primary Orders would be filled," and (iii) attempted to or did cancel the fraudulent orders before they were executed, (*id*. at 5–6 (¶¶ 7–13).)  Like Mr. Coscia and others described herein, Vorley and Chanu traded in gold futures contracts.  (*Id*. at 7 (¶¶ 16, 18).)

### 7. *United States v. John Edmonds*, No. 18-CR-00239 (D. Conn.).

In October 2018, John Edmonds was charged with conspiracy and commodities fraud. (10/9/18 Indictment, *United States v. John Edmonds*, No. 18-CR-00239 (D. Conn.), ECF 1, at 1, 4.)  According to the government, from approximately 2009 through 2015, Edmonds engaged in an illegal scheme on the New York Mercantile Exchange (NYMEX) and COMEX involving precious metals futures contracts.  (*Id*. at 1–2 (¶ 2).)  To execute the scheme, Edmonds and his co-conspirators allegedly (i) placed genuine orders that they wanted to executed, (ii) "placed electronic orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution (the 'Spoof Orders')," and (iii) designed the Spoof Orders to increase the likelihood that their genuine orders were executed.  (*Id*. at 3 (¶ 4).)

### 8. *United States v. Yuchun Mao*, No. 18-CR-00606 (S.D. Tex.).

In October 2018, Yuchun Mao was charged with conspiracy to commit commodities fraud, commodities fraud, and spoofing.  (10/10/18 Indictment, *United States v. Yuchun Mao*, No. 18-CR-00606 (S.D. Tex.), ECF 1, at 3, 6, 7.)  According to the government, from approximately March 2012 through March 2014, Mao engaged in a scheme on the CME and CBOT in which he placed orders for futures contracts that, at the time the orders were placed, he intended to cancel before execution.  (*Id*. at 4 (¶ 14).)

### 9. *United States v. Kamaldeep Gandhi*, No. 18-CR-00609 (S.D. Tex.).

In October 2018, Kamaldeep Gandhi was charged with conspiracy to commit wire fraud, commodities fraud, and spoofing.  (10/11/18 Information, *United States v. Kamaldeep Gandhi*,

No. 18-CR-00609 (S.D. Tex.), ECF 1, at 1–2 (¶ 1).)  According to the government, from March 2012 through March 2014 and May 2014 through October 2014, Gandhi engaged in a scheme on the CME and CBOT, in which he placed fraudulent orders that, at the time the orders were placed, he intended to cancel before execution.  (*Id*. at 3 (¶ 3); *id*. at 6–7 (¶ 7).)

## LEGAL STANDARD

Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM. P. 33.  A new trial is warranted where "the substantial rights of the defendant have been jeopardized by errors or omissions during the trial."  *United States v. Ginsberg*, No. 14-CR-462, 2018 WL 5729745, at *1 (N.D. Ill. Nov. 2, 2018) (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)); *see also United States v. Reed*, 986 F.2d 191, 192 (7th Cir. 1993).  Where, as here, the defendant seeks a new trial on the ground of newly discovered evidence, the Seventh Circuit has long established that the defendant must show that the evidence upon which he relies: "(1) was discovered after trial, (2) could not have been discovered sooner through the exercise of due diligence, (3) is material and not merely impeaching or cumulative, and (4) probably would have led to acquittal." *United States v. O'Malley*, 833 F.3d 810, 813 (7th Cir. 2016).

## ARGUMENT

Following Mr. Coscia's conviction, two sets of material information have emerged that demonstrate that the government's proofs were both demonstrably and verifiably false and that the government either knew or should have known this to be the case.  This post-trial evidence consists of: (1) data produced by CME and ICE—after trial—showing that many key statistics that the government presented as indicative of criminal intent (and accepted by this Court and the Seventh Circuit) were in fact *materially false*; and (2) indictments and enforcement actions investigated prior to Mr. Coscia's trial but returned after trial, which demonstrate that—directly contrary to the

27

government's representations to the jury—other market participants were engaged in substantively similar conduct to Mr. Coscia on the same exchanges, trading the same commodities, during the same time period.

### A. The Government Presented False Evidence to the Jury.

Perhaps the central exhibit in the government's case was ICE Summary Chart 6, purporting to show that Mr. Coscia was allegedly responsible for 96% of all market cancellations. This was a critical piece of evidence not only for the jury, but for this Court and for the Seventh Circuit. (*See* Shenoi Decl., Ex. 2, at 8:4–8) (this Court noted that ICE Summary Chart 6 "seemed to indicate that [Mr. Coscia] was the only one" canceling large orders following a trade on small orders on the opposite side of the market because it presented "a huge disparity" between Mr. Coscia and "everybody else"; the chart "obviously gave the impression that he was an outlier"); *see also Coscia*, 866 F.3d at 795–96 (citing Shenoi Decl., Ex. 1, at 308) ("Mr. Coscia's cancellations represented 96% of all Brent futures cancellations on [ICE] during the two-month period in which he employed his software.").)

It is now undisputed that this chart was materially false. (*See* Shenoi Decl., Ex. 3, at 1–2 ("[D]ue to an inadvertent error in calculating the total alerts from the data [used] to create [ICE] Summary Chart 6, the totals for the alerts for Mr. Coscia and 'All other participants' in . . . ICE Summary Chart 6 were misstated.") It did not show cancellations at all—***far from being responsible for 96% of cancellations, Mr. Coscia was responsible for only a fraction of one percent.*** (Rinaudo Decl. at 6 (¶ 14).) And even as to the unexplained market alerts that ICE Summary Chart 6 actually concerned, the government cannot dispute that the 96% figure that the jury heard was miscalculated and wrong. ICE now claims that the number should have been 91% and there is substantial reason to doubt even that figure. (*See id.* at 5 (¶ 13).) But regardless, the

28

jury never heard that ICE Summary Chart 6 did not cover market cancellations at all and never heard that the 96% figure was wrong.

Under such circumstances, Mr. Coscia's conviction cannot stand. Where a jury is presented with materially false evidence, a new trial is warranted. *See, e.g.*, *United States v. Bender*, 539 F.3d 449, 456 (7th Cir. 2008) (citations omitted) (presenting the jury with false evidence that could have caused jury to "reach[] a different conclusion" is basis for new trial); *United States v. Lanas*, 324 F.3d 894, 902–03 (7th Cir. 2003) (citation omitted) (same); *United States v. Austin*, 103 F.3d 606, 609 (7th Cir. 1997) (citations omitted) (same); *Reed*, 986 F.2d at 192–93 (citations omitted) (same); *United States v. Mazzanti*, 925 F.2d 1026, 1030 n.6 (7th Cir. 1991) (citation omitted) (same).

### B. CME and ICE Post-Trial Data Prove That Mr. Coscia Was Not an Outlier.

The CME and ICE both produced substantial additional trading data following trial. With this data in hand, Mr. Coscia engaged Alexander Rinaudo, a veteran financial industry expert, to review the data. (Rinaudo Decl. at 3 (¶ 9).) Rinaudo's analysis of the post-trial data destroys the foundation of the government's case—that Mr. Coscia's trading activity was out of the ordinary, much less unique, and thereby reflected his criminal intent. *See United States v. Arroyo*, 301 F. Supp. 2d 217, 228–29 (D. Conn. 2004) (court granted Rule 33 motion because post-trial evidence called into question the veracity of government witness's testimony about the defendant's conduct).

#### 1. Mr. Coscia Was Among the Market Leaders in Filling Large Orders and His Fill Rank Was Consistent with His Order Rank.

The government used CME Summary Chart 5 in an attempt to demonstrate that Mr. Coscia was among the market leaders in placing large orders but that his fill rates were inconsistent with his order rank. But the government made three fundamental errors revealed by the new data: (i)

failing to treat modifications as cancellations—something its own witness, Andrew Vrabel, said was necessary; (ii) contrasting Mr. Coscia's individual activity against aggregated traders at the firm level; and (iii) including both large *and* small orders in calculating fill rank and contrasting that against order rank calculated using only large orders. As a result, CME Summary Chart 5 misrepresented the actual facts to the jury. (*See* Rinaudo Decl. at 7 (¶ 17).)

A comparison of the original CME Summary Chart 5 alongside Table 1, below, that corrects these fundamental errors demonstrates that Mr. Coscia was not a market leader in placing large orders, as the government repeatedly represented to the jury, much less did he place the most large orders over the relevant time period. (*Id*. at 8–9 (¶ 18–19).) In contrast, Mr. Coscia *was* a market leader in filling larger orders and, indeed, his large order fills were commensurate with the orders he placed:

**Table 1: Coscia's Large Order Ranks (CME 5)**

|  | Large Order Rank | Filled Large Order Rank |
|---|---|---|
| Aus Dollar | 4 | 1 |
| British Pound | 14 | 8 |
| Canadian Dollar | 7 | 6 |
| Copper | 5 | 2 |
| Corn | 2 | 18 |
| Crude Oil | 2 | 2 |
| E-mini Nasdaq | 57 | 426 |
| EUR/USD | 1 | 1 |
| Gold | 6 | 2 |
| Natural Gas | 2 | 4 |
| S&P Mid Cap | 6 | 1 |
| Soybean Meal | 3 | 9 |
| Soybean Oil | 10 | 141 |
| Soybeans | 2 | 7 |
| Swiss Franc | 22 | 2 |
| Treasury Bond | 3 | 28 |
| Wheat | 1 | 2 |

(*Id*.)

As Table 1 demonstrates, Mr. Coscia was the ***number one filler*** of large orders in the (1) Australian dollar market, (2) Euro/U.S. Dollar market, and (3) S&P Mid Cap market. (*Id*. at 9, Table 1 (¶ 18).) Further, he was the ***number two filler*** of large orders on the (1) copper market, (2) crude oil market, (3) gold market, (4) Swiss Franc market, and (5) wheat market. (*Id*.) And he was a ***top ten filler*** of large orders on the (1) British pound market, (2) Canadian dollar market, (3) natural gas market, (4) soybean meal market, and (5) soybeans market (not seventeenth). (*Id*.) If the jury had the true facts before it, it would have been impossible to conclude that having filled more large orders than any other trader, Mr. Coscia placed large orders with the criminal intent to cancel them.

### 2. Hundreds of Other Traders Had Large Order-To-Trade-Size Ratios.

By using data provided only after trial, Mr. Rinaudo's analysis demonstrates that on the 17 CME markets, Mr. Coscia's Order-to-Trade Size Ratio was par for the course. (*See id*. at 11 (¶ 23).) Across these 17 markets, many hundreds of other traders had a higher Order-to-Trade-Size Ratio than Mr. Coscia. (*Id*.)

**Table 2: Number of Traders**
**with Proportion Greater than 1592%**

| | |
|---|---|
| Aus Dollar | 96 |
| British Pound | 92 |
| Canadian Dollar | 91 |
| Copper | 104 |
| Corn | 532 |
| Crude Oil | 539 |
| E-mini Nasdaq | 371 |
| EUR/USD | 240 |
| Gold | 318 |
| Natural Gas | 191 |
| S&P Mid Cap | 43 |
| Soybean Meal | 222 |
| Soybean Oil | 312 |
| Soybeans | 400 |
| Swiss Franc | 54 |
| Treasury Bond | 522 |
| Wheat | 213 |

31

The government's repeated assertions that Mr. Coscia was unique in Order-to-Trade-Size Ratio were simply false. The claim that Mr. Coscia purportedly was the only trader to have this purportedly singular ratio was important not only during trial but even to the Seventh Circuit. *See Coscia*, 866 F.3d at 796 (holding that Mr. Coscia's "order-to-trade ratio was 1,592%, whereas the order-to-trade ratio for other market participants ranged from 91% to 264%" which suggested that "the large orders were placed, not with the intent to actually consummate the transaction, but rather to shift the market toward the artificial price" of the small order). It can hardly be gainsaid, therefore, that the jury could have reached a different conclusion if presented with the analysis now available to the defendant. *See Arroyo*, 301 F. Supp. 2d at 228–29.

### 3. Hundreds of Other Traders Routinely Placed Both Small and Large Orders, With Different Fill Rates.

Rinaudo's analysis of the post-trial data shows that on the 17 CME markets, Mr. Coscia's placing of small and large orders, with different fill rates, was anything but "unique," "out of whack," or "enormously different" from "what everyone else is doing." On each and every one of these 17 markets, dozens and even hundreds of other traders had a greater difference between their large and small order fill rates. (Rinaudo Decl. at 13–14 (¶ 26).)

Table 3: Fill Rate Differences

| | |
|---|---|
| Aus Dollar | 40 |
| British Pound | 60 |
| Canadian Dollar | 34 |
| Copper | 75 |
| Corn | 310 |
| Crude Oil | 187 |
| E-mini Nasdaq | 138 |
| EUR/USD | 93 |
| Gold | 230 |
| Natural Gas | 67 |
| S&P Mid Cap | 7 |
| Soybean Meal | 60 |
| Soybean Oil | 70 |
| Soybeans | 184 |
| Swiss Franc | 67 |
| Treasury Bond | 164 |
| Wheat | 120 |

(*Id*.) The government's repeated assertions that Mr. Coscia was the only trader who placed both small and large orders, or filled these orders at significantly different rates, is simply false. These facts should have been available to the jury and would have led to a different result.

### C. Subsequent Indictments Show That Mr. Coscia Was Not an Outlier.

Following Mr. Coscia's conviction, various U.S. Attorney's Offices have indicted ***eleven other individuals*** (in 9 separate cases) for allegedly illegal trading activity that involved allegations of commodities fraud and spoofing in the same commodities and on the same markets in which Mr. Coscia traded, and during the same time period. The government also asserts that these other cases of commodities fraud were accomplished in essentially the identical way that Mr. Coscia was accused of doing—that is, by placing illusory orders on the "other side" of the original order.[9]

---

[9]  In addition, several other traders have been the subject of, or referenced in, CFTC enforcement actions for virtually the same allegedly improper conduct. *See, e.g. In the Matter of UBS AG*, CFTC Docket No. 18-07; *In the Matter of Deutsche Bank AG and Deutsche Bank Securities Inc.*, CFTC Docket No. 18-06.

33

These subsequent indictments demonstrate that Mr. Coscia's trading activity was not "one-of-a-kind," as the government claimed at trial and to the Seventh Circuit to demonstrate his purported criminal intent. In particular, the subsequent indictments show that:

- In nine cases, the government alleged that other individuals engaged in a similar trading pattern consisting of large orders on the opposite side of small orders;[10]

- In five cases, the government alleged that this similar trading pattern was used in the same time period as Mr. Coscia did,[11] and

- In five cases, the government alleged that other individuals traded in the same types of futures contracts as Mr. Coscia, such as gold futures.[12]

Importantly, Mr. Coscia could not have discovered the information contained in the indictments through his own due diligence, since the indictments were not returned until after he was convicted. But testimony in these other cases demonstrates that the government did know and that the investigations leading to these indictments were ongoing even before Mr. Coscia was brought to trial.[13]

---

[10] *See supra* Section I.D.

[11] Indictment at 3 (¶ 2), ECF 12, *United States v. James Vorley and Cedric Chanu*, No. 18-CR-00035 (N.D. Ill. July 24, 2018); Indictment at 4 (¶ 2), ECF 66, *United States v. Edward Bases and John Pacilio*, No. 18-CR-00048 (N.D. Ill. July 17, 2018); Indictment at 1–2 (¶ 2), ECF 1, *United States v. John Edmonds*, No. 18-CR-00239 (D. Conn. Oct. 9, 2018); Indictment at 4–5 (¶ 12), ECF 14, *United States v. Andre Flotron*, No. 17-CR-00220 (D. Conn. Sept. 26, 2017); Plea Agreement at 2, ECF 21, *United States v. David Liew*, No. 17-CR-00001 (N.D. Ill. June 1, 2017).

[12] Indictment at 5 (¶ 7–13), ECF 12, *United States v. James Vorley and Cedric Chanu*, No. 18-CR-00035 (N.D. Ill. July 24, 2018); Indictment at 8–9 (¶ 18), 10–11 (¶ 24), ECF 66, *United States v. Edward Bases and John Pacilio*, No. 18-CR-00048 (N.D. Ill. July 17, 2018); Indictment at 1–2 (¶ 2), ECF 1, *United States v. John Edmonds*, No. 18-CR-00239 (D. Conn. Oct. 9, 2018); Indictment at 5–6 (¶ 14), ECF 14, *United States v. Andre Flotron*, No. 17-CR-00220 (D. Conn. Sept. 26, 2017); Plea Agreement at 2, ECF 21, *United States v. David Liew*, No. 17-CR-00001 (N.D. Ill. June 1, 2017).

[13] *See, e.g.*, *U.S. v. Andre Flotron*, Testimony of Kar-Hoe Chan, Trial Transcript, attached hereto as Shenoi Decl., Ex. 5, at 452:14–22 ("[Q.] I'm going to come back to your meetings with the FBI, but we can agree they stretch all the way back to 2015, right? [A.] I think the meetings started in 2014. [Q.] And, actually, even before you started meeting with the government to get ready for this testimony, your lawyers started meeting with the government on your behalf, right? [A.] Yes.").

Again, the point here is not the substantive merit of these other cases. Indictments, of course, are not evidence of guilt, and at least one of these indictments has resulted in an acquittal. The point is that with nearly a dozen other similar investigations underway, the government could not responsibly claim to the jury, to this Court, or to the Seventh Circuit that Mr. Coscia was "one of a kind." (Shenoi Decl., Ex. 4, at 24:22–25) ("[T]he statistics show that during time frame that he was operating a scheme, it was *one of a kind*, insofar as he's the only person that was attempting to manipulate the markets like this.") (emphasis added).) He plainly was not.

Further, the information contained in these indictments strikes at the heart of the government's central argument that Mr. Coscia's trading was so unique that it could only reflect a criminal intent. In the absence of the government's false claims that Mr. Coscia was unique, the jury would not have believed that Mr. Coscia was an outlier who "was really [the] only [person] doing this." *See O'Malley*, 833 F.3d at 813; *see also United States v. Kladouris*, 739 F. Supp. 1221, 1224–25 (N.D. Ill. 1990) (evidence of a later lawsuit by the prosecution's key witness was material and mandated a new trial, because, had the defendant known about the lawsuit at trial, there "might very well" have been a "different" outcome at trial); *United States v. Lipowski*, 423 F. Supp. 864 (D.N.J. 1976) (court ordered new trial where later indictment of eyewitness called into question (1) his testimony at trial and (2) the authenticity of tapes entered into evidence during eyewitness's testimony).

## **CONCLUSION**

For all of the foregoing reasons, Mr. Coscia respectfully requests that the Court grant his

motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.


Dated: January 10, 2019                    */s/ Leonid Feller*
                                           Leonid Feller
                                           Sunil Shenoi
                                           Benjamin O'Connor
                                           KIRKLAND & ELLIS LLP
                                           300 North LaSalle
                                           Chicago, Illinois 60654
                                           Telephone:  (312) 862-2000
                                           Facsimile:  (312) 862-2200
                                           leonid.feller@kirkland.com
                                           sunil.shenoi@kirkland.com
                                           benjamin.oconnor@kirkland.com

                                           *Attorneys for Defendant Michael Coscia*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 10, 2019, a true and correct copy of the foregoing document was served on counsel of record via the Court's CM/ECF System.


*/s/   Leonid Feller*
Leonid Feller