**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | **No. 14-CR-0551** |
| ) | |
| ) | **Honorable Harry D. Leinenweber** |
| **v.** ) | |
| ) | |
| **MICHAEL COSCIA,** ) | |
| ) | |

**DECLARATION OF ALEXANDER RINAUDO IN SUPPORT OF
DEFENDANT'S MOTION FOR NEW TRIAL**

I, Alexander Rinaudo, being duly sworn, state the following under penalty of perjury:

## I.    INTRODUCTION

1.    I am a Managing Director at Econ One Research, Inc. ("Econ One"). Econ One is an economic research and consulting firm which provides research, consulting and expert advice on issues relating to markets, competition, regulation, and valuation.

2.    I have over 17 years of experience in the analysis of financial instruments and financial markets, including complex analyses of securities, commodities, and the markets in which they trade. Prior to joining Econ One, I held senior positions at several consulting firms. Most recently I was the Chief Executive of Data Science Partners. Prior to that, I was a Senior Vice President with Compass Lexecon.

3.    I received my undergraduate degree from the Massachusetts Institute of Technology and an MBA from the New York University-Stern School of Business. I have co-authored several peer reviewed articles analyzing various financial products. My curriculum vitae is attached as Appendix A.

1

## II.    ASSIGNMENT

4.    It is my understanding that the charges against Mr. Coscia alleged that he engaged in improper trading activity, including fraudulently placing orders with the intent to cancel them before execution, on two exchanges—the Chicago Mercantile Exchange ("CME") and the Intercontinental Exchange ("ICE"). Mr. Coscia proceeded to trial in October 2015, and was convicted. The government's case included testimony from witnesses on behalf of each exchange, including Mr. Ryan Cobb from CME and Mr. John Philip Redman from ICE. In preparing this Declaration, I have reviewed the transcripts of the testimony of Mr. Cobb and Mr. Redman, as well as other pertinent portions of the trial transcript.

5.    Prior to trial, both exchanges produced a record of Mr. Coscia's individual order and trading history. Besides data directly related to Mr. Coscia, however, the exchanges provided only discrete snapshots of data prior to trial about other market participants (*i.e.*, "audit trail" data) or the state of the market at particular points in time (*i.e.*, "order book" data).[1] The most comprehensive data provided to Mr. Coscia prior to trial was from CME and consisted of a set of trading data for five days of trading, covering eight contracts, and identified only ten trading firms. ICE produced even less data—only five days of data for ten market participants in a single market—the ICE Brent Futures market.

6.    Importantly, none of the data regarding other market participants or the state of the market disclosed prior to trial was complete enough to allow Mr. Coscia to replicate or evaluate purported comparisons made by government witnesses between Mr.

---

[1] Appendix B to this declaration contains a complete listing and description of the data I reviewed.

2

Coscia's trading behavior and the trading behavior of the general market or specific market participants.

7. Following trial, Mr. Coscia obtained additional data from each exchange. In particular, the CME produced a complete record of all market participants' order and trading history covering approximately 10 weeks (including the entire period of alleged misconduct) and all 17 CME markets in which Mr. Coscia traded.

8. ICE, in turn, also produced additional data to Mr. Coscia following trial, but on a lesser scale than the CME. ICE produced a version of Mr. Coscia's audit trail that included anonymized counterparty identifiers (*i.e.*, individuals or firms that traded with Mr. Coscia), as well as a letter disclosing that (i) the ICE Summary Chart 6 accompanying Mr. Redman's testimony was mislabeled and (ii) that the data provided on ICE Summary Chart 6 was miscalculated. The letter included revised totals that ICE disclosed for the first time following trial that should have appeared on ICE Summary Chart 6.

9. I have been asked by counsel for Mr. Coscia to examine the new evidence produced by the exchanges for the first time following trial to determine whether it directly contradicts and/or refutes trial testimony and exhibits put on by the government.

## III. SUMMARY OF CONCLUSIONS

10. Based on my analysis of the new evidence and data produced for the first time after trial, it is clear that the data presented by the government's witnesses does not support the representations made by the government at trial regarding Mr. Coscia's trading activity. In particular:

(i) Contrary to the evidence presented at trial, compared to other market participants during the relevant period, Mr. Coscia did not place an

3

unusually large number of large orders. Also contrary to the claims made by the government at trial, Mr. Coscia, in fact, filled among the most large orders of any market participant during the period at issue. As a result, in nearly all markets, the newly-disclosed data demonstrates that Mr. Coscia's rank of large orders traded was comparable to his rank of large orders placed.

(ii) Contrary to the evidence presented at trial, it is not true that the ratio of Mr. Coscia's average order size relative to his average trade size was unusually large, in comparison to other market participants, as the government represented. To the contrary, the newly-disclosed data proves that there are many hundreds of other market participants, like Mr. Coscia, that placed large orders, on the one hand, but typically filled in smaller increments. That is, the newly-disclosed data demonstrates that the government's claim that it is rare to have a disproportionate order-to-trade-size ratio is false.

(iii) Contrary to the evidence presented at trial, it is not true that market participants generally place only small orders or only large orders, not a mix of both small and large orders. Like Mr. Coscia, there are many dozens and even hundreds of market participants who placed both large and small orders and, also like Mr. Coscia, filled small orders at a substantially higher rate than they filled large orders.

11. Based on the new evidence produced following trial, it is clear that Mr. Coscia's trading activity was consistent with a large number of other market participants and market activity in general.

4

## IV.    POST TRIAL DATA ANALYZED

12.    The analyses presented in this Declaration are based on data produced for the first time by the CME following Mr. Coscia's trial.  The data produced contains all order and trading activity[2] across 17 product groups[3] for the time period August 8, 2011 to October 18, 2011, the period at issue in Mr. Coscia's indictment.[4]

13.    I have also reviewed data produced by ICE following Mr. Coscia's trial.  As compared to the CME data produced both before and after trial, ICE produced substantially less data.  Along with the letter, which revised the totals in ICE Summary Chart 6, was a backup file supporting the revised totals.  According to the letter, the backup file contained "the underlying order and trade information" from "an ICE system tool that, for regulatory purposes, generates an alert when the tool detects suspicious trading activity."[5]  However, a review of the file suggests that the backup file (and hence the revised totals) may not be accurate.  For example, there are orders listed in the file as being entered without any corresponding cancellation.  Accordingly, there is substantial reason to doubt the accuracy of the revised summary totals that were presented in the letter.

---

[2] The CME dataset contains six types of activity for limit orders: Orders, Modifications, Cancellations, Fills, Expirations and Confirmations.  Orders, Modifications and Cancellations are user-generated activity.  Orders place an order into the limit order book.  Modifications make changes to the parameters of an open order.  Cancellations remove an order from the limit order book. Fills, Expirations and Confirmations are exchange-generated activity indicating that an existing open order has changed. Fills indicate a trade, Expirations indicate that an order has expired, and Confirmations update the status of an order.

[3] These are the same 17 product groups that were listed in the various CME Summary Charts presented at trial.

[4] Similar data was requested from ICE for the Brent Futures market but, to date, no such data has been provided.

[5] June 22, 2016 K. Kliebard Ltr. To J. Manning.

14. It is also worth noting that the pages of ICE Summary Chart 6 where Mr. Coscia was compared to "All other participants" were labeled "Order cancellation comparison" even though as stated in the letter, they actually represented the alerts from an ICE system tool. In fact, compared to all other participants, Mr. Coscia only accounted for a small fraction of all cancellations in the three Brent contracts he traded. According to a summary report produced by ICE, there were 71,785,276 cancellations in these three contracts of which Mr. Coscia accounted for 47,649 (0.066%) of these cancelled orders.[6]

15. Because I did not have access to the corresponding ICE data for the entire Brent market, and because of the fulsomeness of the CME data produced across all relevant markets during the entire time period at issue, this Declaration focuses on the 17 markets addressed in the CME data. Given the robustness of the CME data, it is highly likely that the results obtained herein would be similar for the ICE Brent Futures market in which Mr. Coscia also traded. I am prepared to supplement this Declaration for the ICE market if the necessary ICE data becomes available.

## V. LARGE ORDERS PLACED VERSUS ORDERS FILLED

16. In CME Summary Chart 5 ("CME 5"), Mr. Cobb purported to present Mr. Coscia's rank relative to other traders of how many large orders he placed during the relevant period ("Large Order Entry Rank"). Mr. Cobb also purported to rank Mr. Coscia with regard to how many contracts he executed relative to other traders ("Volume Rank"). CME 5 is reproduced below for reference.

---

[6] See "Brent Market Profile Summary.xls" and "M Coscia Single Participant Profile Summary.xls".

*Large Order and Volume Rank*

| | # of Large Orders | Large Order Entry Rank | Volume Rank |
|---|---|---|---|
| Aus. Dollar | 31,011 | 1 | 33 |
| British Pound | 4,403 | 8 | 87 |
| Canadian Dollar | 5,360 | 2 | 97 |
| Copper | 13,827 | 1 | 32 |
| Corn | 20,765 | 1 | 79 |
| Crude Oil | 65,301 | 1 | 31 |
| E-mini Nasdaq | 924 | 21 | 658 |
| EUR/USD | 126,363 | 1 | 18 |
| Gold | 34,370 | 1 | 21 |
| Natural Gas | 15,557 | 1 | 58 |
| S&P Midcap 400 | 4,791 | 3 | 22 |
| Soybean Meal | 26,963 | 1 | 13 |
| Soybean Oil | 797 | 4 | 250 |
| Soybeans | 36,366 | 1 | 17 |
| Swiss Franc | 1,445 | 4 | 51 |
| Treasury Bond | 36,535 | 1 | 74 |
| Wheat | 28,826 | 1 | 12 |

GOVERNMENT EXHIBIT
CME Summary Chart 5

17.     The newly-produced data demonstrates that CME 5 was inaccurate in three critical respects.  First, CME 5 failed to include order modifications (in which an old order is cancelled and a new order is placed) in its ranking methodology.[7]  Second, CME 5 compared Mr. Coscia's trading activity—an individual—to the trading activity of firms that are made up of dozens of individual traders.[8]  An apples-to-apples comparison should have compared Mr. Coscia to other individual traders, not aggregated firms.  Third, CME 5 compared the ranking of <u>large</u> orders placed to

---

[7] The testimony at trial was that every order modification has the effect of cancelling an existing order and placing a new one.  For example, Mr. Andrew Vrabel testified, "Yes, a modification effectively cancels the order message that's there and replaces it with a new message or a new order." (*United States v. Michael Coscia*, No. 16-3017 (N.D. Ill.), Trial Transcript [hereinafter "Trial Tr."], at 237:8–10.)  Mr. Cobb also testified that it is accurate to look at a modification as "a cancellation and a placement of a new order at the CME." (Trial Tr., at 418:7–9.)  Despite these statements, the analyses presented at trial did <u>not</u> account for modifications as cancellations of an existing order and placement of a new order.  (Trial Tr., at 419:18–19.)  Given the trial testimony, the analyses contained in this Declaration include order modifications in the calculation of total order cancellations and new orders. To be conservative, only modifications where the price changed or order quantity was increased were counted as new orders.

[8] For example, based on my review of the CME data produced after trial, there are over 100 firms in the CME data that have 50 or more individual trader identifiers.

the ranking of volume filled for both large and small orders. To the extent CME 5 asked the jury to draw an inference from the fact that Mr. Coscia ranked high in large orders placed but lower in orders filled, the apples-to-apples comparison should be of large orders placed to large orders filled. This is consistent with Mr. Cobb's presentations in CME Summary Chart 2 and CME Summary Chart 3, where Mr. Cobb summarized various fill statistics for large (Chart 2) and small (Chart 3) orders; for some undisclosed reason, however, Mr. Cobb combined large and small orders in calculating "Volume Rank" in CME 5 but not in calculating "Large Order Entry Rank."

18. Using the newly-produced data, I was able to correct these three errors to produce Table 1 below. Table 1 demonstrates that, in fact, Mr. Coscia was not an outlier when compared to others placing and filling large orders. The two columns include order modifications and show revised rankings when Mr. Coscia's trading activity is compared to other individual traders (rather than aggregated firms) and when large orders placed are compared to large orders filled (rather than against aggregated large and small orders).

Case: 1:14-cr-00551 Document #: 221 Filed: 01/10/19 Page 9 of 23 PageID #:4901

**Table 1: Coscia's Large Order Ranks (CME 5)**

|  | Large Order Rank | Filled Large Order Rank |
|---|---|---|
| Aus Dollar | 4 | 1 |
| British Pound | 14 | 8 |
| Canadian Dollar | 7 | 6 |
| Copper | 5 | 2 |
| Corn | 2 | 18 |
| Crude Oil | 2 | 2 |
| E-mini Nasdaq | 57 | 426 |
| EUR/USD | 1 | 1 |
| Gold | 6 | 2 |
| Natural Gas | 2 | 4 |
| S&P Mid Cap | 6 | 1 |
| Soybean Meal | 3 | 9 |
| Soybean Oil | 10 | 141 |
| Soybeans | 2 | 7 |
| Swiss Franc | 22 | 2 |
| Treasury Bond | 3 | 28 |
| Wheat | 1 | 2 |

19.   The first column shows Mr. Coscia's rank relative to other individual traders in placing large orders in each market. Rather than being ranked first as having placed the most large orders in 11 of 17 markets, Mr. Coscia actually placed the most large orders in only 2 of 17 markets. The second column shows Mr. Coscia's ranking of large orders filled. Mr. Coscia ranks first or second in having the most large orders filled of any trader in 8 of 17 CME markets.[9] Further, in nearly all markets, the data demonstrates that Mr. Coscia's rank of large orders traded was comparable to his rank of large orders placed.

---

[9] This is not surprising when one considers that Mr. Coscia traded over $8 billion dollars on large orders during the period.

9

## VI.    PROPORTION OF ORDER SIZE TO TRADE SIZE

20.    Mr. Redman testified that ICE Summary Chart 3 ("ICE 3") showed "the average size of an order placed into the market compared to the average trade that actually resulted from that to get some idea of the proportion or the ratio of the size of orders that were being floated to the business that was then actually done in the wake of those orders."[10]  In ICE 3, he purported to show these values for Mr. Coscia (*i.e.*, Panther Trading), ten other high frequency traders (who he selected based on their volume of orders[11]), and the average for the market as a whole.  ICE 3 is reproduced below for reference.

Orders-to-trades comparison

| Company | Total orders traded | Average orders traded per day | Average size of trade | Average size shown to market | Proportion of order size to trade size | # of Traders | # of Accounts |
|---|---|---|---|---|---|---|---|
| | All activity for 09/06/2011 - 10/18/2011 in Oct11, Nov11 and Dec11 Brent | | | | | | |
| Panther Trading | 90,454 | 2,918 | 2.5 | 39.8 | 1592% | 3 | 3 |
| Virtu West | 107,658 | 3,473 | 1.4 | 3.7 | 264% | 24 | 1 |
| DRW | 174,112 | 5,617 | 1.4 | 2.8 | 200% | 62 | 9 |
| T Gile | 187,585 | 6,051 | 1.2 | 2.4 | 200% | 242 | 5 |
| Virtu | 75,095 | 2,422 | 1.3 | 2.1 | 162% | 19 | 1 |
| Jump | 218,251 | 7,040 | 1.5 | 2.2 | 147% | 137 | 8 |
| All Brent | 4,906,468 | 158,273 | 1.5 | 2.1 | 140% | 7,208 | 2,326 |
| Geneva | 80,729 | 2,604 | 1.4 | 1.7 | 121% | 86 | 26 |
| Chopper | 398,427 | 12,852 | 1.2 | 1.4 | 117% | 31 | 1 |
| Allston | 65,610 | 2,116 | 1 | 1 | 100% | 22 | 3 |
| Getco | 231,895 | 7,480 | 1.1 | 1 | 91% | 28 | 7 |
| Hudson | 350,612 | 11,310 | 1.1 | 1 | 91% | 24 | 1 |

GOVERNMENT EXHIBIT ICE Summary Chart 3

---

[10] Trial Tr. at 295:3–7.

[11] Trial Tr. at 293:23–24.

21.    Mr. Redman testified that Mr. Coscia's proportion of order size to trade size in the Brent market of 1592% was orders of magnitude greater than other market participants, who had a proportion of 91% to 264%, with an average of 140% across the market as a whole.[12]

22.    Mr. Redman concluded his testimony on ICE 3 stating "what we see here is essentially everybody's orders are all about the same size. They're all in the very small range, and the overall proportion of order-to-trade size is much lower."[13]

23.    The newly-produced CME data is not consistent with Mr. Redman's testimony. As Table 2 shows, in each of the 17 CME markets, there were dozens (and oftentimes hundreds) of traders with order-to-trade-size ratios greater than Mr. Coscia's ratio of 1592%. In 12 commodities—copper, corn, crude oil, E-mini Nasdaq, EUR/USD, gold, natural gas, soybean meal, soybean oil, soybeans, treasury bonds, and wheat—there are at least 100 other traders that had order-to-trade-size ratios greater than Mr. Coscia's.

---

[12] Note that the basis for calculating the figure of 1,592% for Mr. Coscia is not clear. Based on a review of the audit trail data provided by ICE, Mr. Coscia had an average order size of 17.49 and an order-to-trade size ratio of 698%. For purposes of this Declaration, the difference between 1,592% and 698% is not overly significant, other than the obvious point that even more traders would have order-to-trade-size ratios in excess of 698% than the 1,592% used at trial and for purposes of this Declaration.

[13] Trial Tr. at 300:2–5.

11

**Table 2: Number of Traders
with Proportion Greater than 1592%**

| | |
|---|---|
| Aus Dollar | 96 |
| British Pound | 92 |
| Canadian Dollar | 91 |
| Copper | 104 |
| Corn | 532 |
| Crude Oil | 539 |
| E-mini Nasdaq | 371 |
| EUR/USD | 240 |
| Gold | 318 |
| Natural Gas | 191 |
| S&P Mid Cap | 43 |
| Soybean Meal | 222 |
| Soybean Oil | 312 |
| Soybeans | 400 |
| Swiss Franc | 54 |
| Treasury Bond | 522 |
| Wheat | 213 |

## VII.  DIFFERENT ORDER SIZES AND FILL RATES

24.     At trial, both Mr. Redman and Mr. Cobb testified that it was out of the ordinary that Mr. Coscia placed different-sized orders and that his large orders had a fill rate significantly less than his small orders.  Mr. Redman testified, "What we normally see is people placing orders of roughly the same size most of the time and, therefore, there aren't two order sizes in use with a different cancellation rate between them. There's just one order size in use and the cancellation rate is, there's just one."[14] Likewise, Mr. Cobb testified that 35.61% of Mr. Coscia's small orders were filled but only 0.08% of his large orders were filled.[15]

---

[14] Trial Tr. at 292:12–16.

[15] Trial Tr. at 394:9–15.

25.     Again, the CME data demonstrates that Mr. Redman's and Mr. Cobb's testimony was not accurate.  Utilizing the CME data provided after trial, I have computed the large order and small order fill rates, and the differential between the two rates, for every trader in each of the 17 CME markets.  Table 3 lists the results of my analysis for each market.

**Table 3: Fill Rate Differences**

| | |
|---|---|
| Aus Dollar | 40 |
| British Pound | 60 |
| Canadian Dollar | 34 |
| Copper | 75 |
| Corn | 310 |
| Crude Oil | 187 |
| E-mini Nasdaq | 138 |
| EUR/USD | 93 |
| Gold | 230 |
| Natural Gas | 67 |
| S&P Mid Cap | 7 |
| Soybean Meal | 60 |
| Soybean Oil | 70 |
| Soybeans | 184 |
| Swiss Franc | 67 |
| Treasury Bond | 164 |
| Wheat | 120 |

26.     The first column of Table 3 lists out each market.  The second column is a count of the number of traders in that market who have a fill rate differential between large and small orders greater than the 35.53% difference documented for Mr. Coscia.  There are dozens, and even hundreds, of traders who had a greater fill rate differential between large and small orders than Mr. Coscia.[16]  In 16 of 17 markets,

---

[16] These numbers are conservative because they use Mr. Cobb's methodology to determine the size of a "large" order. Mr. Cobb's methodology defined a "large" order based solely on Mr. Coscia's trading, not based on market factors. Specifically, Mr. Cobb reviewed Mr. Coscia's order history in each market and found two clusters of order sizes.  He then characterized any order that was in the second cluster or larger as "Large." (Trial Tr., at 382:12–25.)  For example, in the copper market, Mr. Cobb used a cutoff of 23 contracts to define a "large" order because he found a cluster of

at least 30 traders had fill rate differentials greater than Mr. Coscia's 35.53% differential.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   January 10, 2019
                  New York, NY

_____
Alexander Rinaudo

---

orders made by Mr. Coscia that were smaller than 23 contracts and a second cluster of orders that were 23 contracts or larger.  Therefore, a trader in the copper market who separately placed orders of 20 contracts and 2 contracts (a 10:1 ratio) would not have been counted by Mr. Cobb as placing a large order, even though the trader is clearly using two different order sizes. Table 3 utilizes Mr. Cobb's order-size cutoffs for each market to separate large orders from small orders.  *See* CME Summary Chart 2 for a listing of these cutoffs.

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2019, a true and correct copy of the foregoing document was served on counsel of record via the Court's CM/ECF System.

>  */s/ Leonid Feller*
>  Leonid Feller
>  Sunil Shenoi
>  Benjamin O'Connor
>  KIRKLAND & ELLIS LLP
>  300 North LaSalle
>  Chicago, Illinois 60654
>  Telephone:  (312) 862-2000
>  Facsimile:  (312) 862-2200
>  leonid.feller@kirkland.com
>  sunil.shenoi@kirkland.com
>  benjamin.oconnor@kirkland.com
>
>  *Attorneys for Defendant Michael Coscia*

**Appendix A**



**Alexander Rinaudo**
Managing Director
arinaudo@econone.com

477 Madison Avenue, 6th Floor
New York, NY 10022
Direct: 212-554-3512

1025 Westchester Avenue, Suite 315
White Plains, NY 10604
Direct: 914-359-6862

Alexander Rinaudo is a Managing Director at Econ One Research, Inc.  He has over 15 years of experience in developing economic and financial analysis for complex commercial and regulatory disputes.

Mr. Rinaudo has conducted economic analysis on matters involving securities fraud, business valuation, trading strategies, alternative investment valuation, market timing and portfolio valuation.  Mr. Rinaudo has deep expertise in econometric and statistical analyses, methods he has used to analyze a wide variety of financial products and their markets including equities, options, treasuries, fixed income and structured products.

Mr. Rinaudo has supported clients through all phases of pretrial and trial practice including: review of pretrial discovery, development of economic and financial models to analyze damages, critique of analyses by opposing experts and preparation of testimony. He has experience in a broad range of venues including federal trials, regulatory proceedings, settlement negotiations, mediations, arbitrations and bankruptcy proceedings.

Prior to joining Econ One, Mr. Rinaudo held positions with several consulting firms including: Compass Lexecon, AlixPartners and Analysis Group.  Most recently he was the Chief Executive of Data Science Partners.

**EDUCATION**

Mr. Rinaudo holds an MBA from the Stern School of Business at New York University and a BS from the Massachusetts Institute of Technology.

**PUBLICATIONS**

"Has the VIX Index Been Manipulated?" with B. Malkiel and A. Saha, Journal of Asset Management, accepted, December 2018.

"Option Writing: Using VIX to Improve Returns," with B. Malkiel and A. Saha, *The Journal of Derivatives*, Winter 2018, 38-49.

"Conditional Option Writing: Using VIX to Improve Returns," with A. Saha and B. Malkiel, Seeking Alpha, October 26, 2018.

"Commentary: Inclusion of High-Fee Funds not Necessarily a Breach of Fiduciary Duty," with A. Rinaudo, *Pensions & Investments*, May 14, 2018, 12.

"Are Traditional Valuation Models Flawed? An Illustrative Example: Valuing a Hedge Fund," with A. Saha and B. Malkiel, *ValueWalk*, March 2018.

"Actively Managed versus Passive Mutual Funds: A Horse Race of Two Portfolios" with A. Saha, *The Journal of Financial Transformation* 46, 2017, 193-206.

"Downside Risk Protection of Retirement Assets: a New Approach," with A. Saha, *The Journal of Financial Transformation* 45, 2017, 111-120.

"An Intraday Event Study Methodology for Determining Loss Causation," with A. Saha, *The Journal of Financial Perspectives* 2(2), July 2014, 161-172.

**SELECTED PRIOR CASEWORK**

**Financial Instrument and Portfolio Analysis**

CMMF v. JP Morgan – Analysis and support of expert testimony regarding effect of financial crisis on valuation of portfolio of assets.

Shareholders v. Simon Property Group – Analysis and expert report/testimony support regarding value of conditionally vesting Long Term Incentive Performance units.

**Securities Class Action**

In Re: Bank of America – Merrill Lynch Securities Litigation – Support of analysis, expert testimony and settlement negotiations regarding alleged stock price manipulation prior to merger between Bank of America and Merrill Lynch.

In Re: Citigroup Securities Litigation – Support of analysis, expert testimony and settlement negotiations regarding alleged share price manipulation associated with company disclosures during the financial crisis of 2007/2008.

**Valuation**

BGCantor Market Data, L.P. v. Tullett Prebon Americas Corp. - Support of expert testimony and arbitration negotiations regarding use and valuation of Treasury market data.

Olson v. Halvorsen et al. – Support of expert witness report and trial testimony regarding fair value of Viking Global, a hedge fund, and rebuttal damage analysis.

Survey Sampling International – Valuation of online and phone survey company in conjunction with debt and equity recapitalization.

## **Appendix B**

Table B-1 contains a list of the data I reviewed in the preparation of this Declaration. My description of the data is based on my review of the files and the representations made by the exchanges that the data is complete and accurate. Column A indicates the exchange (CME or ICE) to which the data relates. Column B is an abbreviation of the file name or number for the identification of individual files. Column C indicates the trading date or dates contained within the file.[17] Column D indicates the contracts or markets covered by the data. Column E indicates the number of traders covered in the data. Column F provides a brief description of the data.

While the list of data provided before trial contains a number of entries, the data itself was deficient in two key respects for purposes of analyzing market behavior. First, the data was scattered across various markets, contracts, and time periods. Second, very little of the data contained any information which allowed the orders or trading to be analyzed by individual market participant. As a result, Mr. Coscia could not evaluate and respond to any testimony which characterized his trading compared with general market behavior. This type of analysis, which is contained in this Declaration, is only possible with the data produced by CME after trial because it included all activity across a broad set of contracts with anonymized market participant identifiers for each order and trade.

---

[17] In many of the files, the data actually begins at the end of the prior trading day. For example, in many CME files, if the date in Column C is listed as 8/8/2011, the data will begin at 17:00 on 8/7/2011, which is the end of the prior trading day.

**Table B-1: Exchange Data Reviewed**

## Panel A: Data Received Before Trial

| Exchange | File # or Name | Date(s) | Markets or Contracts | Traders | Type of Data |
|---|---|---|---|---|---|
| CME | CME-COSCIA – USvCOSCIA-0001.TXT - 0023.TXT | 8/7/2011 - 10/18/2011 | 17 CME Markets, 26 Contracts | Coscia Only | Orders and Trades, no counterparty information |
| CME | CME-COSCIA_USvCOSCIA-0024 - 0191.TXT | 8/8/2011 - 10/18/2011 | 15 CME Markets, 22 Contracts | NA | Order Book Data (5-10 levels deep) |
| CME | CME-COSCIA – USvCOSCIA-0192 | 9/28/2011 | GCZ1, HGZ1, EMDZ1, ZLZ1, ZMZ1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0193 | 9/28/2011 | 6EZ1, 6BZ1, CLX1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0194 | 9/23/2011 | 6BZ1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0195 | 9/28/2011 | 6BZ1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0196 | 9/28/2011 | HGZ1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0197 | 9/28/2011 | CLZ1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0198 | 9/28/2011 | EMDZ1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0199 | 9/1/2011 | 6EU1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0200 | 9/28/2011 | 6EZ1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0201 | 9/2/2011 | GCZ1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0202 | 9/28/2011 | GCZ1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0203 | 9/12/2011 | ZMZ1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0204 | 9/13/2011 | ZLU1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0205 | 9/28/2011 | ZMZ1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0206 | 9/28/2011 | ZLZ1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0207 | 9/28/2011 | 6BZ1, 6EZ1, CLX1 | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0208 | 9/28/2011 | GCZ1, EMDZ1, HGZ1, | All | Orders and Trades, No Party Identifiers |

| | | | ZMZ1, ZLZ1 | | |
|---|---|---|---|---|---|
| CME | CME-COSCIA – USvCOSCIA-0209 | 8/17/2011 | 6E, CL | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0210 | 9/2/2011 | 6E, CL | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0211 | 10/7/2011 | 6E, CL | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0212 | 10/14/2011 | 6E, CL | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0213 | 8/17/2011 | GC, ZM, ZL, 6B, HG, EMD | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0214 | 9/2/2011 | GC, ZM, ZL, 6B, HG, EMD | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0215 | 10/7/2011 | GC, ZM, ZL, 6B, HG, EMD | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0216 | 10/14/2011 | GC, ZM, ZL, 6B, HG, EMD | All | Orders and Trades, No Party Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0217 to 0226 | 9/26/2011 - 9/30/2011 | 6BZ1, 6EZ1, CLX1, GCZ1, HGZ1, EMDZ1, ZLZ1, ZMZ1 | 10 Firms | Orders and Trades, No Trader Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0227 | 9/26/2011 | 6A | Gerko | Orders and Trades |
| CME | CME-COSCIA – USvCOSCIA-0228 | 9/23/2011 | 6B | Gerko | Orders and Trades |
| CME | CME-COSCIA – USvCOSCIA-0229 | 9/23/2011 | 6B | BKC1, BKC2, BKC3 | Orders and Trades |
| CME | CME-COSCIA – USvCOSCIA-0230 | 9/19/2011 | 6E | Gerko | Orders and Trades |
| CME | CME-COSCIA – USvCOSCIA-0231 | 10/5/2011 | 6E | Gerko | Orders and Trades |
| CME | CME-COSCIA – USvCOSCIA-0232 | 10/11/2011 | 6E | Gerko | Orders and Trades |
| CME | CME-COSCIA – USvCOSCIA-0233 | 9/2/2011 | GC | HDLD1 | Orders and Trades |
| CME | CME-COSCIA – USvCOSCIA-0234 | 9/2/2011 | GC | QTSTAT3, QT18 | Orders and Trades |
| CME | CME-COSCIA – USvCOSCIA-0235 | 10/6/2011- 10/7/2011 | HG | Gerko | Orders and Trades |
| CME | CME-COSCIA – USvCOSCIA-0236 | 10/14/2011 | ZC | CROENBAUGH2 | Orders and Trades |
| CME | CME-COSCIA – USvCOSCIA-0237 | 9/13/2011 | ZL | BKC1, BKC2, BKC3 | Orders and Trades |

| CME | CME-COSCIA – USvCOSCIA-0238 | 9/12/2011 | ZM | ATS0001 | Orders and Trades |
|-----|------------------------------|-----------|-----|----------|-------------------|
| CME | CME-COSCIA – USvCOSCIA-0239 | 10/10/2011 | ZS | Gerko | Orders and Trades |
| ICE | FSA-0000001 | 9/6/2011 – 9/29/2011 | Brent Oct and Nov | Coscia | Orders and Trades with Counterparty Identifiers |
| ICE | ICE USA-COSCIA 000045 | 9/6/2011- 10/18/2011 | Brent Oct, Nov and Dec | Coscia | Orders and Trades |
| ICE | Summary Files | 9/6/2011- 10/18/2011 | Brent Oct, Nov and Dec | 10 Firms, Market | Aggregated Data presented in ICE 3 |
| ICE | DW-7118 Deals.txt | 9/26/2011- 9/30/2011 | Brent Oct, Nov and Dec | 10 Firms in ICE 3 | Trades |
| ICE | DW-7118 v3.txt | 9/26/2011- 9/30/2011 | Brent Oct, Nov and Dec | 10 Firms in ICE 3 | Orders |

## Panel B: Data Received After Trial

| Exchange | File # or Name | Date(s) | Markets or Contracts | Traders | Type of Data |
|----------|----------------|---------|----------------------|---------|--------------|
| ICE | Data Request 112415.xlsx | 9/6/2011- 10/18/2011 | Brent Oct, Nov and Dec | Coscia | Orders and Trades with Anonymized Counterparty Identifiers |
| ICE | Backup Data.xlsx | 9/6/2011- 10/18/2011 | Brent Oct, Nov and Dec | All | Specific Orders and Trades supporting ICE 6 |
| CME | CME-COSCIA – USvCOSCIA-0240 | 8/1/2011 - 10/31/2011 | ZB | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0241 | 8/1/2011 - 10/31/2011 | 6A | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0242 | 8/1/2011 - 10/31/2011 | 6B | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0243 | 8/1/2011 - 10/31/2011 | HG | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0244 | 8/1/2011 - 10/31/2011 | ZC | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0245 | 8/1/2011 - 10/31/2011 | EMD | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0246 | 8/1/2011 - 10/31/2011 | 6E | All | Trades with Anonymized Party and Counterparty Identifiers |

| Exchange | File # or Name | Date(s) | Markets or Contracts | Traders | Type of Data |
|---|---|---|---|---|---|
| CME | CME-COSCIA – USvCOSCIA-0247 | 8/1/2011 - 10/31/2011 | GC | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0249 | 8/1/2011 - 10/31/2011 | ZL | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0250 | 8/1/2011 - 10/31/2011 | ZS | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0251 | 8/1/2011 - 10/31/2011 | ZM | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0252 | 8/1/2011 - 10/31/2011 | ZW | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0253 | 8/1/2011 - 10/31/2011 | CL | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0254 | 8/1/2011 - 10/31/2011 | 6C | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0255 | 8/1/2011 - 10/31/2011 | 6S | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0256 | 8/1/2011 - 10/31/2011 | NQ | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0257 | 8/1/2011 - 10/31/2011 | NG | All | Trades with Anonymized Party and Counterparty Identifiers |
| CME | CME-COSCIA – USvCOSCIA-0259-0310 | 8/8/2011- 10/18/2011 | 17 Markets, 42 Contracts | All | Orders and Trades with Anonymized Party Identifiers |